UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case Nos. 07-03121 through |
|  | ) | 07-03123 and 07-03125 |
|  | ) |  |
| MILLCREEK BROADCASTING, L.L.C., | ) | Chapter 11 |
| et al.,[1] | ) |  |
|  | ) | Hon. Jacqueline P. Cox |
| Debtors. | ) |  |
|  | ) |  |

**FINAL ORDER (1) AUTHORIZING DEBTORS, AS DEBTORS IN POSSESSION, TO
(A) USE CASH COLLATERAL, AND (B) INCUR POST-PETITION SECURED
INDEBTEDNESS, (2) GRANTING SECURITY INTERESTS AND SUPER-PRIORITY
CLAIMS PURSUANT TO 11 U.S.C. SECTIONS 364(c) & (d), (3) GRANTING
ADEQUATE PROTECTION PURSUANT TO 11 U.S.C SECTIONS 361 AND 363,
(4) MODIFYING AUTOMATIC STAY AND (5) SETTING FINAL HEARING**

By Motion (the **"Motion"**) dated May 24, 2007, Millcreek Broadcasting, L.L.C.,

("**Millcreek**"), 3 Point Media - Utah, L.L.C. ("**3 Point Utah**"), 3 Point Media - Franklin, L.L.C.

("**3 Point Franklin**") and 3 Point Media - Delta, L.L.C. ("**3 Point Delta,**" together with

Millcreek, 3 Point Utah, 3 Point Franklin and 3 Point Delta, the **"Debtors"**), moved this Court

for the entry of an final order (the **"Final Order"**) and in their jointly administered chapter 11

cases (the **"Cases"**) (1) authorizing (a) the use of the Prepetition Senior Lenders' (as defined

below) Cash Collateral (as defined below) and (b) the execution and delivery of that certain

Revolving Loan Promissory Note, dated as of May 30, 2007 (the **"DIP Loan Agreement"**)

pursuant to which the Debtors may obtain certain postpetition loans and other financial

accommodations from D.B. Zwirn Special Opportunities Fund, L.P., as agent (the **"DIP Agent"**)

---

[1]    The Debtors consist of: Millcreek Broadcasting, L.L.C. (EIN: 36-4265091); 3 Point Media – Delta, L.L.C.
(EIN:61-1421503); 3 Point Media – Franklin, L.L.C. (EIN: 36-4499087) and 3 Point Media – Utah, L.L.C.
(EIN: 36-4470799).

for itself and the other financial institutions from time to time party to the DIP Loan Agreement as lenders (collectively, the "**DIP Lenders**"), (2) granting the DIP Lenders security interests, liens and super-priority claims pursuant to 11 U.S.C. §§364(c) & (d), (3) granting the Prepetition Agent (as defined below), for the benefit of the Prepetition Senior Lenders (as defined below), adequate protection pursuant to 11 U.S.C. §§361 and 363, (4) modifying the automatic stay, and (5) setting a final hearing on the Motion. Pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), due notice of the Motion was given and a preliminary hearing (the "**Preliminary Hearing**") was held before this Court on June 13, 2007. Having reviewed and considered the Motion, together with all affidavits, declarations and exhibits filed in support thereof, having completed the Preliminary Hearing in accordance with §§363 and 364 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Code**") and Bankruptcy Rule 4001, all objections to the Motion, if any, having either been withdrawn or overruled, upon all of the pleadings filed with this Court, and after due deliberation and consideration and sufficient cause appearing therefor:

## THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    <u>Commencement of Cases</u>. On February 22, 2007, involuntary petitions were filed against each of the Debtors pursuant to § 303 of the Code by certain of the Prepetition Senior Lenders (as defined herein). Thereafter, each Debtor consented to the entry of an order for relief, which was entered on May 15, 2007 (the "**Conversion Date**"). Pursuant to §§1107 and 1108 of the Code, each Debtor has retained possession of its assets and is authorized to continue the operation and management of its business as a debtor-in-possession. On May 24, 2007, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") in these Cases. The Debtors have consented to entry of orders for relief to maximize the value of

their estates for the benefit of their creditors and other parties in interest by conducting an orderly sale of their assets.

B.      The Motion; Notice.  The Motion was filed on May 24, 2007.  Pursuant to Bankruptcy Rule 4001(c)(1), on May 24, 2007, the Debtors served notice of the Motion and proposed form of this Final Order by telecopy, hand delivery or overnight courier on (i) the Office of the United States Trustee for the Northern District of Illinois (the "**UST**"), (ii) the District Counsel for the Internal Revenue Service, (iii) the Committee, (iv) the twenty largest unsecured creditors of the Debtors (determined on a consolidated basis), and (v) the Debtors' known secured creditors, including counsel to the Prepetition Agent.  The notice of the Motion given by the Debtors was reasonable and sufficient under the circumstances.

C.      Jurisdiction; Core Proceeding.  Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. §157(b)(2).  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§157(b)(1) and 1334(b).

D.      (intentionally omitted)

E.      The Debtors' Stipulations.  Without prejudice to the rights of any other party in interest (but subject to the limitations thereon contained in paragraph 14 below) the Debtors admit, stipulate and agree that:

1.      Millcreek, 3 Point Utah, 3 Point Franklin and 3 Point Delta, as borrowers, D.B. Zwirn Special Opportunities Fund, L.P. (f/k/a Highbridge/Zwirn Special Opportunities Fund, L.P.) as agent (the "**Prepetition Agent**") and the financial institutions from time to time signatory thereto as lenders (the "**Prepetition Senior Lenders**") are party to that certain Amended and Restated Financing Agreement, dated as of July 31, 2003, (as amended, modified

or supplemented prior to the Conversion Date, the **"Prepetition Financing Agreement"**),

pursuant to which the Prepetition Agent and the Prepetition Senior Lenders agreed, among other

things, to (a) amend and restate the terms and conditions of that certain Financing Agreement,

dated as of May 13, 2003, among Millcreek, 3 Point Utah and 3 Point Franklin, as borrowers, the

Prepetition Agent and the Prepetition Senior Lenders, (b) maintain certain loans and other

financial accommodations then outstanding, and (c) extend additional loans and other financial

accommodations to the Debtors.  The maturity date of the Obligations (as defined in the

Prepetition Financing Agreement) under the Prepetition Financing Agreement was December 31,

2005.  Notwithstanding the occurrence of such maturity date, the Debtors have failed to pay the

amounts due and owing to the Prepetition Agent and to the Prepetition Senior Lenders under the

terms of the Prepetition Financing Agreement.  Pursuant to the terms of (w) that certain Security

Agreement, dated as of May 13, 2003, executed by each of Millcreek, 3 Point Utah and 3 Point

Franklin in favor of the Prepetition Agent (as amended, modified or supplemented prior to the

Conversion Date; the **"Security Agreement"**), (x) that certain Pledge Agreement, dated as of

May 13, 2003, executed by each of Millcreek, 3 Point Utah and 3 Point Franklin in favor of the

Prepetition Agent (as amended, modified or supplemented prior to the Conversion Date; the

**"Pledge Agreement"**), (y) that certain Joinder Agreement, dated as of July 31, 2003, executed

by 3 Point Delta in favor of the Prepetition Agent (as amended, modified or supplemented prior

to the Conversion Date; the **"Joinder Agreement"**), and (z) the other Loan Documents (as

defined in the Prepetition Financing Agreement) executed by the Debtors in favor of the

Prepetition Agent, the Prepetition Indebtedness is secured by liens upon and security interests in

all or substantially all of the Debtors' assets (other than broadcast licenses issued by the Federal

Communications Commission ("**FCC**"), as to which the liens and security interests are limited to the proceeds thereof).

2.      As of February 22, 2007, the Debtors were indebted and liable to the Prepetition Senior Lenders, without recourse, counterclaims or offset of any kind, pursuant to the Prepetition Financing Agreement and other Prepetition Credit Documents, including accrued and unpaid principal, interest, fees, costs and expenses, in the aggregate amount of not less than $105,500,000. All of the indebtedness and obligations of the Debtors (including all Obligations, as defined in the Prepetition Financing Agreement) owing to the Prepetition Agent and the Prepetition Senior Lenders pursuant to the Prepetition Financing Agreement, together with all pre-petition and post-petition interest and expenses now or hereafter accrued on such indebtedness and obligations, shall hereinafter collectively be referred to as the "**Prepetition Indebtedness**." All Collateral (as defined in the Prepetition Financing Agreement, the Security Agreement, the Pledge Agreement, the Joinder Agreement and the other Loan Documents executed and delivered in connection therewith; collectively, the "**Prepetition Credit Documents**") of the Debtors that existed as of the Conversion Date and all pre-petition and post-petition proceeds thereof shall hereafter be referred to as the "**Prepetition Collateral**."

3.      The Prepetition Agent, for the benefit of the Prepetition Senior Lenders, properly and timely perfected its security interests in the Prepetition Collateral by, among other things, filing of a series of UCC-1 financing statements against the Debtors (the "**Prepetition Financing Statements**") with the proper offices for the perfection of such security interests.

4.      As of the Conversion Date, (a) the Prepetition Credit Documents were valid and binding agreements and obligations of the Debtors, (b) the Prepetition Agent's liens on and security interests in the Prepetition Collateral, for the benefit of the Prepetition Senior Lenders,

are valid, perfected, enforceable, non-avoidable and, except as specifically permitted under the Prepetition Credit Documents, first priority liens and security interests and (iii) the Debtors (or any party acting by, through or on behalf of the Debtors) may not assert any claim, counterclaim, setoff or defense of any kind or nature which would in any way affect the validity, enforceability and non-avoidability of the Prepetition Indebtedness or the Prepetition Agent's security interests in and liens on the Prepetition Collateral or reduce or affect the obligation to pay the Prepetition Indebtedness.

5.     The Prepetition Indebtedness exceeds the value of the Prepetition Collateral.

6.     The Debtors acknowledge that (a) cash currently in the Debtors' possession, custody and/or control and (b) any post-Conversion Date proceeds, product or profits of the Prepetition Collateral within the meaning of § 552(b) of the Bankruptcy Code, constitute "cash collateral" within the meaning of Section 363(a) of the Bankruptcy Code.

