UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Case Nos. 07-03121 through 07-03123 and 07-03125 |
| MILLCREEK BROADCASTING, L.L.C., et al.,[1] | ) ) ) | Chapter 11 |
| Debtors. | ) ) ) ) | Hon. Jacqueline P. Cox |

## AMENDED FINAL ORDER (1) AUTHORIZING DEBTORS, AS DEBTORS IN POSSESSION, TO (A) USE CASH COLLATERAL, AND (B) INCUR POST-PETITION SECURED INDEBTEDNESS, (2) GRANTING SECURITY INTERESTS AND SUPER-PRIORITY CLAIMS PURSUANT TO 11 U.S.C. SECTIONS 364(c) & (d), (3) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C SECTIONS 361 AND 363, (4) MODIFYING AUTOMATIC STAY AND (5) SETTING FINAL HEARING

Millcreek Broadcasting, L.L.C., ("**Millcreek**"), 3 Point Media - Utah, L.L.C. ("**3**

**Point Utah**"), 3 Point Media - Franklin, L.L.C. ("**3 Point Franklin**") and 3 Point Media - Delta,

L.L.C. ("**3 Point Delta**," together with Millcreek, 3 Point Utah, 3 Point Franklin and 3 Point

Delta, the "**Debtors**"), having moved this Court on May 29, 2008 (the "**Motion**") for

authorization to amend the terms of the Final Order (1) Authorizing Debtors, As Debtors In

Possession, to (A) Use Cash Collateral, and (B) Incur Post-Petition Secured Indebtedness, (2)

Granting Security Interests and Super Priority Claims Pursuant to 11 U.S.C. Sections 364(C) &

(D), (3) Granting Adequate Protection Pursuant to 11 U.S.C Sections 361 And 363, (4)

Modifying Automatic Stay and (5) Setting Final Hearing (the "**Final Cash Collateral Order**");

and the Debtors having previously moved this Court on May 24, 2007 for (1) authorization of (a)

---

[1]    The Debtors consist of: Millcreek Broadcasting, L.L.C. (EIN: 36-4265091); 3 Point Media – Delta, L.L.C. (EIN:61-1421503); 3 Point Media – Franklin, L.L.C. (EIN: 36-4499087) and 3 Point Media – Utah, L.L.C. (EIN: 36-4470799).

the use of the Prepetition Senior Lenders' (as defined below) Cash Collateral (as defined below) and (b) the execution and delivery of that certain Revolving Loan Promissory Note, dated as of June 13, 2007 (the **"Existing DIP Loan Agreement"**) pursuant to which the Debtors obtained certain postpetition loans and other financial accommodations from D.B. Zwirn Special Opportunities Fund, L.P., as agent (the **"DIP Agent"**) for itself and the other financial institutions from time to time party to the Existing DIP Loan Agreement as lenders (collectively, the **"DIP Lenders"**), (2) the granting of security interests, liens and super-priority claims to the DIP Lenders pursuant to 11 U.S.C. §§364(c) & (d), (3) the granting of adequate protection to the Prepetition Agent (as defined below), for the benefit of the Prepetition Senior Lenders (as defined below), pursuant to 11 U.S.C. §§361 and 363, (4) the modification of the automatic stay, and (5) the setting of a final hearing on the Final Cash Collateral Order; and pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (**"Bankruptcy Rules"**), due notice of the Motion was given and a preliminary hearing (the **"Preliminary Hearing"**) was held before this Court; and the Final Hearing having been held on June 13, 2007; and the Final Cash Collateral Order having been entered on June 13, 2007 (Docket No. 97); and it appearing that the Debtors are seeking to amend the Existing DIP Loan Agreement to increase the post-petition proceeds available thereunder, and that the DIP Agent and the DIP Lenders are willing to do so pursuant to the terms set forth in the Amended and Restated Debtor-in-Possession Revolving Loan Promissory Note (the **"Amended DIP Loan Agreement"**)[2]; and one requirement to additional lending under the Amended DIP Loan Agreement being the amendment of the Final Cash Collateral Order (this **"Amended Final Order"**); and based upon all of the pleadings filed with the Court, the evidence presented and the arguments of counsel made at the hearing on the

---

[2]    Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the Amended DIP Loan Agreement.

Motion; and the Court having noted the appearances of all parties-in-interest; and all objections to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court, and it appearing that proper notice of the Motion has been given and the relief requested in the Motion being in the best interests of the Debtor, its estate and creditors, and upon the record herein; and after due deliberation thereon; and sufficient cause appearing therefor;

## THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]:

A.      Commencement of Cases. On February 22, 2007 (the **"Petition Date"**), involuntary petitions were filed against each of the Debtors pursuant to § 303 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the **"Code"**) by certain of the Prepetition Senior Lenders. Thereafter, each Debtor consented to the entry of an order for relief, which was entered on May 15, 2007 (the **"Conversion Date"**). Pursuant to §§1107 and 1108 of the Code, each Debtor has retained possession of its assets and is authorized to continue the operation and management of its business as a debtor-in-possession. On May 24, 2007, the U.S. Trustee appointed an official committee of unsecured creditors (the **"Committee"**) in these Cases. The Debtors have consented to entry of orders for relief to maximize the value of their estates for the benefit of their creditors and other parties in interest by conducting an orderly sale of their assets.

B.      The Motion; Notice. The Motion was filed on May 29, 2008. Pursuant to Bankruptcy Rule 4001(c)(1), on May 29, 2008, the Debtors served notice of the Motion and proposed form of this Amended Final Order by telecopy, hand delivery or overnight courier on (i) the Office of the United States Trustee for the Northern District of Illinois (the **"UST"**), (ii)

---

[3]      Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

3

the District Counsel for the Internal Revenue Service, (iii) the Committee, (iv) counsel to the Prepetition Senior Lenders and the Prepetition Agent, and (v) counsel to the DIP Lenders and the DIP Agent. The notice of the Motion given by the Debtors was reasonable and sufficient under the circumstances.

        C.      Jurisdiction; Core Proceeding. Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. §157(b)(2). This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§157(b)(1) and 1334(b).

        D.      (intentionally omitted)

        E.      The Debtors' Stipulations. Without prejudice to the rights of any other party in interest the Debtors admit, stipulate and agree that:

        1.      Millcreek, 3 Point Utah, 3 Point Franklin and 3 Point Delta, as borrowers, D.B. Zwirn Special Opportunities Fund, L.P. (f/k/a Highbridge/Zwirn Special Opportunities Fund, L.P.) as agent (the **"Prepetition Agent"**) and the financial institutions from time to time signatory thereto as lenders (the **"Prepetition Senior Lenders"**) are party to that certain Amended and Restated Financing Agreement, dated as of July 31, 2003, (as amended, modified or supplemented prior to the Conversion Date, the **"Prepetition Financing Agreement"**), pursuant to which the Prepetition Agent and the Prepetition Senior Lenders agreed, among other things, to (a) amend and restate the terms and conditions of that certain Financing Agreement, dated as of May 13, 2003, among Millcreek, 3 Point Utah and 3 Point Franklin, as borrowers, the Prepetition Agent and the Prepetition Senior Lenders, (b) maintain certain loans and other financial accommodations then outstanding, and (c) extend additional loans and other financial accommodations to the Debtors. The maturity date of the Obligations (as defined in the

Prepetition Financing Agreement) under the Prepetition Financing Agreement was December 31,

2005. Notwithstanding the occurrence of such maturity date, the Debtors failed to pay the

amounts due and owing to the Prepetition Agent and to the Prepetition Senior Lenders under the

terms of the Prepetition Financing Agreement. Pursuant to the terms of (w) that certain Security

Agreement, dated as of May 13, 2003, executed by each of Millcreek, 3 Point Utah and 3 Point

Franklin in favor of the Prepetition Agent (as amended, modified or supplemented prior to the

Conversion Date; the **"Security Agreement"**), (x) that certain Pledge Agreement, dated as of

May 13, 2003, executed by each of Millcreek, 3 Point Utah and 3 Point Franklin in favor of the

Prepetition Agent (as amended, modified or supplemented prior to the Conversion Date; the

**"Pledge Agreement"**), (y) that certain Joinder Agreement, dated as of July 31, 2003, executed

by 3 Point Delta in favor of the Prepetition Agent (as amended, modified or supplemented prior

to the Conversion Date; the **"Joinder Agreement"**), and (z) the other Loan Documents (as

defined in the Prepetition Financing Agreement) executed by the Debtors in favor of the

Prepetition Agent, the Prepetition Indebtedness (as defined herein) is secured by liens upon and

security interests in all or substantially all of the Debtors' assets (other than broadcast licenses

issued by the Federal Communications Commission (**"FCC"**), as to which the liens and security

interests are limited to the proceeds thereof).

      2.     As of February 22, 2007, the Debtors were indebted and liable to the Prepetition

Senior Lenders, without recourse, counterclaims or offset of any kind, pursuant to the Prepetition

Financing Agreement and other Prepetition Credit Documents (as defined herein), including

accrued and unpaid principal, interest, fees, costs and expenses, in the aggregate amount of not

less than $105,500,000. All of the indebtedness and obligations of the Debtors (including all

Obligations) owing to the Prepetition Agent and the Prepetition Senior Lenders pursuant to the

5

Prepetition Financing Agreement, together with all pre-petition and post-petition interest and expenses now or hereafter accrued on such indebtedness and obligations, shall hereinafter collectively be referred to as the **"Prepetition Indebtedness."** All Collateral (as defined in the Prepetition Financing Agreement, the Security Agreement, the Pledge Agreement, the Joinder Agreement and the other Loan Documents executed and delivered in connection therewith; collectively, the **"Prepetition Credit Documents"**) of the Debtors that existed as of the Conversion Date and all pre-petition and post-petition proceeds thereof shall hereafter be referred to as the **"Prepetition Collateral."**

3.    The Prepetition Agent, for the benefit of the Prepetition Senior Lenders, properly and timely perfected its security interests in the Prepetition Collateral by, among other things, filing of a series of UCC-1 financing statements against the Debtors (the **"Prepetition Financing Statements"**) with the proper offices for the perfection of such security interests.