7.     Millcreek entered into a Subordinated Loan Agreement, dated May 13, 2003 (the "**Subordinated Loan Agreement**"), by and among Millcreek, Rocky Mountain Radio Network, Inc. ("**Rocky Mountain**"), Alta Communications VII, L.P. ("**Alta Communications**"), Alta VII Associates, L.L.C. (together with Alta Communications, "**Alta**"), Peter Handy ("**Handy**"), Monroe Partners IX, L.P. ("**Monroe**"), BPIB – Utah, L.L.C. ("**BPIB**"), Bruce A. Buzil ("**Buzil**") and Christopher F. Devine ("**Devine**").  As of the Petition Date, the obligations due and owing under the Subordinated Loan Agreement aggregate approximately $47 million including accrued and unpaid principal and interest.

8.     Millcreek, 3 Point Utah and 3 Point Franklin also borrowed money from, and issued promissory notes to, certain affiliates, as evidenced by: (a) Subordinated Unsecured Promissory Note, dated May 13, 2003, made by Millcreek in the principal amount of

$13,050,000, payable to the order of Lakeshore Media, LLC ("**Lakeshore**"), (b) Promissory

Note, dated July 19, 2002, made by 3 Point Utah, in the principal amount of $2,239,618, and

assigned jointly to Northland Holding Trust ("**Northland**"), Robert E. Neiman ("**Neiman**") and

Buzil on May 13, 2003, and subsequently assigned to Millcreek on May 14, 2003, and (c)

Promissory Note, dated July 19, 2002, made by 3 Point Franklin, in the principal amount of

$1,798,937, and assigned jointly to Northland, Neiman, and Buzil on May 13, 2003, and

subsequently assigned to Millcreek on May 13, 2003 (collectively, the "**Affiliate Notes**", and

together with the Subordinated Loan Agreement, the "**Subordinated Debt**"). Alta, Handy,

Monroe, BPIB, Buzil, Devine, Lakeshore, Northland and Neiman are collectively referred to

herein as the "**Subordinated Creditors**."

     9.    All obligations owed to the Subordinated Creditors are contractually subordinate

to the obligations owed to the Prepetition Senior Lenders. Such subordination is evidenced by

(a) a Subordination Agreement, dated May 13, 2003, among Alta, BPIB, Monroe, Handy,

Millcreek and Rocky Mountain (the "**Alta Subordination Agreement**"), pursuant to which,

among other things, the Subordinated Creditors party thereto acknowledged and agreed that all

indebtedness, obligations and other liabilities owing to such Subordinated Creditors under the

Subordinated Loan Agreement (including, without limitation, all fees, premiums, costs, expenses

and other amounts payable in respect thereof but excluding, among other things, the Deferred

Interest Amount (as defined in the Alta Subordination Agreement), capitalized interest, any

capitalized fees, costs and expenses and any protective advances made to preserve the value of

the Prepetition Collateral (as defined below)), up to the aggregate principal amount of

approximately $47,000,000, is junior and subordinate to the extent set forth in the Subordination

Agreement in right of payment to the infeasible payment in full in cash of the Prepetition Agent

and the Prepetition Senior Lenders' obligations, and (b) the Subordination Agreement, dated May 13, 2003, between each Person listed on the signature pages of such Subordination Agreement, Millcreek, 3 Point Utah, 3 Point Franklin and Rocky Mountain (the "**Affiliate Subordination Agreement**", and together with the Alta Subordination Agreement, the "**Subordination Agreements**") pursuant to which, among other things, the Subordinated Creditors party thereto acknowledged and agreed that all indebtedness, obligations and other liabilities owing to them under the Affiliate Notes is junior and subordinate to the extent set forth in the Affiliate Subordination Agreement in right of payment to the indefeasible payment in full in cash of the Prepetition Agent and the Prepetition Senior Lenders' obligations.

    F. <u>Need For Funding</u>. As a result of their financial condition, the Debtors do not generate sufficient Cash Collateral to operate their respective businesses and do not believe that they have the ability to adequately protect the Prepetition Senior Lenders' security interests without the use of Cash Collateral or additional financing. The Debtors are unable to obtain alternative sources of cash or credit either in the form of unsecured credit allowable as an administrative expense under §503(b)(1) of the Code, unsecured credit allowable under §§364(a) and 364(b) of the Code, or secured credit pursuant to §364(c) or (d) of the Code on terms and conditions more favorable to the Debtors than those set forth in the DIP Loan Agreement and this Final Order. If the Debtors' financing were to be abruptly discontinued, their operations would be severely disrupted and they would be unable to pay operating expenses and operate their businesses in an orderly manner, thereby severely impairing the value of their assets and their ability to sell their assets as a going concern in the most advantageous and efficient manner. Accordingly, the Debtors and their estates will suffer immediate and irreparable harm unless the Debtors are immediately authorized to use Cash Collateral and obtain credit on the terms and

conditions set forth herein.

G.    Lender's Willingness to Extend DIP Financing.  The Court has been advised that the DIP Agent and the DIP Lenders are willing to advance post-petition funds in the form of revolving loans (the "**DIP Loans**") to the Debtors for a period to and including August 13, 2007 (or such later date as the DIP Lenders may determine in their sole discretion), to fund the Debtors' working capital needs, to pay professional fees and to conduct and conclude an orderly sale of the Debtors' assets, subject to the satisfaction of the conditions precedent set forth in the DIP Loan Agreement (substantially in the form of Exhibit A), and subject to the Approved Budget (as defined below).  Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the DIP Loan Agreement.

H.    Budget for Use of Cash Collateral and DIP Financing.  The Debtors have delivered to the Prepetition Agent, the Prepetition Senior Lenders, the DIP Agent and the DIP Lenders a detailed budget which sets forth projected cash receipts and cash disbursements (by line item) on a weekly basis for the time period from and including May 15, 2007 through August 13, 2007, a copy of which is attached hereto as Exhibit B (the "**Approved Budget**"). The Approved Budget may be modified or supplemented from time to time by agreement of the Prepetition Agent, the Prepetition Senior Lenders, the DIP Agent, the DIP Lenders and the Debtors upon notice to the Committee without the need of further notice, hearing or order of this Court.

I.    Good Faith. The Prepetition Agent, the Prepetition Senior Lenders, the DIP Agent and the DIP Lenders have acted in good faith in agreeing to extend, or to consent to the extension of, credit and other financial accommodations to the Debtors in accordance with the DIP Loan Agreement and this Final Order. The terms of the DIP Loan Agreement authorized by this Final Order set forth below are supported by reasonably equivalent value and fair consideration. The agreements and arrangements authorized in this Final Order have been negotiated at arms' length with all parties represented by experienced counsel, are fair and reasonable under the circumstances, are enforceable in accordance with their terms and have been entered into in good faith. Any credit extended and loans made to the Debtors by the DIP Agent and the DIP Lenders pursuant to this Final Order and/or the DIP Loan Agreement shall be deemed to have been extended in good faith, as that term is used in §364(e) of the Code. In making decisions to advance loans to the Debtors, in administering any loans, in accepting the Approved Budget or any future supplemental Approved Budget or in taking any other actions permitted by this Final Order or the DIP Credit Documents (as defined below), neither the Prepetition Agent, the Prepetition Senior Lenders, the DIP Agent nor the DIP Lenders shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of any Debtor.

J.    Cause Shown. Good cause has been shown for the entry of this Final Order. Among other things, entry of this Final Order will maximize value of the Debtors' assets and will avoid immediate and irreparable harm to, and is in the best interests of, the Debtors, their creditors and their estates. Therefore, the Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).

## THEREFORE, IT IS HEREBY ORDERED THAT:[2]

1.    Cash Collateral.  For purposes of this Final Order, **"Cash Collateral"** shall consist of all of the respective property of the Debtors that constitutes cash collateral in which the Prepetition Agent, for the benefit of the Prepetition Senior Lenders, has an interest as provided in §363(a) of the Code and shall include, without limitation:

(a)    All cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any property upon which the Prepetition Agent, for the benefit of the Prepetition Senior Lenders, holds a lien or a replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise, and whether such property that has been converted to cash, existed as of the commencement of this Case, or arose or was generated thereafter; and

(b)    All of the respective deposits, refund claims and rights in retainers of the Debtors upon which the Prepetition Agent, for the benefit of the Prepetition Senior Lenders, holds a lien or replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise.  The Debtors' cash on hand and cash flow from operations consist of proceeds of Prepetition Collateral, and all such cash is Cash Collateral.

2.    Authorization to Use Cash Collateral.  The Prepetition Agent and the Prepetition Senior Lenders have consented to the Debtors' use of Cash Collateral for a specified time on the express terms and conditions set forth in this Final Order, and as provided for in an Approved Budget.  Subject to the terms and conditions of this Final Order, the Debtors may use Cash Collateral, as set forth on the Approved Budget for such time period, to be used for, among

---

[2]    For purposes of this Order, any finding of fact that is more appropriately a conclusion of law shall be deemed a conclusion of law and any conclusion of law that is more appropriately a finding of fact shall be deemed a finding of fact.

11

other things, working capital to support the ongoing operation of the Debtors' businesses pending consummation of a sale pursuant to § 363 of the Code, and to pay fees of professionals. The Debtors shall exhaust all available Cash Collateral prior to making requests for loans under the DIP Loan Agreement. The Debtors' authority to use Cash Collateral shall expire on the earliest of (i) the close of business on August 13, 2007; (ii) the consummation of a sale of all or substantially all of the Debtors' assets to the Prepetition Senior Lenders (or their designee) pursuant to § 363 of the Code and (iii) the occurrence of a Termination Event. In no event shall the Debtors be authorized to use Cash Collateral or DIP Loans to pay (x) any items except as provided herein and set forth in the Approved Budget or as hereafter approved in writing by the Prepetition Agent and the DIP Agent and on notice to the Committee's counsel;  or (y) any prepetition claims or expenses except as set forth in the Approved Budget with the written consent of the Prepetition Agent and the DIP Agent subject to Court approval on notice to the Committee's counsel.

      3.    <u>Authorization to Borrow; DIP Loan Agreement</u>.