4.    As of the Conversion Date, (a) the Prepetition Credit Documents were valid and binding agreements and obligations of the Debtors, (b) the Prepetition Agent's liens on and security interests in the Prepetition Collateral, for the benefit of the Prepetition Senior Lenders, are valid, perfected, enforceable, non-avoidable and, except as specifically permitted under the Prepetition Credit Documents, first priority liens and security interests and (iii) the Debtors (or any party acting by, through or on behalf of the Debtors) may not assert any claim, counterclaim, setoff or defense of any kind or nature which would in any way affect the validity, enforceability and non-avoidability of the Prepetition Indebtedness or the Prepetition Agent's security interests in and liens on the Prepetition Collateral or reduce or affect the obligation to pay the Prepetition Indebtedness.

5.    The Prepetition Indebtedness exceeds the value of the Prepetition Collateral.

6

6.      The Debtors acknowledge that (a) cash currently in the Debtors' possession,
custody and/or control and (b) any post-Conversion Date proceeds, product or profits of the
Prepetition Collateral within the meaning of § 552(b) of the Bankruptcy Code, constitute "cash
collateral" within the meaning of Section 363(a) of the Bankruptcy Code.

7.      Millcreek entered into a Subordinated Loan Agreement, dated May 13, 2003 (the
**"Subordinated Loan Agreement"**), by and among Millcreek, Rocky Mountain Radio Network,
Inc. (**"Rocky Mountain"**), Alta Communications VII, L.P. (**"Alta Communications"**), Alta VII
Associates, L.L.C. (together with Alta Communications, **"Alta"**),  Peter Handy (**"Handy"**),
Monroe Partners IX, L.P. (**"Monroe"**), BPIB – Utah, L.L.C. (**"BPIB"**), Bruce A. Buzil (**"Buzil"**)
and Christopher F. Devine (**"Devine"**).  As of the Petition Date, the obligations due and owing
under the Subordinated Loan Agreement aggregate approximately $47 million including accrued
and unpaid principal and interest.

8.      Millcreek, 3 Point Utah and 3 Point Franklin also borrowed money from, and
issued promissory notes to, certain affiliates, as evidenced by: (a) Subordinated Unsecured
Promissory Note, dated May 13, 2003, made by Millcreek in the principal amount of
$13,050,000, payable to the order of Lakeshore Media, LLC (**"Lakeshore"**), (b) Promissory
Note, dated July 19, 2002, made by 3 Point Utah, in the principal amount of $2,239,618, and
assigned jointly to Northland Holding Trust (**"Northland"**), Robert E. Neiman (**"Neiman"**) and
Buzil on May 13, 2003, and subsequently assigned to Millcreek on May 14, 2003, and (c)
Promissory Note, dated July 19, 2002, made by 3 Point Franklin, in the principal amount of
$1,798,937, and assigned jointly to Northland, Neiman, and Buzil on May 13, 2003, and
subsequently assigned to Millcreek on May 13, 2003 (collectively, the **"Affiliate Notes"**, and
together with the Subordinated Loan Agreement, the **"Subordinated Debt"**).  Alta, Handy,

7

Monroe, BPIB, Buzil, Devine, Lakeshore, Northland and Neiman are collectively referred to herein as the "**Subordinated Creditors**."

9.     All obligations owed to the Subordinated Creditors are contractually subordinate to the obligations owed to the Prepetition Senior Lenders. Such subordination is evidenced by (a) a Subordination Agreement, dated May 13, 2003, among Alta, BPIB, Monroe, Handy, Millcreek and Rocky Mountain (the "**Alta Subordination Agreement**"), pursuant to which, among other things, the Subordinated Creditors party thereto acknowledged and agreed that all indebtedness, obligations and other liabilities owing to such Subordinated Creditors under the Subordinated Loan Agreement (including, without limitation, all fees, premiums, costs, expenses and other amounts payable in respect thereof but excluding, among other things, the Deferred Interest Amount (as defined in the Alta Subordination Agreement), capitalized interest, any capitalized fees, costs and expenses and any protective advances made to preserve the value of the Prepetition Collateral), up to the aggregate principal amount of approximately $47,000,000, is junior and subordinate to the extent set forth in the Subordination Agreement in right of payment to the infeasible payment in full in cash of the Prepetition Agent and the Prepetition Senior Lenders' obligations, and (b) the Subordination Agreement, dated May 13, 2003, between each Person listed on the signature pages of such Subordination Agreement, Millcreek, 3 Point Utah, 3 Point Franklin and Rocky Mountain (the "**Affiliate Subordination Agreement**", and together with the Alta Subordination Agreement, the "**Subordination Agreements**") pursuant to which, among other things, the Subordinated Creditors party thereto acknowledged and agreed that all indebtedness, obligations and other liabilities owing to them under the Affiliate Notes is junior and subordinate to the extent set forth in the Affiliate Subordination Agreement in right of

8

payment to the indefeasible payment in full in cash of the Prepetition Agent and the Prepetition Senior Lenders' obligations.

   F. <u>Need For Additional Funding</u>. As a result of their financial condition, the Debtors do not generate sufficient Cash Collateral to operate their respective businesses and do not believe that they have the ability to adequately protect the Prepetition Senior Lenders' security interests without the use of Cash Collateral or additional financing. The Debtors are unable to obtain alternative sources of cash or credit either in the form of unsecured credit allowable as an administrative expense under §503(b)(1) of the Code, unsecured credit allowable under §§364(a) and 364(b) of the Code, or secured credit pursuant to §364(c) or (d) of the Code on terms and conditions more favorable to the Debtors than those set forth in the Amended DIP Loan Agreement and this Amended Final Order. If the Debtors' financing were to be abruptly discontinued, their operations would be severely disrupted and they would be unable to pay operating expenses and operate their businesses in an orderly manner, thereby severely impairing the value of their assets and their ability to complete the sale of their assets as a going concern in the most advantageous and efficient manner. Accordingly, the Debtors and their estates will suffer immediate and irreparable harm unless the Debtors are immediately authorized to continue their use of Cash Collateral and to obtain additional credit on the terms and conditions set forth herein.

   G. <u>Lenders' Willingness to Extend DIP Financing</u>. The Court has been advised that in addition to the post-petition funds advanced under the Final Cash Collateral Order, the DIP Agent and the DIP Lenders are willing to advance additional post-petition funds in the form of additional revolving loans (collectively, the **"DIP Loans"**) to the Debtors for a period to and including September 30, 2008 (or such later date as the DIP Lenders may

9

determine in their sole discretion), to fund the Debtors' working capital needs, to pay professional fees and to conclude an orderly sale of the Debtors' assets, subject to the satisfaction of the conditions precedent set forth in the Amended DIP Loan Agreement (substantially in the form of Exhibit A), and subject to the Approved Budget (as defined below). Under the Final Cash Collateral Order, the Committee and other parties in interest had until July 30, 2007 (the **"Investigation Deadline"**) to investigate the validity, perfection and enforceability of the Prepetition Indebtedness and the Prepetition Agent's liens (for the benefit of the Prepetition Senior Lenders) on the Prepetition Collateral. Pursuant to the terms of the Final Cash Collateral Order, (i) the Prepetition Indebtedness and the Prepetition Agent's security interests in and liens upon the Prepetition Collateral have been recognized as allowable, valid, binding, in full force and effect, not subject to any claims, counterclaims, setoff or defenses, perfected and senior to all other liens upon and claims against the Prepetition Collateral to the extent provided therein, (ii) the Prepetition Indebtedness is allowed in the full amount specified in Paragraph E thereof pursuant to §§502 and 506 of the Code, and (iii) the stipulations contained in Paragraph E are binding on all parties in interest.

       H.    Budget for Use of Cash Collateral and DIP Financing. The Debtors have delivered to the Prepetition Agent, the Prepetition Senior Lenders, the DIP Agent and the DIP Lenders a detailed budget which sets forth projected cash receipts and cash disbursements (by line item) on a weekly basis for the time period through and including January 3, 2009, a copy of which is attached to the Amended DIP Loan Agreement (the **"Approved Budget"**). The Approved Budget may be modified or supplemented from time to time by agreement of the Prepetition Agent, the Prepetition Senior Lenders, the DIP Agent, the DIP Lenders and the Debtors upon notice to the Committee without the need of further notice, hearing or order of this

Court.

    I.    <u>Good Faith</u>. The Prepetition Agent, the Prepetition Senior Lenders, the DIP Agent and the DIP Lenders have acted in good faith in agreeing to extend, or to consent to the extension of, credit and other financial accommodations to the Debtors in accordance with the Amended DIP Loan Agreement and this Amended Final Order. The terms of the Amended DIP Loan Agreement authorized by this Amended Final Order set forth below are supported by reasonably equivalent value and fair consideration. The agreements and arrangements authorized in this Amended Final Order have been negotiated at arms' length with all parties represented by experienced counsel, are fair and reasonable under the circumstances, are enforceable in accordance with their terms and have been entered into in good faith. Any credit extended and loans made to the Debtors by the DIP Agent and the DIP Lenders pursuant to this Amended Final Order and/or the Amended DIP Loan Agreement shall be deemed to have been extended in good faith, as that term is used in §364(e) of the Code. In making decisions to advance loans to the Debtors, in administering any loans, in accepting the Approved Budget or any future supplemental Approved Budget or in taking any other actions permitted by this Amended Final Order or the DIP Credit Documents (as defined below), neither the Prepetition Agent, the Prepetition Senior Lenders, the DIP Agent nor the DIP Lenders shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of any Debtor.