      (a)    The Debtors are authorized to enter into and be bound by the following documents, and to borrow money and perform their obligations thereunder in accordance with the terms thereof:

          (i)    the DIP Loan Agreement in substantially the form attached hereto as <u>Exhibit A</u>;

          (ii)    the Approved Budget;

          (iii)    all such financing statements, notices, schedules, other security agreements, deeds of trust, mortgages, instruments, guaranties, subordination agreements, acceptance agreements and documents

as may be necessary or required to evidence their obligations to the
DIP Agent and the DIP Lenders, to consummate the terms and
provisions of the Motion and this Final Order and to evidence
perfection of the liens and security interests to be given to the DIP
Agent for the benefit of the DIP Lenders pursuant hereto and
thereto, and such other agreements and documents as are set forth
in or contemplated by the foregoing documents as a condition to
the DIP Agent's and the DIP Lenders' willingness to make loans
pursuant thereto or as the DIP Agent and the DIP Lenders shall
reasonably require in connection with or to evidence the DIP Loan
Agreement whether now or hereafter executed by or on behalf of
the Debtors and delivered to the DIP Agent for the benefit of the
DIP Lenders.

(b) Pursuant to the DIP Credit Agreement, the Debtors shall only be permitted
(i) to borrow to pay professional fees set forth in the Approved Budget, (ii) for all items
other than professional fees, to borrow an amount equal to the succeeding 2 week
projection contained in an Approved Budget in any one borrowing and (iii) for all items
other than professional fees, to borrow under the DIP Credit Agreement once every 2
weeks; provided, that, the DIP Agent and the DIP Lenders may in their sole discretion
lend more often than once every 2 weeks.

(c) For purposes of the Motion and this Final Order, the documents listed in
subparagraphs (i) through (iii) above shall hereinafter collectively be referred to as the
**"DIP Credit Documents."** The DIP Credit Documents shall be incorporated as part of

this Final Order and shall be deemed binding on and enforceable against the Debtors, their estates, and their successors and assigns. The Debtors are further authorized to execute and deliver any non-material amendments or modifications to any of the DIP Credit Documents or the terms of the DIP Loan Agreement set forth herein and/or any waivers as may be agreed upon in writing by the DIP Agent, the DIP Lenders and the Debtors upon notice to the Committee without the need of further notice, hearing or order of this Court. All indebtedness and obligations incurred on or after the Conversion Date by the Debtors to the DIP Agent or the DIP Lenders pursuant to the DIP Credit Documents (including principal, accrued and unpaid interest and costs and expenses, including reasonable attorneys' fees and expenses) are referred to herein as the "**DIP Indebtedness**".

4. <u>Maximum Amount of Borrowing</u>. The maximum aggregate outstanding principal amount of the DIP Indebtedness at any time as a result of amounts that the Debtors may borrow from the DIP Agent and the DIP Lenders pursuant to this Final Order and the DIP Credit Documents shall be $2,000,000; <u>provided</u>, <u>however</u>, that if the DIP Agent and the DIP Lenders advance funds in excess of these limitations or restrictions set forth herein or in the DIP Credit Documents, such advances shall constitute part of the DIP Indebtedness and shall be entitled to the benefits of the DIP Credit Documents and this Final Order. In no event shall Debtors use any DIP Loans to pay any items except as provided herein and as set forth in an Approved Budget or as may hereafter be consented to in writing by the DIP Agent and the DIP Lenders on notice to the Committee's counsel.

5.    Interest; Fees; Professional Expenses. The rate of interest to be charged on DIP Loans and other extensions of credit to any Debtor under the DIP Loan Agreement shall be at a rate equal to 15% per annum. The Debtors shall pay to the DIP Agent and the DIP Lenders a $20,000 Closing Fee and an $8,000 Facility Fee upon entry of this Final Order. Interest on the DIP Indebtedness shall be payable monthly, in arrears, and such interest and all post-petition fees and reimbursable expenses set forth in the DIP Loan Agreement and relating to the DIP Indebtedness may be charged to the loan account in accordance with the DIP Loan Agreement, including but not limited to legal and financial advisory fees, recording fees, auditing fees and any out-of-pocket expenses. Default interest shall accrue and be payable in accordance with the terms of the DIP Loan Agreement.

6.    Sale Provisions. As a condition to entering into the DIP Loan Agreement and as additional adequate protection for use of the Cash Collateral, the Debtors and the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders have agreed to the following deadlines and procedures (the "Sale Process"):

(a)    File Sale Motion. By no later than June 20, 2007, the Debtors shall file a motion and supporting papers, in a form and substance reasonably acceptable to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders, with the Bankruptcy Court pursuant to § 363 of the Code providing for a sale of all or substantially all of the assets of the Debtors' respective estates, free and clear of all liens with such liens to attach to the sale proceeds (the "Sale Motion"). Notice of the Sale Motion shall comply with Bankruptcy Rules 2002 and 6004(a) and 6006 unless otherwise shortened by the Bankruptcy Court. The Sale Motion shall provide for a sale of the Debtors' respective assets to the Prepetition Lenders (or their designee) through a credit bid pursuant to § 363(k) of the Code.

(b)    Sale Hearing. By no later than July 16, 2007, the Debtors shall have obtained a final order, in form and substance reasonably acceptable to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders approving the Sale Motion (the "Sale Order") which order shall not be subject to appeal unless the DIP Lenders waive such condition. To the extent necessary, the order approving the sale shall be subject to approval of the FCC.

7.    Termination of DIP Loan Agreement; Termination of Cash Collateral
Usage. The DIP Loan Agreement and the Debtors' right to use Cash Collateral shall
immediately and automatically terminate, and all DIP Indebtedness shall be immediately due and
payable, upon the earliest to occur ("**Termination Date**") of the following (each, a
"**Termination Event**"):

(a)    the date on which the Debtors fail to comply with any of the terms of this
Final Order;

(b)    the effective date of any confirmed chapter 11 plan of reorganization in
the Cases or liquidation of the Cases;

(c)    entry of an order, without the prior written consent of the DIP Agent, the
DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders, (i) converting the
Cases to cases under chapter 7 of the Code; (ii) dismissing the Cases; (iii) appointing a
trustee under Chapter 7 or Chapter 11 of the Code or appointing an examiner with
expanded powers (powers beyond those set forth in §1106(a)(3) and (4) of the Code);
(iv) reversing, vacating or otherwise amending, supplementing or modifying this Final
Order, or (v) granting relief from the automatic stay to any creditor holding or asserting a
lien or reclamation claim on a material portion (i.e., more than $50,000 in the aggregate)
of the assets of the Debtors necessary to the operation of their businesses or where the
deprivation to the Debtors of such assets could reasonably be expected to have a material
adverse effect on the Debtors;

(d)    except as permitted under this Final Order, any proceeding shall be
commenced seeking (i) the invalidation, subordination or other challenging by the
Debtors or any statutory committee of unsecured creditors appointed in the Cases of the

16

superpriority claim or liens granted to the DIP Agent, for the benefit of the DIP Lenders, and the Prepetition Agent, for the benefit of the Prepetition Senior Lenders, under this Final Order or (ii) any relief under §506(c) of the Code with respect to any Prepetition Collateral or other DIP Collateral (as defined below);

      (e)    any application by the Debtors for entry of an order approving use of Cash Collateral (other than any application related to this Final Order or the Final Order), or any financing or loans secured by liens which are senior, pari passu or junior to the DIP Agent's or the Prepetition Agent's liens on DIP Collateral or Prepetition Collateral, respectively, without the prior written approval of the DIP Agent and the Prepetition Agent;

      (f)    the consummation of a sale of all or substantially all of the Debtors ' assets, whether done pursuant to one transaction or a series of transactions;

      (g)    failure to prosecute, withdrawal or adjournment of the Sale Motion without the prior written consent of the DIP Agent and the Prepetition Agent;

      (h)    the Sale Order is not entered by July 16, 2007; or

      (i)    the occurrence of an "Event of Default" as defined under the DIP Loan Agreement.

      8.    <u>Security for DIP Indebtedness and Adequate Protection for Cash Collateral Usage</u>.

      (a)    To secure all DIP Indebtedness under the DIP Loan Agreement, the DIP Agent, for the benefit of the DIP Lenders, shall be granted, in each case subject and subordinate to the Carve-Out (as defined below):

      (i)    pursuant to 364(c)(1) of the Code, a superpriority administrative

expense claim with priority over all administrative expenses of the
kind specified in §§ 503(b) or 507(b) of the Code;

(ii)    pursuant to § 364(c)(3) of the Code, a perfected junior security
interest in and lien upon all of the existing or after acquired
property and assets of the Debtors of any kind or nature, whether
real or personal, tangible or intangible, wherever located, now
owned or hereafter acquired or arising and all proceeds, products,
rents and profits thereof, which is subject to Prior Claims (other
than the Prepetition Collateral);

(iii)   pursuant to § 364(c)(2) of the Code, a perfected first priority
security interest in and lien upon all of the existing or after
acquired property and assets of the Debtors of any kind or nature,
whether real or personal, tangible or intangible, wherever located,
now owned or hereafter acquired or arising and all proceeds,
products, rents and profits thereof, which is not subject to any Prior
Claim; and

(iv)    pursuant to § 364(d)(1) of the Code, a perfected first priority
security interest in and lien upon all of the existing or after
acquired property and assets of the Debtors of any kind or nature,
whether real or personal, tangible or intangible, wherever located,
now owned or hereafter acquired or arising and all proceeds,
products, rents and profits thereof which is Prepetition Collateral.

The collateral set forth in clauses (ii), (iii) and (iv) shall collectively be referred to as the

"**DIP Collateral**".  DIP Collateral shall include, and the DIP Lenders shall be entitled to have their superpriority administrative expense claim set forth in clause (i) above paid from, the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (the "**Avoidance Actions**"), provided, however, that such lien and right to repayment shall be limited to the amount of DIP Indebtedness arising from the funding of DIP Loans for: (X) Committee professional fees and expenses; (Y) U.S. Trustee fees and (Z) that portion of fees and expenses of the Debtors' professionals that would not be included in any hypothetical surcharge under 11 U.S.C. § 506(c).  The  sole issue in determining the amount under clause (Z) above shall be whether any particular fee or expense could or could not be lawfully surcharged to a secured lender's collateral under section 506(c).  As part of the hypothetical surcharge analysis, the DIP Lenders' consent that such fee or expense in clause (Z) above shall not be disputed to the extent such fee or expense was included in the Approved Budget, was incurred in compliance with paragraph 12 of this Final Order and is allowed by further Court order.