    J.    <u>Cause Shown</u>. Good cause has been shown for the entry of this Amended Final Order. Among other things, entry of this Amended Final Order will maximize value of the Debtors' assets and will avoid immediate and irreparable harm to, and is in the best interests of, the Debtors, their creditors and their estates. Therefore, the Debtors have requested immediate

11

entry of this Amended Final Order pursuant to Bankruptcy Rule 4001(c)(2).

## THEREFORE, IT IS HEREBY ORDERED THAT:

1.    Cash Collateral.  For purposes of this Amended Final Order, "**Cash Collateral**" shall consist of all of the respective property of the Debtors that constitutes cash collateral in which the Prepetition Agent, for the benefit of the Prepetition Senior Lenders, has an interest as provided in §363(a) of the Code and shall include, without limitation:

(a)    All cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any property upon which the Prepetition Agent, for the benefit of the Prepetition Senior Lenders, holds a lien or a replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise, and whether such property that has been converted to cash, existed as of the commencement of this Case, or arose or was generated thereafter; and

(b)    All of the respective deposits, refund claims and rights in retainers of the Debtors upon which the Prepetition Agent, for the benefit of the Prepetition Senior Lenders, holds a lien or replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise.  The Debtors' cash on hand and cash flow from operations consist of proceeds of Prepetition Collateral, and all such cash is Cash Collateral.

2.    Authorization to Use Cash Collateral.  The Prepetition Agent and the Prepetition Senior Lenders have consented to the Debtors' use of Cash Collateral for a specified time on the express terms and conditions set forth in this Amended Final Order, and as provided for in an Approved Budget.  Subject to the terms and conditions of this Amended Final Order, the Debtors may use Cash Collateral, as set forth on the Approved Budget for such time period,

12

to be used for, among other things, working capital to support the ongoing operation of the

Debtors' businesses pending consummation of a sale pursuant to § 363 of the Code, and to pay

fees of professionals. The Debtors shall exhaust all available Cash Collateral prior to making

requests for loans under the Amended DIP Loan Agreement. The Debtors' authority to use Cash

Collateral shall expire on the earliest of (i) the close of business on September ; (ii) the

consummation of a sale of all or substantially all of the Debtors' assets to the Prepetition Senior

Lenders (or their designee) pursuant to § 363 of the Code and (iii) the occurrence of a

Termination Event (as defined herein). In no event shall the Debtors be authorized to use Cash

Collateral or DIP Loans to pay (x) any items except as provided herein and set forth in the

Approved Budget or as hereafter approved in writing by the Prepetition Agent and the DIP

Agent and on notice to the Committee's counsel; or (y) any prepetition claims or expenses except

as set forth in the Approved Budget with the written consent of the Prepetition Agent and the

DIP Agent subject to Court approval on notice to the Committee's counsel.

      3.     <u>Authorization to Borrow; Amended DIP Loan Agreement</u>.

      (a)     The Debtors are authorized to enter into and be bound by the following

documents, and to borrow money and perform their obligations thereunder in accordance

with the terms thereof:

          (i)     the Amended DIP Loan Agreement in substantially the form attached hereto as <u>Exhibit A</u>;

          (ii)     the Approved Budget;

          (iii)     all such financing statements, notices, schedules, other security agreements, deeds of trust, mortgages, instruments, guaranties, subordination agreements, acceptance agreements and documents

13

as may be necessary or required to evidence their obligations to the DIP Agent and the DIP Lenders, to consummate the terms and provisions of the Motion and this Amended Final Order and to evidence perfection of the liens and security interests to be given to the DIP Agent for the benefit of the DIP Lenders pursuant hereto and thereto, and such other agreements and documents as are set forth in or contemplated by the foregoing documents as a condition to the DIP Agent's and the DIP Lenders' willingness to make loans pursuant thereto or as the DIP Agent and the DIP Lenders shall reasonably require in connection with or to evidence the Amended DIP Loan Agreement whether now or hereafter executed by or on behalf of the Debtors and delivered to the DIP Agent for the benefit of the DIP Lenders.

(b)    Pursuant to the Amended DIP Loan Agreement, the Debtors shall only be permitted (i) to borrow to pay professional fees set forth in the Approved Budget, (ii) for all items other than professional fees, to borrow an amount equal to the succeeding 2 week projection contained in an Approved Budget in any one borrowing and (iii) for all items other than professional fees, to borrow under the Amended DIP Loan Agreement once every 2 weeks; provided, that, the DIP Agent and the DIP Lenders may in their sole discretion lend more often than once every 2 weeks.

(c)    For purposes of the Motion and this Amended Final Order, the documents listed in subparagraphs (i) through (iii) above shall hereinafter collectively be referred to as the **"DIP Credit Documents."** The DIP Credit Documents shall be incorporated as

14

part of this Amended Final Order and shall be deemed binding on and enforceable against the Debtors, their estates, and their successors and assigns. The Debtors are further authorized to execute and deliver any non-material amendments or modifications to any of the DIP Credit Documents or the terms of the Amended DIP Loan Agreement set forth herein and/or any waivers as may be agreed upon in writing by the DIP Agent, the DIP Lenders and the Debtors upon notice to the Committee without the need of further notice, hearing or order of this Court. All indebtedness and obligations incurred on or after the Conversion Date by the Debtors to the DIP Agent or the DIP Lenders pursuant to the DIP Credit Documents (including principal, accrued and unpaid interest and costs and expenses, including reasonable attorneys' fees and expenses) are referred to herein as the **"DIP Indebtedness"**.

4.      Maximum Amount of Borrowing. The maximum aggregate outstanding principal amount of the DIP Indebtedness at any time as a result of amounts that the Debtors may borrow from the DIP Agent and the DIP Lenders pursuant to this Amended Final Order and the DIP Credit Documents shall be $3,500,000; provided, however, that if the DIP Agent and the DIP Lenders advance funds in excess of these limitations or restrictions set forth herein or in the DIP Credit Documents, such advances shall constitute part of the DIP Indebtedness and shall be entitled to the benefits of the DIP Credit Documents and this Amended Final Order. In no event shall Debtors use any DIP Loans to pay any items except as provided herein and as set forth in an Approved Budget or as may hereafter be consented to in writing by the DIP Agent and the DIP Lenders on notice to the Committee's counsel.

15

5.　　Interest; Fees; Professional Expenses. The rate of interest to be charged on DIP Loans and other extensions of credit to any Debtor under the Amended DIP Loan Agreement shall be at a rate equal to 15% per annum. The Debtors shall pay to the DIP Agent and the DIP Lenders a $20,000 Closing Fee and an $8,000 Facility Fee upon entry of this Amended Final Order. Interest on the DIP Indebtedness shall be payable monthly, in arrears, and such interest and all post-petition fees and reimbursable expenses set forth in the Amended DIP Loan Agreement and relating to the Amended DIP Indebtedness may be charged to the loan account in accordance with the Amended DIP Loan Agreement, including but not limited to legal and financial advisory fees, recording fees, auditing fees and any out-of-pocket expenses. Default interest shall accrue and be payable in accordance with the terms of the Amended DIP Loan Agreement.

6.　　[Intentionally Omitted.]

7.　　Termination of Amended DIP Loan Agreement; Termination of Cash Collateral Usage. The Amended DIP Loan Agreement and the Debtors' right to use Cash Collateral shall immediately and automatically terminate, and all DIP Indebtedness shall be immediately due and payable, upon the earliest to occur ("**Termination Date**") of the following (each, a "**Termination Event**"):

(a)　　the date on which the Debtors fail to comply with any of the terms of this Amended Final Order;

(b)　　the effective date of any confirmed chapter 11 plan of reorganization in the Cases or liquidation of the Cases;

(c)　　entry of an order, without the prior written consent of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders, (i) converting the

16

Cases to cases under chapter 7 of the Code; (ii) dismissing the Cases; (iii) appointing a trustee under Chapter 7 or Chapter 11 of the Code or appointing an examiner with expanded powers (powers beyond those set forth in §1106(a)(3) and (4) of the Code); (iv) reversing, vacating or otherwise amending, supplementing or modifying this Amended Final Order, or (v) granting relief from the automatic stay to any creditor holding or asserting a lien or reclamation claim on a material portion (i.e., more than $50,000 in the aggregate) of the assets of the Debtors necessary to the operation of their businesses or where the deprivation to the Debtors of such assets could reasonably be expected to have a material adverse effect on the Debtors;

(d)     except as permitted under this Amended Final Order, any proceeding shall be commenced seeking (i) the invalidation, subordination or other challenging by the Debtors or any statutory committee of unsecured creditors appointed in the Cases of the superpriority claim or liens granted to the DIP Agent, for the benefit of the DIP Lenders, and the Prepetition Agent, for the benefit of the Prepetition Senior Lenders, under this Amended Final Order or (ii) any relief under §506(c) of the Code with respect to any Prepetition Collateral or other DIP Collateral (as defined below);

(e)     any application by the Debtors for entry of an order approving use of Cash Collateral (other than any application related to this Amended Final Order), or any financing or loans secured by liens which are senior, pari passu or junior to the DIP Agent's or the Prepetition Agent's liens on DIP Collateral or Prepetition Collateral, respectively, without the prior written approval of the DIP Agent and the Prepetition Agent;

(f)     the consummation of a sale of all or substantially all of the Debtors' assets,

17

whether done pursuant to one transaction or a series of transactions; or

(g)    the occurrence of an "Event of Default" as defined under the Amended

DIP Loan Agreement.

8.    Security for DIP Indebtedness and Adequate Protection for Cash

Collateral Usage.