(b)      As adequate protection for the Prepetition Agent and the Prepetition Senior Lenders in respect of any diminution in the value of the Prepetition Agent's and the Prepetition Senior Lenders' interest (including, without limitation, the payment of fees and expenses on account of professionals retained by the Prepetition Agent on behalf of the Prepetition Senior Lenders pursuant to the terms of the Prepetition Credit Documents) in the Prepetition Collateral resulting from the Debtors' use of Cash Collateral, the incurrence by the Debtors of DIP Indebtedness or otherwise, the Prepetition Agent, for the benefit of the Prepetition Senior Lenders, shall be granted (in each case subject and

subordinate to the Carve-Out and the priority of the liens and claims granted to the DIP

Agent and the DIP Lenders with respect to DIP Indebtedness (as set forth in the

preceding paragraph), but in any case at all times senior to the rights of Debtors and any

successor trustee or estate representative in the Cases or any Successor Cases):

> (i)     pursuant to 364(c)(1) of the Code, a superpriority administrative
>         expense claim with priority over all administrative expenses of the
>         kind specified in §§ 503(b) or 507(b) of the Code;
>
> (ii)    pursuant to §§ 361 and 363 of the Code, a perfected junior security
>         interest in and lien upon the DIP Collateral which is subject to
>         Prior Claims (other than the Prepetition Collateral); and
>
> (iii)   pursuant to §§ 361 and 363 of the Code, a perfected second
>         priority priming security interest in the DIP Collateral which is not
>         otherwise subject to Prior Claims.

The adequate protection set forth in clause (i), (ii), and (iii) shall include, and the

Prepetition Senior Lenders shall be entitled to have their superpriority administrative

expense claim set forth in clause (i) above paid from, the Debtors' Avoidance Actions,

provided, however, that such adequate protection shall be limited to the amount of any

diminution in the value of the Prepetition Collateral arising from the funding of DIP

Loans provided, however, that such lien and right to repayment shall be limited to the

amount of DIP Indebtedness arising from the funding of DIP Loans for: (X) Committee

professional fees and expenses; (Y) U.S. Trustee fees and (Z) that portion of fees and

expenses of the Debtors' professionals that would not be included in any hypothetical

surcharge under 11 U.S.C. § 506(c).  The sole issue in determining the amount under

clause (Z) above shall be whether any particular fee or expense could or could not be

lawfully surcharged to a secured lender's collateral under section 506(c).   As part of the

hypothetical surcharge analysis, the DIP Lenders' consent that such fee or expense in

clause (Z) above shall not be disputed to the extent such fee or expense was included in

the Approved Budget, was incurred in compliance with paragraph 12 of this Final Order

and is allowed by further Court order.

(c)     In addition, Prepetition Agent shall have all of the rights accorded it

pursuant to §507(b) of the Code in respect of the adequate protection provided herein.

(d)     As used herein, the term **"Prior Claims"** shall mean (i) any non-

avoidable, valid, enforceable and perfected liens and security interests in favor of any

person or entity on or in the assets of the Debtors, as a pre-petition debtor, which existed

on the Conversion Date (including any valid liens and security interests in existence on

the Conversion Date that are perfected after the Conversion Date as permitted by §546(b)

of the Code) and are not subject to §552(a) of the Code, but only to the extent such liens

and security interests are superior in priority to the Prepetition Agent's pre-petition liens

and security interests, after giving effect to any existing subordination or intercreditor

arrangements (provided that this clause (i) shall exclude the pre-petition and post-petition

liens and security interests securing the Prepetition Indebtedness, which liens and security

interests shall be subordinate to the liens and security interests securing the DIP

Indebtedness), and (ii) the Carve-Out.   Other than (x) the first priority liens and security

interests in favor of the DIP Agent, for the benefit of the DIP Lenders, pursuant to the

DIP Credit Documents and this Final Order, (y) the liens and security interests in favor of

the Prepetition Agent, for the benefit of the Prepetition Senior Lenders, pursuant to the

Prepetition Credit Documents, and (z) the Prior Claims, no other claims, liens or security interests whether prior to or pari passu with, the claims, liens or security interests of the DIP Agent (for the benefit of the DIP Lenders) and the Prepetition Agent (for the benefit of the Prepetition Senior Lenders) shall attach to the DIP Collateral in this or any subsequent or superseding cases (including, without limitation, the conversion of the Cases to cases under chapter 7 of the Code or any other proceeding related hereto or thereto (collectively, "**Successor Cases**")), without the express written consent of the DIP Agent and the Prepetition Agent (which consent may be withheld in their sole discretion). Nothing herein shall be construed to divest the Debtors of control over the exercise or non-exercise of the rights or powers under the Code that may give rise to recoveries under Avoidance Actions whether prior to or following the occurrence of a Termination Date. In addition, except to the extent otherwise expressly set forth in this Final Order or in a written instrument duly executed by the DIP Agent or the Prepetition Agent, no post-petition liens or security interests granted to the DIP Agent or the Prepetition Agent, and no post-petition claim of the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders, shall be subject to subordination to any other liens, security interests or claims under § 510 of the Code or otherwise. Any security interest or lien upon the DIP Collateral which is avoided or otherwise preserved for the benefit of any Estate under §551 or any other provision of the Code shall be subordinate to the post-petition security interests in and liens of the DIP Agent and the Prepetition Agent on the DIP Collateral.

      9.     Automatic Perfection of New Liens. All liens and security interests granted to the DIP Agent (for the benefit of the DIP Lenders) and the Prepetition Agent (for the

benefit of the Prepetition Senior Lenders) by this Final Order and/or the DIP Credit Documents

shall be, and hereby are, deemed duly perfected and recorded under all applicable federal or state

or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession,

further order, acknowledgment, landlord or warehousemen lien waivers or other act, shall be

required to effect such perfection; provided, however, that notwithstanding the provisions of

§362 of the Code, (i) the DIP Agent and the Prepetition Agent may, at their sole option, file or

record or cause the Debtors to execute, file or record, at the Debtors' expense, such UCC

financing statements, notices of liens and security interests, mortgages and other similar

documents or obtain landlord or warehousemen lien waivers or other third party consents as the

DIP Agent and the Prepetition Agent may require, and (ii) the DIP Agent and the Prepetition

Agent may require the Debtors to deliver any chattel paper, instruments or securities evidencing

or constituting any DIP Collateral, and the Debtors are directed to cooperate and comply

therewith. If the DIP Agent and the Prepetition Agent, in their sole discretion, shall elect for any

reason to cause to be obtained any such landlord or warehousemen lien waivers or other third

party consents or cause to be filed or recorded any such notices, financing statements, mortgages

or other documents with respect to such security interests and liens, or if the DIP Agent and the

Prepetition Agent, in their sole discretion, shall elect to take possession of any DIP Collateral, all

such landlord or warehousemen lien waivers or other third party consents, financing statements

or similar documents or taking possession shall be deemed to have been filed or recorded or

taken in the Cases as of the Conversion Date but with the priorities as set forth herein. The DIP

Agent and the Prepetition Agent may (in their discretion) but shall not be required to file a

certified copy of this Final Order in any filing or recording office in any county or other

jurisdiction in which any Debtor has real or personal property and such filing or recording shall

be accepted and shall constitute further evidence of perfection of the DIP Agent's and the

Prepetition Agent's interests in the DIP Collateral. Neither the granting of the liens and security

interests to the DIP Agent and the Prepetition Agent in the DIP Collateral nor the exercise of any

rights or remedies by the DIP Agent or the Prepetition Agent in connection therewith will result

in any breach, violation or infringement of (i) any trademark, copyright or other intellectual

property right of any Debtor or any third party, or (ii) any contract to which any Debtor or any of

its properties is subject.

       10.    <u>Bankruptcy Code §506(c) Waiver</u>. No costs or expenses of administration

or other charge, lien, assessment or claim incurred at any time (including, without limitation, any

expenses set forth in the Approved Budget) by the Debtors or any other person or entity shall be

imposed against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior

Lenders, their claims, or their collateral under § 506(c) of the Code or otherwise, unless, prior to

incurring such costs or expenses, the party proposing to incur and/or impose such cost or expense

shall obtain the written consent of the DIP Agent, the DIP Lenders, the Prepetition Agent or the

Prepetition Senior Lenders (as applicable) allowing such charge to be imposed. Nothing in this

Final Order shall constitute consent by the DIP Agent, the DIP Lenders, the Prepetition Agent or

the Prepetition Senior Lenders to the imposition of any costs or expense of administration or

other charge, lien, assessment or claim (including, without limitation, any amounts set forth in

the Approved Budget) against the DIP Agent, the DIP Lenders, the Prepetition Agent or the

Prepetition Senior Lenders, their claims or their collateral under §506(c) of the Code or

otherwise. Neither the DIP Agent, the DIP Lenders, the Prepetition Agent nor the Prepetition

Senior Lenders shall be subject to the equitable doctrine of "marshaling" or any other similar

doctrine with respect to any of their Prepetition Collateral or DIP Collateral.