(a)    To secure all DIP Indebtedness under the DIP Credit Documents, the DIP

Agent, for the benefit of the DIP Lenders, shall be granted, in each case subject and

subordinate to the Carve-Out (as defined below):

(i)    pursuant to 364(c)(1) of the Code, a superpriority administrative

expense claim with priority over all administrative expenses of the

kind specified in §§ 503(b) or 507(b) of the Code;

(ii)    pursuant to § 364(c)(3) of the Code, a perfected junior security

interest in and lien upon all of the existing or after acquired

property and assets of the Debtors of any kind or nature, whether

real or personal, tangible or intangible, wherever located, now

owned or hereafter acquired or arising and all proceeds, products,

rents and profits thereof, which is subject to Prior Claims (other

than the Prepetition Collateral);

(iii)    pursuant to § 364(c)(2) of the Code, a perfected first priority

security interest in and lien upon all of the existing or after

acquired property and assets of the Debtors of any kind or nature,

whether real or personal, tangible or intangible, wherever located,

now owned or hereafter acquired or arising and all proceeds,

products, rents and profits thereof, which is not subject to any Prior

Claim; and

(iv)     pursuant to § 364(d)(1) of the Code, a perfected first priority

security interest in and lien upon all of the existing or after

acquired property and assets of the Debtors of any kind or nature,

whether real or personal, tangible or intangible, wherever located,

now owned or hereafter acquired or arising and all proceeds,

products, rents and profits thereof which is Prepetition Collateral.

The collateral set forth in clauses (ii), (iii) and (iv) shall collectively be referred to as the

"**DIP Collateral**". DIP Collateral shall include, and the DIP Lenders shall be entitled to

have their superpriority administrative expense claim set forth in clause (i) above paid

from, the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548,

549 and 550 of the Bankruptcy Code (the "**Avoidance Actions**"), provided, however, that

such lien and right to repayment shall be limited to the amount of DIP Indebtedness

arising from the funding of DIP Loans for: (X) Committee professional fees and

expenses; (Y) U.S. Trustee fees and (Z) that portion of fees and expenses of the Debtors'

professionals that would not be included in any hypothetical surcharge under 11 U.S.C. §

506(c). The  sole issue in determining the amount under clause (Z) above shall be

whether any particular fee or expense could or could not be lawfully surcharged to a

secured lender's collateral under section 506(c).  As part of the hypothetical surcharge

analysis, the DIP Lenders' consent that such fee or expense in clause (Z) above shall not

be disputed to the extent such fee or expense was included in the Approved Budget, was

incurred in compliance with paragraph 12 of this Amended Final Order and is allowed by

19

further Court order.

     (b)     As adequate protection for the Prepetition Agent and the Prepetition

Senior Lenders in respect of any diminution in the value of the Prepetition Agent's and

the Prepetition Senior Lenders' interest (including, without limitation, the payment of fees

and expenses on account of professionals retained by the Prepetition Agent on behalf of

the Prepetition Senior Lenders pursuant to the terms of the Prepetition Credit Documents)

in the Prepetition Collateral resulting from the Debtors' use of Cash Collateral, the

incurrence by the Debtors of DIP Indebtedness or otherwise, the Prepetition Agent, for

the benefit of the Prepetition Senior Lenders, shall be granted (in each case subject and

subordinate to the Carve-Out and the priority of the liens and claims granted to the DIP

Agent and the DIP Lenders with respect to DIP Indebtedness (as set forth in the

preceding paragraph), but in any case at all times senior to the rights of Debtors and any

successor trustee or estate representative in the Cases or any Successor Cases):

          (i)     pursuant to 364(c)(1) of the Code, a superpriority administrative

                    expense claim with priority over all administrative expenses of the

                    kind specified in §§ 503(b) or 507(b) of the Code;

          (ii)     pursuant to §§ 361 and 363 of the Code, a perfected junior security

                    interest in and lien upon the DIP Collateral which is subject to

                    Prior Claims (other than the Prepetition Collateral); and

          (iii)     pursuant to §§ 361 and 363 of the Code, a perfected second

                    priority priming security interest in the DIP Collateral which is not

                    otherwise subject to Prior Claims.

The adequate protection set forth in clause (i), (ii), and (iii) shall include, and the

20

Prepetition Senior Lenders shall be entitled to have their superpriority administrative expense claim set forth in clause (i) above paid from, the Debtors' Avoidance Actions, provided, however, that such adequate protection shall be limited to the amount of any diminution in the value of the Prepetition Collateral arising from the funding of DIP Loans provided, further, that such lien and right to repayment shall be limited to the amount of DIP Indebtedness arising from the funding of DIP Loans for: (X) Committee professional fees and expenses; (Y) U.S. Trustee fees and (Z) that portion of fees and expenses of the Debtors' professionals that would not be included in any hypothetical surcharge under 11 U.S.C. § 506(c). The sole issue in determining the amount under clause (Z) above shall be whether any particular fee or expense could or could not be lawfully surcharged to a secured lender's collateral under section 506(c). As part of the hypothetical surcharge analysis, the DIP Lenders' consent that such fee or expense in clause (Z) above shall not be disputed to the extent such fee or expense was included in the Approved Budget, was incurred in compliance with paragraph 12 of this Amended Final Order and is allowed by further Court order.

(c)     In addition, Prepetition Agent shall have all of the rights accorded it pursuant to §507(b) of the Code in respect of the adequate protection provided herein.

(d)     As used herein, the term "**Prior Claims**" shall mean (i) any non-avoidable, valid, enforceable and perfected liens and security interests in favor of any person or entity on or in the assets of the Debtors, as a pre-petition debtor, which existed on the Conversion Date (including any valid liens and security interests in existence on the Conversion Date that are perfected after the Conversion Date as permitted by §546(b) of the Code) and are not subject to §552(a) of the Code, but only to the extent such liens

21

and security interests are superior in priority to the Prepetition Agent's pre-petition liens and security interests, after giving effect to any existing subordination or intercreditor arrangements (provided that this clause (i) shall exclude the pre-petition and post-petition liens and security interests securing the Prepetition Indebtedness, which liens and security interests shall be subordinate to the liens and security interests securing the DIP Indebtedness), and (ii) the Carve-Out. Other than (x) the first priority liens and security interests in favor of the DIP Agent, for the benefit of the DIP Lenders, pursuant to the DIP Credit Documents and this Amended Final Order, (y) the liens and security interests in favor of the Prepetition Agent, for the benefit of the Prepetition Senior Lenders, pursuant to the Prepetition Credit Documents, and (z) the Prior Claims, no other claims, liens or security interests whether prior to or pari passu with, the claims, liens or security interests of the DIP Agent (for the benefit of the DIP Lenders) and the Prepetition Agent (for the benefit of the Prepetition Senior Lenders) shall attach to the DIP Collateral in this or any subsequent or superseding cases (including, without limitation, the conversion of the Cases to cases under chapter 7 of the Code or any other proceeding related hereto or thereto (collectively, "**Successor Cases**")), without the express written consent of the DIP Agent and the Prepetition Agent (which consent may be withheld in their sole discretion). Nothing herein shall be construed to divest the Debtors of control over the exercise or non-exercise of the rights or powers under the Code that may give rise to recoveries under Avoidance Actions whether prior to or following the occurrence of a Termination Date. In addition, except to the extent otherwise expressly set forth in this Amended Final Order or in a written instrument duly executed by the DIP Agent or the Prepetition Agent, no post-petition liens or security interests granted to the DIP Agent or the

22

Prepetition Agent, and no post-petition claim of the DIP Agent, the DIP Lenders, the

Prepetition Agent or the Prepetition Senior Lenders, shall be subject to subordination to

any other liens, security interests or claims under § 510 of the Code or otherwise. Any

security interest or lien upon the DIP Collateral which is avoided or otherwise preserved

for the benefit of any Estate under §551 or any other provision of the Code shall be

subordinate to the post-petition security interests in and liens of the DIP Agent and the

Prepetition Agent on the DIP Collateral.

9.    Automatic Perfection of New Liens. All liens and security interests

granted to the DIP Agent (for the benefit of the DIP Lenders) and the Prepetition Agent (for the

benefit of the Prepetition Senior Lenders) by this Amended Final Order and/or the DIP Credit

Documents shall be, and hereby are, deemed duly perfected and recorded under all applicable

federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation,

possession, further order, acknowledgment, landlord or warehousemen lien waivers or other act,

shall be required to effect such perfection; provided, however, that notwithstanding the

provisions of §362 of the Code, (i) the DIP Agent and the Prepetition Agent may, at their sole

option, file or record or cause the Debtors to execute, file or record, at the Debtors' expense, such

UCC financing statements, notices of liens and security interests, mortgages and other similar

documents or obtain landlord or warehousemen lien waivers or other third party consents as the

DIP Agent and the Prepetition Agent may require, and (ii) the DIP Agent and the Prepetition

Agent may require the Debtors to deliver any chattel paper, instruments or securities evidencing

or constituting any DIP Collateral, and the Debtors are directed to cooperate and comply

therewith. If the DIP Agent and the Prepetition Agent, in their sole discretion, shall elect for any

reason to cause to be obtained any such landlord or warehousemen lien waivers or other third

party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if the DIP Agent and the Prepetition Agent, in their sole discretion, shall elect to take possession of any DIP Collateral, all such landlord or warehousemen lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in the Cases as of the Conversion Date but with the priorities as set forth herein. The DIP Agent and the Prepetition Agent may (in their discretion) but shall not be required to file a certified copy of this Amended Final Order in any filing or recording office in any county or other jurisdiction in which any Debtor has real or personal property and such filing or recording shall be accepted and shall constitute further evidence of perfection of the DIP Agent's and the Prepetition Agent's interests in the DIP Collateral. Neither the granting of the liens and security interests to the DIP Agent and the Prepetition Agent in the DIP Collateral nor the exercise of any rights or remedies by the DIP Agent or the Prepetition Agent in connection therewith will result in any breach, violation or infringement of (i) any trademark, copyright or other intellectual property right of any Debtor or any third party, or (ii) any contract to which any Debtor or any of its properties is subject.