11.   Modification of Automatic Stay.

(a)    Except as set forth in subparagraphs (b) and (c) of this Paragraph 11, the

automatic stay pursuant to § 362 of the Code is hereby modified as to the DIP Agent, the

DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders to permit them to

perform in accordance with, and exercise, enjoy and enforce their rights, benefits,

privileges and remedies pursuant to, the DIP Credit Documents and this Final Order

without further application or motion to, or order from the Court, and neither § 105 of the

Code nor any other provision of the Code or applicable law shall be utilized to prohibit

the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and

remedies regardless of any change in circumstances (whether or not foreseeable).  The

DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders

are hereby granted, to the extent necessary, leave, among other things, to (i) receive

payments on the DIP Indebtedness and collections on and proceeds of the DIP Collateral

and apply any of same to the DIP Indebtedness in the manner specified in this Final

Order and the DIP Credit Documents, and to maintain, create, or change any accounts at

any lending institutions as the DIP Agent, the DIP Lenders, the Prepetition Agent and the

Prepetition Senior Lenders deem necessary or desirable to do so, (ii) file or record any

financing statements, mortgages or other instruments or other documents to evidence the

security interests in and liens upon the DIP Collateral, (iii) charge and collect any

interest, fees, costs and other expenses accruing at any time under the DIP Credit

Documents as provided therein, (iv) give the Debtors any notice provided for in any of

the DIP Credit Documents or this Final Order, and (v)  upon the occurrence of an Event

of Default (as defined in the DIP Loan Agreement or any other DIP Credit Document),

and without application and motion to, or order from the Court or any other court and without any interference from any Debtor or any other party in interest, (A) terminate the DIP Loan Agreement and/or the other DIP Credit Documents, (B) cease making DIP Loans and/or suspend or terminate the commitments under the DIP Credit Documents, (C) declare all DIP Indebtedness immediately due and payable and/or (D) take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale.

(b)　Upon the occurrence of a Termination Event, and from and after the fifth (5th) business day (the "**Enforcement Date**") after the DIP Agent's delivery of a notice (an "**Enforcement Notice**") to counsel for the Debtors and any Committee of the DIP Lenders' intention to exercise its default-related rights and remedies, (i) the automatic stay pursuant to §362 of the Code will be further modified, to the extent necessary, so as to permit the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders without further application or motion to, or order from, the Court, to take any action recited in this Paragraph 11, and to foreclose or otherwise enforce their security interests in or liens on any or all of the DIP Collateral and/or Prepetition Collateral, and/or to exercise any other default-related rights and remedies under the DIP Credit Documents, the Prepetition Credit Documents, this Final Order or applicable law, and (ii) neither §105 of the Code nor any other provision of the Code or applicable law shall be utilized to prohibit the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders from exercising or enforcing such default-related rights and remedies, regardless of any change in circumstances (whether or not foreseeable). If the Debtors, any Committee or any other person or entity

26

challenges the occurrence of any Termination Event, any such objector's remedies shall

be and hereby are limited to requesting a hearing before this Court at any time on or prior

to the Enforcement Date (x) solely for the purpose of obtaining a judicial determination

that no Termination Event has occurred and (y) based on any such judicial determination,

seeking to enjoin the DIP Agent, the DIP Lenders, the Prepetition Agent or Prepetition

Senior Lender, as applicable, from exercising any default-related rights and remedies

(other than the actions set forth in 10(a) above). In any such hearing, the sole issue

before the Court shall be whether a Termination Event has occurred and has not been

timely cured (to the extent any such cure is permitted under the terms of the DIP Credit

Documents), and the Debtors, any Committee and any other party that is permitted to

intervene or be heard at such hearing shall be precluded from raising or litigating any

other issue, defense, claim or counterclaim (including, without limitation, any defense or

claim based on adequate protection).

      (c)     If the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition

Senior Lenders are entitled, and have elected in accordance with the provisions hereof, to

enforce their liens or security interests or exercise any other default-related remedies, and

provided that the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition

Senior Lenders, in their sole discretion, have made available to the Debtors (through

additional DIP Loans or by consenting to the Debtors' use of Cash Collateral) sufficient

funds to pay the reasonable and necessary costs thereof, if any, the Debtors shall

cooperate with the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition

Senior Lenders (as applicable) in connection with such enforcement action by, among

other things, (i) providing at all reasonable times access to the Debtors' premises to

representatives or agents of the DIP Agent, the DIP Lenders, the Prepetition Agent or the

Prepetition Senior Lenders (including any collateral liquidator or consultant),

(ii) providing the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition

Senior Lenders, and their respective representatives or agents, at all reasonable times

access to the Debtors ' books and records and any information or documents requested by

the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders

or their respective representatives, (iii) performing all other obligations set forth in the

DIP Credit Documents, and (iv) taking reasonable steps to safeguard and protect the DIP

Collateral, and the Debtors shall not otherwise interfere with or actively encourage others

to interfere with the DIP Agent's, the DIP Lenders', the Prepetition Agent's or the

Prepetition Senior Lenders' enforcement of rights.  In addition, at any time after the DIP

Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders is

entitled to relief from the automatic stay, and has elected in accordance with the

provisions hereof, to enforce its liens or security interests or exercise any other default-

related remedies, and provided that the DIP Agent, the DIP Lenders, the Prepetition

Agent or the Prepetition Senior Lenders, in their sole discretion, have made available to

the Debtors (through additional DIP Loans or by consenting to the Debtors ' use of Cash

Collateral) sufficient funds to pay the reasonable and necessary costs thereof, the Debtors

shall, at the written request of the DIP Agent, the DIP Lenders, the Prepetition Agent or

the Prepetition Senior Lenders, use commercially reasonable efforts to sell or otherwise

dispose of any or all of the Prepetition Collateral and DIP Collateral on terms and

conditions acceptable to the DIP Agent, the DIP Lenders, the Prepetition Agent or the

Prepetition Senior Lenders, and in connection thereof file the appropriate motions for sale

and obtain approval of the Court for each such sale or other disposition, and shall turn

over the proceeds of such sale(s) or other disposition(s) to the DIP Agent, the DIP

Lenders, the Prepetition Agent or the Prepetition Senior Lenders, as applicable, for

application to the DIP Indebtedness and the Prepetition Indebtedness in accordance with

the provisions hereof and the DIP Credit Documents.

12.     Professional Fees, Administrative Expenses and Other Related Costs.

(a)     As used herein, the term **"Carve-Out"** shall mean (i) the unpaid fees of

the clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C.

§1930(a) and (b) (the **"Statutory Fees"**), (ii) after delivery to the Debtors and their

counsel of an Enforcement Notice and during the continuance of such Event of Default,

the payment of professional fees and disbursements (the **"Professional Fees and**

**Disbursements"**) incurred in an amount not to exceed (x) $400,000 for all retained

professionals of the Debtors that are required to file fee applications with the Court in the

aggregate (the **"Debtors Professionals"**) and (y) $100,000 for all retained professionals

of any official committees in the aggregate (collectively with the Debtors Professionals,

the **"Retained Professionals"**), (iii) Professional Fees and Disbursements for Retained

Professionals incurred prior to the delivery of the Enforcement Notice (but limited to the

amounts set forth in the Approved Budget for the time periods and professionals as set

forth therein), regardless of when such amounts are approved or paid (provided, however,

that the dollar limitation in clause (ii) shall not be reduced by the amount of any

Professional Fees and Disbursements incurred, awarded or paid prior to the delivery of

the Enforcement Notice); and (iv) all accrued and unpaid allowed administrative expense

claims (other than Professional Fees and Disbursements) to the extent contemplated in

the Approved Budget.

(b)  Prior to the earlier of the delivery of an Enforcement Notice or the
Termination Date, and to the extent permitted by order of the Court, the Debtors shall
promptly pay (subject to final approval and allowance by the Court) to professionals such
fees permitted to be paid pursuant to order of the Court, but in no event shall such
payments exceed the amounts set forth in the Approved Budget.

(c)  Notwithstanding anything to the contrary in this Final Order or the DIP
Credit Documents, no Cash Collateral, proceeds of DIP Loans or other extensions of
credit, or, prior to payment in full in cash of the DIP Indebtedness and Prepetition
Indebtedness, any DIP Collateral or Prepetition Collateral (or proceeds thereof) may be
used to pay, any claims for services rendered by any professional in connection with the
assertion of or joinder in any claim, counterclaim, action, proceeding, application,
motion, objection, defense or other contested matter, the purpose of which is to seek or
the result of which would be to obtain any order, judgment, determination, declaration or
similar relief (i) invalidating, setting aside, avoiding or subordinating, in whole or in part,
the DIP Indebtedness or Prepetition Indebtedness, or the DIP Agent's or the Prepetition
Agent's liens and security interests in the Prepetition Collateral or DIP Collateral, (ii) for
monetary, injunctive or other affirmative relief against the DIP Agent, the DIP Lenders,
the Prepetition Agent or the Prepetition Senior Lenders, or (iii) preventing, hindering or
otherwise delaying the exercise by the DIP Agent, the DIP Lenders, the Prepetition Agent
or the Prepetition Senior Lenders of any of their respective rights and remedies under this
Final Order, the Prepetition Credit Documents, the DIP Credit Documents or applicable
law, or the enforcement or realization (whether by foreclosure, credit bid, further order of

this Court, or otherwise) by the DIP Agent, the DIP Lenders, the Prepetition Agent or the

Prepetition Senior Lenders upon any Prepetition Collateral or other DIP Collateral;

provided, however, that such funds and proceeds not to exceed $100,000 may be used by

Committee professionals to investigate such matters[3]; provided, further, that any such

investigation, if any, must be completed not later than five (5) business days before the

hearing to approve the Sale. The dollar amounts available to be paid under the Carve-Out

shall be deemed reduced to the extent proceeds of any DIP Loans or proceeds of any

Prepetition Collateral or DIP Collateral are used to pay (i) fees or expenses of any

professionals arising from and after the delivery of an Enforcement Notice and (ii) any

post Petition Date retainer of any estate professionals. The DIP Agent, the DIP Lenders,

the Prepetition Agent and the Prepetition Senior Lenders retain any and all rights as

parties in interest to object to any claims of any professionals.

(d)    The DIP Agent, the DIP Lenders, the Prepetition Agent and the

Prepetition Senior Lenders retain any and all rights as parties in interest to object to any

claims of any Retained Professionals.

13.    Release.  Subject to entry of the Final Order and the reservation of rights

provisions of Paragraph 14 hereof, the Debtors and their Estate hereby release and discharge the

Prepetition Agent and the Prepetition Senior Lenders, together with any of their respective

affiliates, agents, attorneys, officers, directors and employees, from any and all claims and causes

of action arising out of, based upon or related to, in whole or in part, (a) any of the Prepetition

Credit Documents, (b) any aspect of the pre-petition relationships between the Debtors or their

affiliates relating to any of the Prepetition Credit Documents or any transaction contemplated

---

[3]    The amount allocated to the investigation shall not increase the budgeted amount for the Committee
professionals.

thereby, or (c) any other acts or omissions by a Prepetition Senior Lender in connection with any

of the Prepetition Credit Documents, or its pre-petition relationship with the Debtors or any of

their affiliates relating to any of the Prepetition Credit Documents or any transaction

contemplated thereby.