10.    Bankruptcy Code §506(c) Waiver. No costs or expenses of administration or other charge, lien, assessment or claim incurred at any time (including, without limitation, any expenses set forth in the Approved Budget) by the Debtors or any other person or entity shall be imposed against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders, their claims, or their collateral under § 506(c) of the Code or otherwise, unless, prior to incurring such costs or expenses, the party proposing to incur and/or impose such cost or expense shall obtain the written consent of the DIP Agent, the DIP Lenders, the Prepetition Agent or the

Prepetition Senior Lenders (as applicable) allowing such charge to be imposed. Nothing in this
Amended Final Order shall constitute consent by the DIP Agent, the DIP Lenders, the
Prepetition Agent or the Prepetition Senior Lenders to the imposition of any costs or expense of
administration or other charge, lien, assessment or claim (including, without limitation, any
amounts set forth in the Approved Budget) against the DIP Agent, the DIP Lenders, the
Prepetition Agent or the Prepetition Senior Lenders, their claims or their collateral under §506(c)
of the Code or otherwise. Neither the DIP Agent, the DIP Lenders, the Prepetition Agent nor the
Prepetition Senior Lenders shall be subject to the equitable doctrine of "marshaling" or any other
similar doctrine with respect to any of their Prepetition Collateral or DIP Collateral.

11.    Modification of Automatic Stay.

(a)    Except as set forth in subparagraphs (b) and (c) of this Paragraph 11, the
automatic stay pursuant to § 362 of the Code is hereby modified as to the DIP Agent, the
DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders to permit them to
perform in accordance with, and exercise, enjoy and enforce their rights, benefits,
privileges and remedies pursuant to, the DIP Credit Documents and this Amended Final
Order without further application or motion to, or order from the Court, and neither § 105
of the Code nor any other provision of the Code or applicable law shall be utilized to
prohibit the exercise, enjoyment and enforcement of any of such rights, benefits,
privileges and remedies regardless of any change in circumstances (whether or not
foreseeable). The DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition
Senior Lenders are hereby granted, to the extent necessary, leave, among other things, to
(i) receive payments on the DIP Indebtedness and collections on and proceeds of the DIP
Collateral and apply any of same to the DIP Indebtedness in the manner specified in this

25

Amended Final Order and the DIP Credit Documents, and to maintain, create, or change any accounts at any lending institutions as the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders deem necessary or desirable to do so, (ii) file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral, (iii) charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Credit Documents as provided therein, (iv) give the Debtors any notice provided for in any of the DIP Credit Documents or this Amended Final Order, and (v) upon the occurrence of an Event of Default (as defined in the Amended DIP Loan Agreement or any other DIP Credit Document), and without application and motion to, or order from the Court or any other court and without any interference from any Debtor or any other party in interest, (A) terminate the Amended DIP Loan Agreement and/or the other DIP Credit Documents, (B) cease making DIP Loans and/or suspend or terminate the commitments under the DIP Credit Documents, (C) declare all DIP Indebtedness immediately due and payable and/or (D) take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale.

(b)     Upon the occurrence of a Termination Event, and from and after the fifth (5th) business day (the "**Enforcement Date**") after the DIP Agent's delivery of a notice (an "**Enforcement Notice**") to counsel for the Debtors and any Committee of the DIP Lenders' intention to exercise its default-related rights and remedies, (i) the automatic stay pursuant to §362 of the Code will be further modified, to the extent necessary, so as to permit the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders without further application or motion to, or order from, the

26

Court, to take any action recited in this Paragraph 11, and to foreclose or otherwise

enforce their security interests in or liens on any or all of the DIP Collateral and/or

Prepetition Collateral, and/or to exercise any other default-related rights and remedies

under the DIP Credit Documents, the Prepetition Credit Documents, this Amended Final

Order or applicable law, and (ii) neither §105 of the Code nor any other provision of the

Code or applicable law shall be utilized to prohibit the DIP Agent, the DIP Lenders, the

Prepetition Agent or the Prepetition Senior Lenders from exercising or enforcing such

default-related rights and remedies, regardless of any change in circumstances (whether

or not foreseeable). If the Debtors, any Committee or any other person or entity

challenges the occurrence of any Termination Event, any such objector's remedies shall

be and hereby are limited to requesting a hearing before this Court at any time on or prior

to the Enforcement Date (x) solely for the purpose of obtaining a judicial determination

that no Termination Event has occurred and (y) based on any such judicial determination,

seeking to enjoin the DIP Agent, the DIP Lenders, the Prepetition Agent or Prepetition

Senior Lender, as applicable, from exercising any default-related rights and remedies

(other than the actions set forth in 10(a) above). In any such hearing, the sole issue

before the Court shall be whether a Termination Event has occurred and has not been

timely cured (to the extent any such cure is permitted under the terms of the DIP Credit

Documents), and the Debtors, any Committee and any other party that is permitted to

intervene or be heard at such hearing shall be precluded from raising or litigating any

other issue, defense, claim or counterclaim (including, without limitation, any defense or

claim based on adequate protection).

(c)    If the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition

27

Senior Lenders are entitled, and have elected in accordance with the provisions hereof, to
enforce their liens or security interests or exercise any other default-related remedies, and
provided that the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition
Senior Lenders, in their sole discretion, have made available to the Debtors (through
additional DIP Loans or by consenting to the Debtors' use of Cash Collateral) sufficient
funds to pay the reasonable and necessary costs thereof, if any, the Debtors shall
cooperate with the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition
Senior Lenders (as applicable) in connection with such enforcement action by, among
other things, (i) providing at all reasonable times access to the Debtors' premises to
representatives or agents of the DIP Agent, the DIP Lenders, the Prepetition Agent or the
Prepetition Senior Lenders (including any collateral liquidator or consultant),
(ii) providing the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition
Senior Lenders, and their respective representatives or agents, at all reasonable times
access to the Debtors' books and records and any information or documents requested by
the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders
or their respective representatives, (iii) performing all other obligations set forth in the
DIP Credit Documents, and (iv) taking reasonable steps to safeguard and protect the DIP
Collateral, and the Debtors shall not otherwise interfere with or actively encourage others
to interfere with the DIP Agent's, the DIP Lenders', the Prepetition Agent's or the
Prepetition Senior Lenders' enforcement of rights. In addition, at any time after the DIP
Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders is
entitled to relief from the automatic stay, and has elected in accordance with the
provisions hereof, to enforce its liens or security interests or exercise any other default-

28

related remedies, and provided that the DIP Agent, the DIP Lenders, the Prepetition
Agent or the Prepetition Senior Lenders, in their sole discretion, have made available to
the Debtors (through additional DIP Loans or by consenting to the Debtors' use of Cash
Collateral) sufficient funds to pay the reasonable and necessary costs thereof, the Debtors
shall, at the written request of the DIP Agent, the DIP Lenders, the Prepetition Agent or
the Prepetition Senior Lenders, use commercially reasonable efforts to sell or otherwise
dispose of any or all of the Prepetition Collateral and DIP Collateral on terms and
conditions acceptable to the DIP Agent, the DIP Lenders, the Prepetition Agent or the
Prepetition Senior Lenders, and in connection thereof file the appropriate motions for sale
and obtain approval of the Court for each such sale or other disposition, and shall turn
over the proceeds of such sale(s) or other disposition(s) to the DIP Agent, the DIP
Lenders, the Prepetition Agent or the Prepetition Senior Lenders, as applicable, for
application to the DIP Indebtedness and the Prepetition Indebtedness in accordance with
the provisions hereof and the DIP Credit Documents.

        12.     Professional Fees, Administrative Expenses and Other Related Costs.

        (a)     As used herein, the term **"Carve-Out"** shall mean (i) the unpaid fees of
the clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C.
§1930(a) and (b) (the **"Statutory Fees"**), (ii) after delivery to the Debtors and their
counsel of an Enforcement Notice and during the continuance of such Event of Default,
the payment of professional fees and disbursements (the **"Professional Fees and
Disbursements"**) incurred in an amount not to exceed (x) $400,000 for all retained
professionals of the Debtors that are required to file fee applications with the Court in the
aggregate (the **"Debtors' Professionals"**) and (y) $100,000 for all retained professionals

of any official committees in the aggregate (collectively with the Debtors' Professionals, the **"Retained Professionals"**),  (iii) Professional Fees and Disbursements for Retained Professionals incurred prior to the delivery of the Enforcement Notice (but limited to the amounts set forth in the Approved Budget for the time periods and professionals as set forth therein), regardless of when such amounts are approved or paid (provided, however, that the dollar limitation in clause (ii) shall not be reduced by the amount of any Professional Fees and Disbursements incurred, awarded or paid prior to the delivery of the Enforcement Notice); and (iv) all accrued and unpaid allowed administrative expense claims (other than Professional Fees and Disbursements) to the extent contemplated in the Approved Budget.

      (b)      Prior to the earlier of the delivery of an Enforcement Notice or the Termination Date, and to the extent permitted by order of the Court, the Debtors shall promptly pay (subject to final approval and allowance by the Court) to professionals such fees permitted to be paid pursuant to order of the Court, but in no event shall such payments exceed the amounts set forth in the Approved Budget.

      (c)      Notwithstanding anything to the contrary in this Amended Final Order or the DIP Credit Documents, no Cash Collateral, proceeds of DIP Loans or other extensions of credit, or, prior to payment in full in cash of the DIP Indebtedness and Prepetition Indebtedness, any DIP Collateral or Prepetition Collateral (or proceeds thereof) may be used to pay, any claims for services rendered by any professional in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination,

30

declaration or similar relief (i) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Indebtedness or Prepetition Indebtedness, or the DIP Agent's or the Prepetition Agent's liens and security interests in the Prepetition Collateral or DIP Collateral, (ii) for monetary, injunctive or other affirmative relief against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders, or (iii) preventing, hindering or otherwise delaying the exercise by the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders of any of their respective rights and remedies under this Amended Final Order, the Prepetition Credit Documents, the DIP Credit Documents or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of this Court, or otherwise) by the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders upon any Prepetition Collateral or other DIP Collateral. The dollar amounts available to be paid under the Carve-Out shall be deemed reduced to the extent proceeds of any DIP Loans or proceeds of any Prepetition Collateral or DIP Collateral are used to pay (i) fees or expenses of any professionals arising from and after the delivery of an Enforcement Notice and (ii) any post Petition Date retainer of any estate professionals. The DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders retain any and all rights as parties in interest to object to any claims of any professionals.