14.    Preservation of Third-Party Rights.  Notwithstanding anything contained

herein to the contrary, the extent, validity, perfection and enforceability of the Prepetition

Indebtedness and the Prepetition Agent's liens (for the benefit of the Prepetition Senior Lenders)

on the Prepetition Collateral are for all purposes subject to the rights of any party in interest other

than the Debtors to file a complaint (a) pursuant to Bankruptcy Rule 7001, seeking to invalidate,

subordinate or otherwise challenge the Prepetition Indebtedness and/or the Prepetition Agent's

pre-petition liens upon and security interests in the Prepetition Collateral or (b) with respect to

the matters released by the Debtors and their estates in Paragraph 13 above; provided, however,

that if such complaint is not timely filed by the Committee or such other parties in interest by

July 30, 2007 (or such later date as may be set by further order of the Court for cause shown after

a hearing on notice to the Prepetition Agent; the "Investigation Deadline") : (i) the Prepetition

Indebtedness and the Prepetition Agent's security interests in and liens upon the Prepetition

Collateral shall be recognized and allowable as valid, binding, in full force and effect, not subject

to any claims, counterclaims, setoff or defenses, perfected and senior to all other liens upon and

claims against the Prepetition Collateral to the extent provided herein, and the Prepetition

Indebtedness shall be allowed in the full amount specified in Paragraph E hereof pursuant to

§§502 and 506 of the Code, and (ii) the stipulations contained in paragraph E shall be binding on

all parties in interest.  The Committee is hereby granted  standing, to the extent necessary, to file

a complaint in the name of the Debtors to challenge the priority or perfection of the Prepetition

Agent's security interest in and liens upon the Prepetition Collateral.

15.　　Access; Reports.  Until the DIP Indebtedness and Prepetition Indebtedness has been paid in full in cash, the Debtors shall (i) at all reasonable times provide the DIP Agent and the Prepetition Agent with access to the Debtors' books and records consistent with the requirements contained in the DIP Credit Documents and the Prepetition Loan Documents, and (ii) deliver to the DIP Agent and the Prepetition Agent the information set forth in the DIP Loan Agreement with copies to the Committee's counsel.

16.　　Use of Proceeds of DIP Financing and Cash Collateral.

(a)　　Subject to the terms and conditions set forth below, and except as the DIP Agent and the Prepetition Agent otherwise consent in writing, Cash Collateral and funds borrowed under the DIP Loan Agreement shall be used by the Debtors solely for the purposes and up to the amounts set forth in the Approved Budget for the applicable line item during the applicable seven-day period:

(i)　　For each period beginning on the Conversion Date and ending on the last day of each seven-day period set forth in the Approved Budget, the aggregate cumulative disbursements by the Debtors under the Approved Budget as a whole shall not exceed one hundred ten percent (110%) of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the Approved Budget.

(ii)　　For each period beginning on the Conversion Date and ending on the last day of each seven-day period set forth in the Approved Budget, the aggregate cumulative disbursements by the Debtors

under any disbursement line item in the Approved Budget for any seven-day period shall not exceed one hundred ten percent (110%) of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the Approved Budget.

(b)     To the extent any additional line item is added to the Approved Budget in accordance with the provisions of this Final Order, such line items shall be subject to such variance provisions as the Debtors, the DIP Agent and the Prepetition Agent may mutually agree in writing in their respective sole discretion.

(c)     The tests set forth (a) above shall not fail as a result of any excess related solely to amounts budgeted for the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders professionals.

(d)     The DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders (i) may assume the Debtors will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral or Prepetition Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the DIP Agent and the DIP Lenders are estimates only, and the Debtors remain obligated to pay any and all DIP Indebtedness in accordance with the terms of the DIP Credit Documents and this Final Order. All advances and extensions of credit shall be based upon the terms and conditions of the DIP Loan Agreement, as the same may be adjusted from time to time. The DIP Agent and the DIP Lenders shall have the right but not the obligation to extend credit independent of any Approved Budget line item restrictions on

loan availability set forth in the DIP Loan Agreement, and all such DIP Loans shall be entitled to the benefits and protections of this Final Order.

17.    Application of Collateral Proceeds. Except to the extent the DIP Agent and the Prepetition Agent otherwise direct in writing, upon the sale or other disposition of the DIP Collateral, all proceeds of DIP Collateral (including Prepetition Collateral) shall be applied as follows: (a) first, to fund the Carve-Out, (to the extent applicable); (b) second, to repay all fees and expenses incurred by the DIP Agent and the DIP Lenders pursuant to the DIP Loan Agreement; (c) third, to repay the DIP Indebtedness, (d) fourth, to repay all adequate protection claims of the Prepetition Agent and the Prepetition Senior Lenders pursuant to this Final Order and the Stipulation and Order (I) Authorizing the Use of Cash Collateral Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364 and (II) Granting Adequate Protection Pursuant to Sections 361 and 363 entered May 15, 2007; (e) fifth, to repay the Prepetition Indebtedness; (f) sixth, to repay all fees and expenses incurred by the Prepetition Agent and the Prepetition Senior Lenders pursuant to the Prepetition Credit Documents; and (g) seventh, thereafter, to the Debtors' estates.

18.    No Requirement to Accept Title to Collateral. Neither the DIP Agent, the DIP Lenders, the Prepetition Agent nor the Prepetition Senior Lenders shall be obligated to accept title to any portion of the DIP Collateral or Prepetition Collateral in payment of any of the Prepetition Indebtedness or DIP Indebtedness, in lieu of payment in cash or cash equivalents, nor shall the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders be obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any other person or entity.

19.    Affiliate Payments. Except as otherwise agreed in writing by the DIP

Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders in their sole discretion, the Debtors shall not make any loans, advances, distributions, transfers or other payments of any kind whatsoever to any insider or affiliate, including any equity interest holder, without prior order of the Bankruptcy Court.

20.    Effect of Plan.  The provisions of the DIP Credit Documents and of this Final Order  and any actions taken pursuant thereto or hereto, and the liens, super-priority administrative claims, rights and remedies granted to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders pursuant to this Final Order and the DIP Credit Documents, shall not be modified, altered or impaired in any manner by, and shall survive entry of any order confirming any plan of reorganization or liquidation in the Cases (and, to the extent not satisfied in full in cash, the DIP Indebtedness and Prepetition Indebtedness shall not be discharged by the entry of any such order, or pursuant to §1141(d)(4) of the Code, the Debtors having hereby waived such discharge), and the terms and provisions of this Final Order as well as the super-priority administrative claims and liens granted pursuant to this Final Order and the DIP Credit Documents shall continue in full force and effect notwithstanding the entry of such order, and such super-priority administrative claims and liens shall maintain their priority as provided by this Final Order until all of the DIP Indebtedness and Prepetition Indebtedness is indefeasibly paid in full in cash and discharged.  The liens, security interests, rights and remedies granted to the DIP Agent (for the benefit of the DIP Lenders) and the Prepetition Agent (for the benefit of the Prepetition Senior Lenders) pursuant to this Order and the DIP Credit Documents shall not be modified, altered or impaired in any manner by any plan of reorganization or liquidation for Debtors.

21.    Authorized Signatories.  The signatures of one or more of the officers of

the Debtors appearing on any one or more of the DIP Credit Documents to be executed after the entry of this Final Order shall bind the Debtors. No further board of directors or other approval shall be necessary.

22.     No Waiver.

(a)     The Prepetition Agent and the Prepetition Senior Lenders may petition this Court for any such additional adequate protection or other protection as they may require with respect to the Prepetition Indebtedness. Except as otherwise specifically provided herein, the Prepetition Agent and the Prepetition Senior Lenders do not waive any rights they have pursuant to the Prepetition Credit Documents, and the Prepetition Agent and the Prepetition Senior Lenders shall retain all rights available pursuant to the Code or any other applicable law.

(b)     The rights and obligations of the Debtors and the rights, claims, liens, security interests and priorities of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders arising under this Final Order are in addition to, and not intended as a waiver or substitution for, the rights, obligations, claims, liens, security interests and priorities granted by the Debtors under the DIP Credit Documents and the Prepetition Credit Documents. The DIP Agent's, the DIP Lenders', the Prepetition Agent's or the Prepetition Senior Lenders' failure, at any time or times hereafter, to require strict performance by the Debtors (or by any Chapter 7 or Chapter 11 trustee or estate representative hereinafter appointed in the Cases or any Successor Cases) of any provision of this Final Order, the Prepetition Credit Documents or DIP Credit Documents shall not waive, affect or diminish any right to demand strict compliance and performance therewith. No delay on the part of the DIP Agent, the DIP Lenders, the

Prepetition Agent or the Prepetition Senior Lenders in the exercise of any right or remedy under this Final Order, the Prepetition Credit Documents or the DIP Credit Documents shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy. None of the rights or remedies of the DIP Agent, the DIP Lenders, the Prepetition Agent or Prepetition Senior Lender under this Final Order, the Prepetition Credit Documents or the DIP Credit Documents shall be deemed to have been suspended or waived unless such suspension or waiver is in writing, signed by a duly authorized officer of the DIP Agent, the DIP Lenders, the Prepetition Agent or Prepetition Senior Lender, as applicable, and directed to the Debtors specifying such suspension or waiver.

23.    Service of Pleadings; Other Reports and Data. Debtors shall deliver to the DIP Agent, the Prepetition Agent and their respective counsel, as soon as is practicable, copies of any pleading, notice of other document filed by the Debtors in the Cases.

24.    Notices. During the pendency of the Cases, any notice given to the Debtors, the DIP Agent or the Prepetition Agent under this Final Order or the DIP Credit Documents will be effective if given by facsimile, U.S. mail, overnight courier or messenger, or electronic mail addressed as follows:

If to the DIP Agent or the Prepetition Agent:

> D.B. Zwirn Special Opportunities Fund, L.P.
> 745 5th Avenue
> New York, New York 10151
> Attention: Steve Campbell
>          (scampbell@dbzco.com)
> Facsimile: (646) 720-9074

with a copy to:    Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd.
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603-5792
Attention: Ronald Barliant, Esq.