(d)      The DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders retain any and all rights as parties in interest to object to any claims of any Retained Professionals.

13.      <u>Release</u>. The Debtors and their Estates hereby release and discharge the

31

Prepetition Agent and the Prepetition Senior Lenders, together with any of their respective
affiliates, agents, attorneys, officers, directors and employees, from any and all claims and causes
of action arising out of, based upon or related to, in whole or in part, (a) any of the Prepetition
Credit Documents, (b) any aspect of the pre-petition relationships between the Debtors or their
affiliates relating to any of the Prepetition Credit Documents or any transaction contemplated
thereby, or (c) any other acts or omissions by a Prepetition Senior Lender in connection with any
of the Prepetition Credit Documents, or its pre-petition relationship with the Debtors or any of
their affiliates relating to any of the Prepetition Credit Documents or any transaction
contemplated thereby.

        14.    [Intentionally Omitted.]

        15.    Access; Reports. Until the DIP Indebtedness and Prepetition Indebtedness
has been paid in full in cash, the Debtors shall (i) at all reasonable times provide the DIP Agent
and the Prepetition Agent with access to the Debtors' books and records consistent with the
requirements contained in the DIP Credit Documents and the Prepetition Loan Documents, and
(ii) deliver to the DIP Agent and the Prepetition Agent the information set forth in the Amended
DIP Loan Agreement with copies to the Committee's counsel.

        16.    Use of Proceeds of DIP Financing and Cash Collateral.

        (a)    Subject to the terms and conditions set forth below, and except as the DIP
Agent and the Prepetition Agent otherwise consent in writing, Cash Collateral and funds
borrowed under the Amended DIP Loan Agreement shall be used by the Debtors solely
for the purposes and up to the amounts set forth in the Approved Budget for the
applicable line item during the applicable seven-day period:

(i)     For each period beginning on the Conversion Date and ending on

the last day of each seven-day period set forth in the Approved

Budget, the aggregate cumulative disbursements by the Debtors

under the Approved Budget as a whole shall not exceed one

hundred ten percent (110%) of the aggregate cumulative amount

budgeted for such cumulative time period pursuant to the

Approved Budget.

(ii)    For each period beginning on the Conversion Date and ending on

the last day of each seven-day period set forth in the Approved

Budget, the aggregate cumulative disbursements by the Debtors

under any disbursement line item in the Approved Budget for any

seven-day period shall not exceed one hundred ten percent (110%)

of the aggregate cumulative amount budgeted for such cumulative

time period pursuant to the Approved Budget.

(b)     To the extent any additional line item is added to the Approved Budget in

accordance with the provisions of this Amended Final Order, such line items shall be

subject to such variance provisions as the Debtors, the DIP Agent and the Prepetition

Agent may mutually agree in writing in their respective sole discretion.

(c)     The tests set forth (a) above shall not fail as a result of any excess related

solely to amounts budgeted for the DIP Agent, the DIP Lenders, the Prepetition Agent or

the Prepetition Senior Lenders professionals.

(d)     The DIP Agent, the DIP Lenders, the Prepetition Agent and the

Prepetition Senior Lenders (i) may assume the Debtors will comply with the Approved

33

Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral or Prepetition Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the DIP Agent and the DIP Lenders are estimates only, and the Debtors remain obligated to pay any and all DIP Indebtedness in accordance with the terms of the DIP Credit Documents and this Amended Final Order. All advances and extensions of credit shall be based upon the terms and conditions of the Amended DIP Loan Agreement, as the same may be adjusted from time to time. The DIP Agent and the DIP Lenders shall have the right but not the obligation to extend credit independent of any Approved Budget line item restrictions on loan availability set forth in the Amended DIP Loan Agreement, and all such DIP Loans shall be entitled to the benefits and protections of this Amended Final Order.

17.    <u>Application of Collateral Proceeds</u>. Except to the extent the DIP Agent and the Prepetition Agent otherwise direct in writing, upon the sale or other disposition of the DIP Collateral, all proceeds of DIP Collateral (including Prepetition Collateral) shall be applied as follows: (a) <u>first</u>, to fund the Carve-Out, (to the extent applicable); (b) <u>second</u>, to repay all fees and expenses incurred by the DIP Agent and the DIP Lenders pursuant to the Amended DIP Loan Agreement; (c) <u>third</u>, to repay the DIP Indebtedness, (d) <u>fourth</u>, to repay all adequate protection claims of the Prepetition Agent and the Prepetition Senior Lenders pursuant to this Amended Final Order and the Stipulation and Order (I) Authorizing the Use of Cash Collateral Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364 and (II) Granting Adequate Protection Pursuant to Sections 361 and 363 entered May 15, 2007; (e) <u>fifth</u>, to repay the

34

Prepetition Indebtedness; (f) <u>sixth</u>, to repay all fees and expenses incurred by the Prepetition

Agent and the Prepetition Senior Lenders pursuant to the Prepetition Credit Documents; and (g)

<u>seventh</u>, thereafter, to the Debtors' estates.

18.    <u>No Requirement to Accept Title to Collateral</u>.  Neither the DIP Agent, the

DIP Lenders, the Prepetition Agent nor the Prepetition Senior Lenders shall be obligated to

accept title to any portion of the DIP Collateral or Prepetition Collateral in payment of any of the

Prepetition Indebtedness or DIP Indebtedness, in lieu of payment in cash or cash equivalents, nor

shall the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Senior Lenders be

obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any

other person or entity.

19.    <u>Affiliate Payments</u>.  Except as otherwise agreed in writing by the DIP

Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders in their sole

discretion, the Debtors shall not make any loans, advances, distributions, transfers or other

payments of any kind whatsoever to any insider or affiliate, including any equity interest holder,

without prior order of the Bankruptcy Court.

20.    <u>Effect of Plan</u>.  The provisions of the DIP Credit Documents and of this

Amended Final Order and any actions taken pursuant thereto or hereto, and the liens, super-

priority administrative claims, rights and remedies granted to the DIP Agent, the DIP Lenders,

the Prepetition Agent and the Prepetition Senior Lenders pursuant to this Amended Final Order

and the DIP Credit Documents, shall not be modified, altered or impaired in any manner by, and

shall survive entry of any order confirming any plan of reorganization or liquidation in the Cases

(and, to the extent not satisfied in full in cash, the DIP Indebtedness and Prepetition Indebtedness

shall not be discharged by the entry of any such order, or pursuant to §1141(d)(4) of the Code,

35

the Debtors having hereby waived such discharge), and the terms and provisions of this

Amended Final Order as well as the super-priority administrative claims and liens granted

pursuant to this Amended Final Order and the DIP Credit Documents shall continue in full force

and effect notwithstanding the entry of such order, and such super-priority administrative claims

and liens shall maintain their priority as provided by this Amended Final Order until all of the

DIP Indebtedness and Prepetition Indebtedness is indefeasibly paid in full in cash and

discharged. The liens, security interests, rights and remedies granted to the DIP Agent (for the

benefit of the DIP Lenders) and the Prepetition Agent (for the benefit of the Prepetition Senior

Lenders) pursuant to this Amended Final Order and the DIP Credit Documents shall not be

modified, altered or impaired in any manner by any plan of reorganization or liquidation for

Debtors.

21.     Authorized Signatories. The signatures of one or more of the officers of

the Debtors appearing on any one or more of the DIP Credit Documents to be executed after the

entry of this Amended Final Order shall bind the Debtors. No further board of directors or other

approval shall be necessary.

22.     No Waiver.

(a)     The Prepetition Agent and the Prepetition Senior Lenders may petition this

Court for any such additional adequate protection or other protection as they may require

with respect to the Prepetition Indebtedness. Except as otherwise specifically provided

herein, the Prepetition Agent and the Prepetition Senior Lenders do not waive any rights

they have pursuant to the Prepetition Credit Documents, and the Prepetition Agent and

the Prepetition Senior Lenders shall retain all rights available pursuant to the Code or any

other applicable law.

(b)    The rights and obligations of the Debtors and the rights, claims, liens,

security interests and priorities of the DIP Agent, the DIP Lenders, the Prepetition Agent

and the Prepetition Senior Lenders arising under this Amended Final Order are in

addition to, and not intended as a waiver or substitution for, the rights, obligations,

claims, liens, security interests and priorities granted by the Debtors under the DIP Credit

Documents and the Prepetition Credit Documents. The DIP Agent's, the DIP Lenders',

the Prepetition Agent's or the Prepetition Senior Lenders' failure, at any time or times

hereafter, to require strict performance by the Debtors (or by any Chapter 7 or Chapter 11

trustee or estate representative hereinafter appointed in the Cases or any Successor Cases)

of any provision of this Amended Final Order, the Prepetition Credit Documents or DIP

Credit Documents shall not waive, affect or diminish any right to demand strict

compliance and performance therewith. No delay on the part of the DIP Agent, the DIP

Lenders, the Prepetition Agent or the Prepetition Senior Lenders in the exercise of any

right or remedy under this Amended Final Order, the Prepetition Credit Documents or the

DIP Credit Documents shall preclude any other or further exercise of any such right or

remedy or the exercise of any other right or remedy. None of the rights or remedies of

the DIP Agent, the DIP Lenders, the Prepetition Agent or Prepetition Senior Lender

under this Amended Final Order, the Prepetition Credit Documents or the DIP Credit

Documents shall be deemed to have been suspended or waived unless such suspension or

waiver is in writing, signed by a duly authorized officer of the DIP Agent, the DIP

Lenders, the Prepetition Agent or Prepetition Senior Lender, as applicable, and directed

to the Debtors specifying such suspension or waiver.