(ronald.barliant@goldbergkohn.com)
Facsimile:  (310) 863-9880

with a copy to:            Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York  10022
Attention:  Adam C. Harris, Esq.
(adam.harris@srz.com)
David M. Hillman, Esq.
(david.hillman@srz.com)
Facsimile:  (212) 593-5955

If to the Debtors, to:     Millcreek Broadcasting L.L.C.
980 North Michigan Drive
Suite 1880
Chicago, Illinois  60611
Attention:  Bruce Buzil
(bbuzil@marathonmedia.com)
Christopher Devine
(cdevine@marathonmedia.com)
Facsimile:  312-587-9520

and

with a copy to:            Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
Attention:  Timothy R. Pohl (tpohl@skadden.com)
Facsimile:  (312) 407-0700

or to such other address as each party may designate for itself by like notice.  Any such notice,

demand, or request shall be deemed given when received if personally delivered or sent by

overnight courier, or when deposited in the United States mails, postage paid, if sent by

registered or certified mail.

25.    Final Order Binding On Successors.  The provisions of this Final Order

shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition

Agent, the Prepetition Senior Lenders, the Debtors and their respective successors and assigns

(including any trustee or other estate representative appointed as a representative of any Estate or

of the estate in any Successor Case).  Except as otherwise explicitly set forth in this Final Order,

no third parties are intended to be or shall be deemed third party beneficiaries of this Final Order or the DIP Credit Documents.

     26.    No Dismissal. If these cases are dismissed, converted, otherwise superseded or substantively consolidated, the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders' rights and remedies under this Final Order and the DIP Credit Documents shall be and remain in full force and effect as if such Cases had not been filed or such Cases had not been dismissed, converted or superseded. Furthermore, notwithstanding any such dismissal, conversion, supercission or consolidation, all of the terms and conditions of this Final Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

     27.    Effect of Modification of Final Order. It having been found that permitting Cash Collateral usage and making DIP Loans and other financial accommodations to the Debtors to be in good faith, the DIP Agent, the DIP Lenders, the Prepetition Agent or Prepetition Senior Lender shall be entitled to the full protection of § 364(e) of the Code with respect to the DIP Indebtedness and Prepetition Indebtedness and the liens and priorities created or authorized by this Final Order in the event that this Final Order or any authorization contained herein is stayed, vacated, reversed or modified on appeal. Each of the terms and conditions set forth in this Final Order constitutes a part of the authorization under § 364 of the Code, and is therefore, subject to the protections contained in § 364(e) of the Code. Any stay, modification, reversal or vacatur of this Final Order shall not affect the validity of any DIP Indebtedness or Prepetition Indebtedness outstanding immediately prior to the effective time of such stay, modification or vacatur, or the validity or enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such DIP Indebtedness or Prepetition Indebtedness.

Notwithstanding any such stay, modification or vacatur, any DIP Indebtedness or Prepetition Indebtedness outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Final Order, and the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders shall be entitled to all of the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such DIP Indebtedness and Prepetition Indebtedness.

28.    <u>Controlling Effect of Final Order</u>.  In the event of any conflict between the terms and provisions of this Final Order and the DIP Credit Documents, the terms and provisions of this Final Order shall control; <u>provided, however</u>, to the extent that specific provisions of this Final Order expressly contradict or expressly limit specific provisions of the DIP Credit Documents, nothing in this Final Order shall be construed as limiting any rights and remedies of the DIP Agent or the DIP Lenders, or the obligations of the Debtors, under the DIP Credit Documents.

29.    <u>Final Order Effective</u>.  This Final Order shall be effective as of the date of signature by the Court, and the Clerk of the Court is hereby directed to enter this Order on the docket of this Court maintained in regard to these Cases.

**IT IS SO ORDERED.**

Jacqueline P. Cox

Dated:  June 19, 2007

J. P. Cox

_____
United States Bankruptcy Judge

41

# Exhibit A

## DEBTOR-IN-POSSESSION
## REVOLVING LOAN PROMISSORY NOTE

$2,000,000

New York, New York
Dated as of June 13, 2007

On February 22, 2007 (the "Petition Date"), four creditors filed involuntary chapter 11 petitions against each of **MILLCREEK BROADCASTING, L.L.C.** ("Millcreek" or "Administrative Borrower"), **3 POINT MEDIA - UTAH, L.L.C.** ("3 Point Utah"), **3 POINT MEDIA - FRANKLIN, L.L.C.** ("3 Point Franklin") and **3 POINT MEDIA - DELTA, L.L.C.** ("3 Point Delta," together with Millcreek, 3 Point Utah, 3 Point Franklin and 3 Point Delta, the "Borrowers") for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code"), and on May [15], 2007 (the "Conversion Date") the Bankruptcy Court entered an order for relief. On May 15, 2007, the Debtors filed the Debtors Answer to Involuntary Chapter 11 Petitions consenting to reorganization relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested that the four chapter 11 cases (the "Chapter 11 Cases") be jointly administered. Borrowers have requested that D. B. Zwirn Special Opportunities Fund, L.P., as agent (the "Agent") for the financial institutions from time to time parties hereto as lenders (the "Lenders"), make advances in its discretion from time to time evidenced by this Revolving Loan Promissory Note (as the same may be amended, modified, renewed, restated or supplemented from time to time, this "Note"). Borrowers intend to utilize such advances to fund their working capital requirements through the conclusion of a sale of all or substantially all of their assets to the Prepetition Senior Secured Lenders. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in Section 19 of this Note.

1.    Revolving Advances.

(a)    Subject to the terms and conditions hereof, Lenders shall make available to Borrowers, from time to time until the Maturity Date, advances (each, a "Revolving Advance" or a "Revolving Loan"). The aggregate amount of Revolving Loans outstanding shall not exceed at any time two million dollars ($2,000,000) (the "Maximum Amount"). The obligation of each Lender to make Revolving Loans under this Note shall be several and not joint and several. Until August 13, 2007, Borrowers may from time to time borrow, repay and reborrow under this Section 1, provided, that, the Debtors shall only be permitted (i) to borrow an amount equal to the succeeding 2 week projection contained in an Approved Budget in any one borrowing, and (ii) to borrow hereunder once every 2 weeks; provided, further, that the Agent and Lenders may in their sole discretion lend more often than once every 2 weeks. Each Revolving Loan shall be made on notice by Administrative Borrower to the Agent at the address specified in Section 21(a) hereof or such other person or persons designated by the Lenders in writing to Borrowers. Any such notice must be given no later than 11:00 a.m. (New York time) on the date that is at least one (1) Business Day prior to the date of the proposed Revolving Loan; provided, that, the initial Revolving Loan may be made simultaneously with the execution of this Note by the Lenders. Each such notice (a "Notice of Revolving Advance") shall be given in writing (by

telecopy or overnight courier) specifying (i) the amount of such Revolving Loan, (ii) the proposed date of such Revolving Loan, which must be a Business Day, and (iii) such other information as may be reasonably required by any Lender. Upon receipt of a Notice of Revolving Advance, subject to the satisfaction of the conditions set forth in this Note, Lenders shall simultaneously and proportionately to their Pro Rata Share of the Maximum Amount, make the proceeds of such Revolving Loan available to Borrowers on the applicable date of funding of such Revolving Loan by transferring immediately available funds equal to such proceeds to Borrowers' Designated Account, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligation to make any Revolving Loan requested hereunder, nor shall any Lender's Pro Rata Share of the Maximum Amount be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make any Revolving Loan requested hereunder, and each Lender shall be obligated to make each Revolving Loan required to be made by it by the term of this Note regardless of the failure by any other Lender. The entire unpaid balance of the Revolving Loans and all other Obligations shall be immediately due and payable in full in immediately available funds on the Maturity Date.

(b)     Each Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Revolving Advance or similar notice believed by such Lender to be genuine. Each Lender may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for such Lender has actual knowledge to the contrary.

(c)     Borrowers shall utilize the proceeds of Revolving Loans to fund working capital requirements and other corporate purposes of Borrowers and their respective subsidiaries in accordance with the Budget (including, without limitation, the payment of any of the costs and expenses of financing the transactions contemplated by this Note that are payable by Borrowers, and other payments permitted by the terms of this Note, the other Loan Documents, the Bankruptcy Code, the Bankruptcy Court (by court order), and the Final Order).

2.     <u>Certain Conditions to Each Revolving Loan</u>.  Lenders shall not be obligated to fund any Revolving Loan, if, as of the date thereof:

(a)     Borrowers shall not have paid any amount then payable hereunder or under any other Loan Document or shall not have performed any of its respective obligations hereunder or under any other Loan Document;

(b)     with respect to any Revolving Loans to be made upon entry of the Final Order, unless each of the following conditions precedent shall have been satisfied in a manner satisfactory to Lenders:

(1)     Borrowers shall have duly executed and delivered this Note;

(2)     Borrowers shall have duly paid any and all fees, costs and expenses then payable hereunder or under any other Loan Document (including, without limitation, the Closing Fee, the Facility Fee and the fees, costs and expenses of counsel to

10302415.10

Lenders) and shall have fully performed all of its obligations hereunder or under any other Loan Document;

(3)     (i) the Bankruptcy Court shall have entered the Final Order, and (ii) the Final Order shall not have been vacated, reversed, modified or amended without the Agent's and Lenders' consent, and no appeal of any such order shall have been timely filed or a stay of such order pending appeal shall be presently effective;

(4)     Borrowers shall have delivered to the Agent and Lenders the Budget that is in form and substance satisfactory in the Lenders' sole discretion;

(5)     The Agent shall have received evidence of insurance coverage with respect to the business and operations of the Borrowers as Agent may reasonably request, in each case, where requested by Agent, with such endorsements as to the named insureds or loss payees thereunder as Agent may request, and providing that such policy may be terminated or canceled (by the insurer or the insured thereunder) only upon 30 days' prior written notice to Agent and each such named insured or loss payee, together with evidence of the payment of all premiums due in respect thereof for such period as Agent may request;

(6)     Agent shall have received such depository account, blocked account, lockbox account and similar agreements and other documents, each in form and substance reasonably satisfactory to Agent and Lenders, as Agent and Lenders may reasonably request with respect to Borrowers' cash management system;

(7)     no event or circumstance shall have occurred since the Petition Date that could reasonably be expected to have a Material Adverse Effect, as reasonably determined by Lenders; and

(8)     no Bankruptcy Court order has been entered (i) authorizing Borrowers to obtain financing or credit pursuant to section 364 of the Bankruptcy Code from any Person other than Lenders secured by a security interest or administrative claim; or (ii) providing adequate protection to any Person under sections 361 through 364 of the Bankruptcy Code by granting a security interest in any of the Collateral or an administrative claim.