23.    Service of Pleadings; Other Reports and Data. Debtors shall deliver to the

DIP Agent, the Prepetition Agent and their respective counsel, as soon as is practicable, copies of any pleading, notice of other document filed by the Debtors in the Cases.

24.    <u>Notices</u>.  During the pendency of the Cases, any notice given to the Debtors, the DIP Agent or the Prepetition Agent under this Amended Final Order or the DIP Credit Documents will be effective if given by facsimile, U.S. mail, overnight courier or messenger, or electronic mail addressed as follows:

If to the DIP Agent or the Prepetition Agent:

> D.B. Zwirn Special Opportunities Fund, L.P.
> 745 5th Avenue
> New York, New York  10151
> Attention:  Steve Campbell
> (scampbell@dbzco.com)
> Facsimile:  (646) 720-9074

with a copy to:
> Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd.
> 55 East Monroe Street, Suite 3300
> Chicago, Illinois  60603-5792
> Attention: Ronald Barliant, Esq.
> (ronald.barliant@goldbergkohn.com)
> Facsimile:  (310) 863-9880

with a copy to:
> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York  10022
> Attention:  Adam C. Harris, Esq.
> (adam.harris@srz.com)
> David M. Hillman, Esq.
> (david.hillman@srz.com)
> Facsimile:  (212) 593-5955

If to the Debtors, to:
> Millcreek Broadcasting L.L.C.
> 980 North Michigan Drive
> Suite 1880
> Chicago, Illinois  60611
> Attention:  Bruce Buzil
> (bbuzil@marathonmedia.com)
> Christopher Devine
> (cdevine@marathonmedia.com)
> Facsimile:  312-587-9520

and

with a copy to:      Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
Attention: Timothy R. Pohl (tpohl@skadden.com)
Facsimile: (312) 407-0700

or to such other address as each party may designate for itself by like notice. Any such notice,

demand, or request shall be deemed given when received if personally delivered or sent by

overnight courier, or when deposited in the United States mails, postage paid, if sent by

registered or certified mail.

25.    Amended Final Order Binding On Successors. The provisions of this

Amended Final Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP

Lenders, the Prepetition Agent, the Prepetition Senior Lenders, the Debtors and their respective

successors and assigns (including any trustee or other estate representative appointed as a

representative of any Estate or of the estate in any Successor Case). Except as otherwise

explicitly set forth in this Amended Final Order, no third parties are intended to be or shall be

deemed third party beneficiaries of this Amended Final Order or the DIP Credit Documents.

26.    No Dismissal. If these cases are dismissed, converted, otherwise

superseded or substantively consolidated, the DIP Agent, the DIP Lenders, the Prepetition Agent

or the Prepetition Senior Lenders' rights and remedies under this Amended Final Order and the

DIP Credit Documents shall be and remain in full force and effect as if such Cases had not been

filed or such Cases had not been dismissed, converted or superseded. Furthermore,

notwithstanding any such dismissal, conversion, supercission or consolidation, all of the terms

and conditions of this Amended Final Order, including, without limitation, the liens and the

priorities granted hereunder, shall remain in full force and effect.

27.    Effect of Modification of Amended Final Order. It having been found that

permitting Cash Collateral usage and making DIP Loans and other financial accommodations to the Debtors to be in good faith, the DIP Agent, the DIP Lenders, the Prepetition Agent or Prepetition Senior Lender shall be entitled to the full protection of § 364(e) of the Code with respect to the DIP Indebtedness and Prepetition Indebtedness and the liens and priorities created or authorized by this Amended Final Order in the event that this Amended Final Order or any authorization contained herein is stayed, vacated, reversed or modified on appeal. Each of the terms and conditions set forth in this Amended Final Order constitutes a part of the authorization under § 364 of the Code, and is therefore, subject to the protections contained in § 364(e) of the Code. Any stay, modification, reversal or vacatur of this Amended Final Order shall not affect the validity of any DIP Indebtedness or Prepetition Indebtedness outstanding immediately prior to the effective time of such stay, modification or vacatur, or the validity or enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such DIP Indebtedness or Prepetition Indebtedness. Notwithstanding any such stay, modification or vacatur, any DIP Indebtedness or Prepetition Indebtedness outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Amended Final Order, and the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Senior Lenders shall be entitled to all of the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such DIP Indebtedness and Prepetition Indebtedness.

        28.    Controlling Effect of Amended Final Order. In the event of any conflict between the terms and provisions of this Amended Final Order and the DIP Credit Documents, the terms and provisions of this Amended Final Order shall control; provided, however, to the extent that specific provisions of this Amended Final Order expressly contradict or expressly

limit specific provisions of the DIP Credit Documents, nothing in this Amended Final Order

shall be construed as limiting any rights and remedies of the DIP Agent or the DIP Lenders, or

the obligations of the Debtors, under the DIP Credit Documents.

29.    Amended Final Order Effective.  This Amended Final Order shall be

effective as of the date of signature by the Court, and the Clerk of the Court is hereby directed to

enter this Amended Final Order on the docket of this Court maintained in regard to these Cases.

**IT IS SO ORDERED.**

Dated:  June 17, 2008

Jacqueline P. Cox

_____J. Cox_____
UNITED STATES BANKRUPTCY JUDGE

41

# Exhibit A

# AMENDED AND RESTATED
## DEBTOR-IN-POSSESSION
## REVOLVING LOAN PROMISSORY NOTE

$3,500,000.00

New York, New York
Dated as of May 29, 2008

FOR VALUE RECEIVED, **MILLCREEK BROADCASTING, L.L.C.** ("Millcreek" or "Administrative Borrower"), **3 POINT MEDIA - UTAH, LLC** ("3 Point Utah"), **3 POINT MEDIA - FRANKLIN, LLC** ("3 Point Franklin") and **3 POINT MEDIA - DELTA, LLC** ("3 Point Delta," together with Millcreek, 3 Point Utah, and 3 Point Franklin, the "Borrowers" or the "Debtors") hereby promise to pay to D. B. Zwirn Special Opportunities Fund, L.P., as agent (the "Agent") for the financial institutions from time to time parties hereto as lenders (the "Lenders"), (i) the principal sum of three million, five hundred thousand dollars ($3,500,000.00), or, if less, the aggregate unpaid principal amount of all Revolving Loans (as hereinafter defined) made by the Agent (in its sole and absolute discretion) to the Borrowers, and (ii) interest on any and all principal amounts remaining unpaid hereunder from time to time outstanding from the date hereof until such principal amounts become due, at a rate per annum equal to the Interest Rate (as hereinafter defined) in effect from time to time, in the manner and at the place hereinafter provided on the Maturity Date. This Amended and Restated Note ("Note") amends, supplements, modifies and completely restates and replaces the Revolving Loan Promissory Note, dated June 13, 2007, among the Borrowers and the Agent (as amended or otherwise modified prior to the date hereof, the "Existing Note"), but shall not constitute a payment, release, satisfaction or novation of any of the obligations under the Existing Note or any of the other Loan Documents. All amounts outstanding under the Existing Note shall automatically be deemed outstanding hereunder.

1.     Definitions. The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"3 Point - Delta" shall have the meaning given such term in the recital to this Note.

"3 Point - Franklin" shall have the meaning given such term in the recital to this Note.

"3 Point - Utah" shall have the meaning given such term in the recital to this Note.

"Agent" shall have the meaning given such term in the recital to this Note.

"Bankruptcy Code" shall mean chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Illinois (Eastern Division).

"Borrower" and "Borrowers" shall have the meaning given such term in the recital to this Note.

"Broadcast Licenses" means, with respect to any radio station, all applications, requests, licenses, authorizations, consents, permits and approvals (including, without limitation, all FCC and FAA applications, requests, licenses, authorizations, consents, permits and approvals) necessary for the lawful operation of such radio station, including any amendments, modifications, consents or additional authorizations issued from time to time.

"Budget" means the monthly budget for Borrowers comprised of weekly cash flow statements through January 3, 2009, a copy of which is attached hereto as Exhibit A.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Cash Collateral" shall mean "cash collateral" as that phrase is defined in Section 363(a) of the Bankruptcy Code.

"Chapter 11 Case" and "Chapter 11 Cases" means the chapter 11 cases of 3 Point Delta (07-03122), 3 Point Franklin (07-03123), 3 Point Utah (07-03125) and Millcreek (07-03121).

"Closing Fee" shall have the meaning given such term in Section 8 of this Note.

"Collateral" shall mean the assets and property covered by the First Amended Final Order and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of Lenders, to secure the Obligations. Without limiting the foregoing, the Collateral shall include all present and future property of each Borrower under Section 541(a) of the Bankruptcy Code (including, without limitation, avoidance actions) and all proceeds thereof.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 13 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations, including the First Amended Final Order.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make its portion of the Revolving Loans to the Borrowers in the principal amount set forth on the signature page to the Note for each Lender, as the same may be terminated or reduced from time to time in accordance with the terms of the Note.

"Communications Laws" means all applicable provisions of (i) the Communications Act, and (ii) the rules, regulations, published policies and published decisions promulgated and in effect from time to time (A) under the Communications Act, and (B) by the FCC.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (ii) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (iii) any obligation of such Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(d) of this Note.

"Designated Account" shall mean account number #900205807, ABA routing number 124001545 maintained by the Borrowers with JPMorgan Chase Bank, N.A. in Salt Lake City, Utah or such other deposit account of Borrowers (located in the United States) that has been designated as such in writing by Borrowers to Lenders.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Event of Default" shall have the meaning given such term in Section 17 of this Note.

"Existing Note" shall the meaning given such term in the recital to this Note.