(c)     any representation or warranty by any Borrower contained herein or in any other Loan Document shall be untrue or incorrect as of such date in any material respect, except to the extent that such representation or warranty expressly relates to an earlier date;

(d)     except as occasioned by the commencement of the Chapter 11 Cases and the actions, proceedings, investigations and other matters related thereto, any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof and Lenders shall have determined not to make any Revolving Loan so long as such Material Adverse Effect is continuing;

(e)     (i) any Event of Default shall have occurred and be continuing or would result after giving effect to any Revolving Loan; or (ii) any Default shall have occurred and be

continuing or would result after giving effect to any Revolving Loan, and Lenders shall have determined not to make any Revolving Loan so long as such Default is continuing;

       (f)     any Broadcast License with respect to a Station is not issued in the name of a Borrower, is not validly issued and in full force and effect, is impaired by any act of or omission by a Borrower, its employees or agents, has been revoked, cancelled or forfeited or has expired; or

       (g)     after giving effect to any Revolving Loan, the outstanding principal amount of all Revolving Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount then authorized by the Final Order.

       The request and acceptance by Borrowers of the proceeds of any Revolving Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by each Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by Borrowers of the granting and continuance of Lenders' Liens, pursuant to the Collateral Documents.

     3.     Payment of Principal. FOR VALUE RECEIVED, Borrowers promise to pay to the Agent, in the manner and at the place hereinafter provided, the unpaid principal amount of all Revolving Loans made by Lenders to Borrowers on the Maturity Date.

     4.     Payment of Interest.

       (a)     Borrowers also promise to pay interest on the unpaid principal amount hereof from the date hereof until paid in full, in arrears on each applicable Interest Payment Date, at the rate per annum equal to the Reference Rate plus three percentage points (3.0%).

       (b)     If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

       (c)     All computations of fees and interest shall be made by Lenders on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable. Each determination by Lenders of an interest rate hereunder shall be final, binding and conclusive on Borrowers (absent manifest error).

       (d)     So long as an Event of Default shall have occurred and be continuing, and at the election of Lenders confirmed by written notice from the Agent to Borrowers, the interest rate applicable to the Obligations shall be increased by four percentage points (4.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

       (e)     Notwithstanding anything to the contrary set forth in this Section 4, if a court of competent jurisdiction determines in a final order that the rate of interest payable

hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate.

5.   Payments.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the following account:

| | |
|---|---|
| Bank Name: | LaSalle Bank N.A. - Chicago |
| ABA Number: | 071000505 |
| Account Name: | LaSalle Trust / D.B. Zwirn Special Opportunities Fund, L.P. |
| Account Number: | 722108.2 |
| Contact: | Greg Myers 312.904.0283 |
| Ref.: | Millcreek |

or to such other account as shall be designated in a written notice delivered by the Agent to Borrowers.  Each payment made hereunder shall be credited first, to fees and reimbursable expenses of the Agent and Lenders then due and payable pursuant to any of the Loan Documents; second, to interest then due and payable on the Revolving Loans; third, to the principal balance of the Revolving Loans until the same has been paid in full; and fourth, to all other Obligations.

Borrowers hereby authorize the Agent to, and the Agent may, from time to time, charge the Loan Account of Borrowers with any amount due and payable by Borrowers under any Loan Document.  Borrowers agree that the Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing.  Any amount charged to the Loan Account of Borrower shall be deemed a Revolving Loan hereunder made by Lenders to Borrowers.  Borrowers confirm that any charges that the Agent may so make to the Loan Account of Borrowers as herein provided will be made as an accommodation to Borrowers and solely at the Agents' discretion.

6.   Optional Prepayments.  Borrowers shall have the right at any time and from time to time to prepay the principal of this Note in whole or in part (without premium or penalty).

7.   Mandatory Prepayments.

(a)   If at any time the aggregate outstanding principal amount of the Revolving Loans exceed the Maximum Amount, Borrowers shall immediately repay the aggregate outstanding Revolving Loans to the extent required to eliminate such excess.

(b)   Immediately upon receipt by any Borrower of cash proceeds of any asset disposition, unless the Lenders agree otherwise, such Borrower shall prepay the Revolving Loans in an amount equal to 100% of such proceeds, net of (A) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by Borrowers in connection therewith (in each case, paid to non-affiliates), (B) transfer or sales taxes, and (C) amounts required to be applied to the repayment of debt secured by such assets sold.  Any such prepayment shall be applied in accordance with Section 7(e).

10302415.10

-5-

(c)    If any Borrower issues Stock or any debt securities, no later than the Business Day following the date of receipt of the cash proceeds thereof, Borrowers shall prepay the Revolving Loans in an amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs paid to non-affiliates in connection therewith. Any such prepayment shall be applied in accordance with Section 7(e).

(d)    Upon the receipt by any Borrower of any Extraordinary Receipts, Borrowers shall prepay the outstanding principal of the Revolving Loans in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts. Any such prepayment shall be applied in accordance with Section 7(e).

(e)    <u>Application of Certain Mandatory Prepayments</u>. Any prepayments made by Borrowers pursuant to Sections 7(b) through (d) above shall be applied pursuant to Section 5 hereof. The Maximum Amount shall be permanently reduced by the amount of all prepayments made pursuant to Section 7(b).

(f)    <u>No Implied Consent</u>. Nothing in this Section 7 shall be construed to constitute Lenders' consent to any transaction that is not permitted by other provisions of this Note or the other Loan Documents.

8.    <u>Fees</u>. Borrowers shall pay to the Lenders the following fees:

(a)    <u>Closing Fee</u>. On or prior to the date hereof, Borrowers shall pay to the Agent a nonrefundable closing fee (the "<u>Closing Fee</u>") equal to $20,000, which shall be deemed fully earned when paid.

(b)    <u>Facility Fee</u>. On or prior to the date hereof, Borrowers shall pay to the Agent a nonrefundable facility fee (the "<u>Facility Fee</u>") equal to $8,000, which shall be deemed fully earned when paid.

9.    <u>Indemnity</u>.

(a)    Borrowers shall indemnify and hold harmless Agent and each Lender and each of their respective affiliates, and Agent's each such Lender's respective officers, directors, employees, attorneys, agents and representatives (each, an "<u>Indemnified Person</u>"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "<u>Indemnified Liabilities</u>"); provided, that Borrowers shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR**

**LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10.    Adjustments for Withholding, Capital Adequacy Etc.  Notwithstanding anything to the contrary contained herein, all payments to the Agent by Borrowers under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  If Borrowers shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note, then (i) the amount payable shall be increased (and for greater certainty, in the case of interest, the amount of interest shall be increased) as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) each Lender receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (ii) Borrowers shall make such deductions or withholdings, and (iii) Borrowers shall immediately pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from Borrowers (but excluding taxation on the overall net income of any Lender)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of each Lender with respect to this Note or to increase the cost to each Lender of making or maintaining amounts available under this Note, Borrowers agree to pay each Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such reduction or increase.

Borrowers agree to immediately pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by Borrowers under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

Borrowers shall indemnify each Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable by Borrowers hereunder) paid by each Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Taxes or Other Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on each Lender's

10302415.10                                                -7-

overall net income. Payment under this indemnification shall be made upon demand. A certificate as to the amount of such Taxes or Other Taxes submitted to Borrowers by each Lender shall be conclusive evidence, absent manifest error, of the amount due from Borrowers to each Lender.

Borrowers shall furnish to each Lender the original or a certified copy of a receipt evidencing payment of Taxes or Other Taxes made by Borrowers within thirty (30) days after the date of any payment of Taxes or Other Taxes.

11.     Securitization. Each Lender may at any time pledge or grant a security interest in all or any portion of its rights under this Note, the other Loan Documents and the Revolving Loans made by it as collateral security to secure obligations of such Lender, affiliates of such Lender or funds or accounts managed by such Lender or an affiliate of such Lender.

12.     Priority of Obligations and Lenders' Liens.

(a)     The priority of Lenders' Liens on the Collateral and of the Obligations shall be set forth in the Final Order.

(b)     Borrowers shall be entitled to use Cash Collateral in accordance with the Budget except as expressly prohibited by this Note or the other Loan Documents.

13.     Further Assurances. Each Borrower agrees that it shall, at Borrowers' expense and upon request of the Agent, duly execute and deliver or cause to be duly executed and delivered, to the Agent such further instruments and do and cause to be done such further acts as may be necessary or proper in the opinion of the Agent to carry out more effectively the provisions and purposes of this Note or any other Loan Document, including, upon the Agent's written request and in form and substance satisfactory to the Agent, security agreements, UCC-1 financing statements and other Collateral Documents granting to the Agent, for the benefit of the Lenders, first priority Liens in the Collateral to secure the Obligations.

14.     Reports and Notices.

(a)     Borrowers hereby agree to deliver to Lenders on a weekly basis, cash receipts and disbursements of the Borrowers as at the end of each weekly period ending after the Closing Date.

(b)     Borrowers hereby agree to deliver to Lenders as soon as available, and in any event within 30 days after the end of each fiscal month of Borrowers commencing with the first fiscal month of Borrowers ending after the date hereof, internally prepared consolidated and consolidating balance sheets and consolidated and consolidating statements of operations and retained earnings as at the end of such fiscal month, all in reasonable detail and certified by an authorized officer of Borrowers as fairly presenting, in all material respects, the financial position of Borrowers as at the end of such fiscal month and the results of operations, retained earnings and cash flows of Borrowers for such fiscal month, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished to Lenders, subject to normal year-end adjustments and the absence of any footnotes.

10302415.10

-8-