"Extraordinary Receipts" means any cash received by Borrowers not in the ordinary course of business (and not consisting of proceeds described Sections 7(b) and (c) hereof), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or

-3-

other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any purchase agreement.

"FAA" means the Federal Aviation Administration or any successor to the functions and powers thereof.

"FCC" means the Federal Communications Commission or any successor to the functions and powers thereof.

"FCC License" means the broadcast licenses issued to Borrowers by the FCC with respect to a Station.

"Facility Fee" shall have the meaning given such term in Section 8 of this Note.

"Final Order" shall mean the Final Order (1) Authorizing Debtors, As Debtors In Possession, To (A) Use Cash Collateral, And (B) Incur Post-Petition Secured Indebtedness, (2) Granting Security Interests And Super-Priority Claims Pursuant To 11 U.S.C. Sections 364(C) & (D), (3) Granting Adequate Protection Pursuant To 11 U.S.C Sections 361 And 363, (4) Modifying Automatic Stay And (5) Setting Final Hearing entered by the Bankruptcy Court on June 19, 2007 (Docket Entry No. 97).

"First Amended Final Order" shall mean the First Amended Final Order (1) Authorizing Debtors, As Debtors In Possession, To (A) Use Cash Collateral, And (B) Incur Post-Petition Secured Indebtedness, (2) Granting Security Interests And Super-Priority Claims Pursuant To 11 U.S.C. Sections 364(C) & (D), (3) Granting Adequate Protection Pursuant To 11 U.S.C Sections 361 And 363, (4) Modifying Automatic Stay And (5) Setting Final Hearing, together with all extensions, modifications and amendments thereto, authorizing Borrowers to obtain credit, incur Indebtedness, and grant Liens under this Note and the other Loan Documents, all as set forth in such order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Indebtedness" shall mean, without duplication, with respect to any Person, (i) all indebtedness of such Person for borrowed money; (ii) all obligations of such Person for the deferred purchase price of property or services (other than trade payables, payables to vendors or other account payables incurred in the ordinary course of such Person's business and not past due for more than 90 days after the date such payable was created); (iii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (iv) all obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or Lenders thereunder are limited to repossession or sale of such property; (v) all capitalized lease obligations of such Person; (vi) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (vii) all obligations and liabilities, calculated on a basis reasonably satisfactory to Lenders and in accordance with accepted practice, of such Person under interest rate or currency swaps and other derivatives;

-4-

(viii) all Contingent Obligations; (ix) all other items which, in accordance with GAAP, would be included as liabilities on the liability side of the balance sheet of such Person; and (x) all obligations referred to in clauses (i) through (ix) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Interest Payment Date" shall mean the first Business Day of each month to occur while any Revolving Loans are outstanding; provided that, in addition to the foregoing, each of (x) the date upon which all of the Revolving Loans have been paid in full and (y) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Interest Rate" means a rate of interest equal to 15% per annum.

"Inventory" means, with respect to any Person, all goods and merchandise of such Person, including, without limitation, all raw materials, work-in-process, packaging, supplies, materials and finished goods of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other similar property the sale or other disposition of which would give rise to an account receivable or cash.

"Lenders" shall have the meaning given such term in the recital to this Note.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Loan Account" means an account maintained hereunder by Agent on its books of account at the Payment Office, and with respect to Borrowers, in which the Borrowers will be charged with all Revolving Loans made to, and all other Obligations incurred by, Borrowers.

"Loan Documents" shall mean the Note, the Collateral Documents, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, Lenders and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Borrower, or any employee of any Borrower, and delivered to Lenders in connection with the Note or the transactions contemplated thereby. Any reference in this Note or any other Loan Document to a Loan Document shall include all appendices, exhibits or

-5-

schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"<u>Material Adverse Deviation</u>" shall mean (i) the aggregate expenditures by the Borrowers for any Budget period shall exceed, without the prior written consent of Lenders, the aggregate amount budgeted for such period as set forth in the Budget by more than a factor of ten percent (10%) of such aggregate amount or (ii) the Borrowers' expenditures shall exceed the Budget amount for any line item by more than a factor of ten percent (10%) of the budgeted amount for such line item.

"<u>Material Adverse Effect</u>" means a material adverse effect on (i) the operations, business assets or properties or condition (financial or otherwise) of any Borrower or of the Borrowers taken as a whole (other than those resulting solely from the commencement of the Chapter 11 Cases), (ii) the ability of any Borrower to perform any of its obligations under any Loan Document to which it is a party (other than those resulting solely from the commencement of the Chapter 11 Cases), (iii) the legality, validity or enforceability of this Note or any other Loan Document, (iv) the rights and remedies of Lenders under any Loan Document, or (v) the validity, perfection or priority of a Lien in favor of Lenders on any of the Collateral.

"<u>Maturity Date</u>" means the earliest of: (i) the close of business on September 30, 2008; (ii) the consummation of a sale of substantially all of the Debtors' assets pursuant to § 363 of the Bankruptcy Code; or (iii) a Termination Event (as defined in the First Amended Final Order, as may be applicable).

"<u>Maximum Amount</u>" shall have the meaning given such term in Section 2 of this Note.

"<u>Millcreek</u>" shall have the meaning given such term in the recital of this Note.

"<u>Note</u>" shall have the meaning given such term in the recital to this Note.

"<u>Notice of Revolving Advance</u>" shall have the meaning given such term in Section 2 of this Note.

"<u>Obligations</u>" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrowers to Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the Note or any of the other Loan Documents. This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrowers under the Note or any of the other Loan Documents.

"<u>Other Taxes</u>" shall have the meaning given such term in Section 10 of this Note.

"<u>Payment Office</u>" means such office or offices of a Lenders as may be designated in writing from time to time by such Lenders to Borrowers.

-6-

"Permitted Encumbrances" shall mean the following encumbrances: (a) Liens for taxes or assessments or other governmental charges not yet due and payable; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Borrower is a party as lessee made in the ordinary course of business; (d) inchoate and unperfected workers', mechanics' or similar liens arising in the ordinary course of business, so long as such Liens attach only to equipment, fixtures or real estate; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Borrower is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) purchase money security interests and capital leases incurred prior to the Petition Date; (h) Liens pursuant to the Prepetition Loan Agreement and (i) the Liens in favor of the Lenders securing the Obligations.

"Permitted Indebtedness" shall mean: (a) current Indebtedness maturing in less than 90 days and incurred in the ordinary course of business for supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other Loan Documents; (c) Prepetition Indebtedness; (d) deferred taxes and other expenses incurred in the ordinary course of business; (e) other Indebtedness listed in the Budget and (f) administrative expenses of Borrowers for which the Bankruptcy Court has not directed payment.

"Permitted Priority Encumbrances" shall mean all Permitted Encumbrances other than the Liens permitted under clauses (a), (d) and (h) of the definition of the term "Permitted Encumbrances."

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Prepetition Indebtedness" shall mean all Indebtedness of Borrowers incurred or assumed prior to the Petition Date.

"Prepetition Loan Agreement" means that certain Amended and Restated Financing Agreement, dated as of July 31, 2003, among Borrowers, the financial institutions from time to time party thereto and D. B. Zwirn Special Opportunities Fund, L.P. (f/k/a Highbridge/Zwirn Special Opportunities Fund, L.P.), as agent, as amended, modified or supplemented through the Petition Date.

"Prepetition Senior Secured Lenders" means the Lenders party to the Prepetition Loan Agreement.

"Pro Rata Share" means with respect to a Lender's obligation to make Revolving Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such Lender's Commitment by (ii) the Maximum Amount.

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Revolving Loan" shall have the meaning given such term in Section 2 of this Note.

"Stations" means radio broadcast stations (i) KUUU (FM), Tooele, Utah (FCC Facility ID No. 37876 (ii) KUDE (FM), Nephi, Utah (FCC Facility ID No. 72769); (iii) KUDD (FM), Roy, Utah (FCC Facility ID No. 33438); (iv) KAUU (FM) (formerly KNJQ (FM)), Manti, Utah (FCC Facility ID No. 59034); (v) KYLZ (FM) (formerly KBNZ), Tremonton, Utah (FCC Facility ID No.20304); (vi) KOAY (formerly KFMS (FM)), Coalville, Utah (FCC Facility ID No. 87974); and (vii) KMGR (FM) Delta, Utah (FCC Facility ID No. 65377).

"Stock" shall mean all shares, options, warrants, general or limited partnership interests or other equivalents (regardless of how designated) of or in a corporation, partnership or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act).

"Stockholder" shall mean with respect to any Person, each holder of Stock of such Person.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

2.    Revolving Advances.

(a)    Subject to the terms and conditions hereof, Lenders shall make available to Borrowers, from time to time until the Maturity Date, advances (each, a "Revolving Advance" or a "Revolving Loan"). The aggregate amount of Revolving Loans outstanding shall not exceed at any time three million, five hundred thousand dollars ($3,500,000.00) (the "Maximum Amount"). The obligation of each Lender to make Revolving Loans under this Note shall be several and not joint and several. Until the Maturity Date, Borrowers may from time to time borrow, repay and reborrow under this Section 2, provided, that, the Debtors shall only be permitted (i) to borrow to pay professional fees set forth in the Approved Budget, (ii) for all items other than professional fees, to borrow an amount equal to the succeeding 2 week projection contained in an Approved Budget in any one borrowing and (iii) for all items other than professional fees, to borrow once every 2 weeks; provided, further, that the Agent and Lenders may in their sole discretion lend more often than once every 2 weeks. Each Revolving Loan shall be made on notice by Administrative Borrower to the Agent at the address specified in Section 20(a) hereof or such other person or persons designated by the Lenders in writing to Borrowers. Any such notice must be given no later than 11:00 a.m. (New York time) on the date that is at least one (1) Business Day prior to the date of the proposed Revolving Loan. Each such notice (a "Notice of Revolving Advance") shall be given in writing (by telecopy or overnight