## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN  DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 07-03121 through |
| | ) | 07-03123 and 07-03125 |
| | ) | |
| MILLCREEK BROADCASTING, L.L.C., | ) | Chapter 11 |
| et al.,[1] | ) | |
| Debtors. | ) | Hon. Jacqueline P. Cox |
| | ) | |
| | ) | Hearing Date:  Jan. 13, 2011 |
| | ) | Hearing Time:  10:30 a.m. |
| | ) | Objection Deadline:  Jan. 7, 2011 at 5:00 |
| | | p.m. (Central) |

## NOTICE OF APPLICATION

Please take notice that on December 21, 2010, Skadden, Arps, Slate, Meagher & Flom LLP filed the **SECOND AND FINAL FEE APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AS COUNSEL TO THE DEBTORS, SEEKING (I) INTERIM ALLOWANCE AND PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF CHARGES AND DISBURSEMENTS INCURRED AS COUNSEL TO THE DEBTORS FOR THE INTERIM PERIOD OF SEPTEMBER 1, 2008 THROUGH NOVEMBER 30, 2010, AND (II) FINAL APPROVAL OF THE PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF CHARGES FOR THE PERIOD OF MAY 15, 2007 THROUGH NOVEMBER 30, 2010.**

Dated:  December 21, 2010

> SKADDEN, ARPS, SLATE,
>  MEAGHER & FLOM LLP
> Matthew M. Murphy (ARDC No. 06257958)
> Jonathan G. Pfleeger (ARDC No. 06280869)
> 155 N. Wacker Drive
> Chicago, Illinois  60606
> (312) 407-0700
>
> */s/ Matthew M. Murphy*
> Attorneys for Debtors
> and Debtors-in-Possession

---

[1]   The Debtors consist of:  Millcreek Broadcasting, L.L.C. (EIN: 36-4265091); 3 Point Media – Delta, L.L.C. (EIN: 61-1421503); 3 Point Media – Franklin, L.L.C. (EIN: 36-4499087) and 3 Point Media – Utah, L.L.C. (EIN: 36-4470799).

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN  DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 07-03121 through |
| | ) | 07-03123 and 07-03125 |
| | ) | |
| MILLCREEK BROADCASTING, L.L.C., | ) | Chapter 11 |
| et al.,[1] | ) | Hon. Jacqueline P. Cox |
| Debtors. | ) | |
| | ) | Hearing Date:  Jan. 13, 2011 |
| | ) | Hearing Time:  10:30 a.m. |
| | ) | Objection Deadline:  Jan. 7, 2011 at 5:00 |
| | | p.m. (Central) |

**SECOND AND FINAL FEE APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AS COUNSEL TO THE DEBTORS, SEEKING (I) INTERIM ALLOWANCE AND PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF CHARGES AND DISBURSEMENTS INCURRED AS COUNSEL TO THE DEBTORS FOR THE INTERIM PERIOD OF SEPTEMBER 1, 2008 THROUGH NOVEMBER 30, 2010, AND (II) FINAL APPROVAL OF THE PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF CHARGES FOR THE PERIOD OF MAY 15, 2007 THROUGH NOVEMBER 30, 2010**

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), counsel for Millcreek Broadcasting, L.L.C. ("Millcreek"), 3 Point Media – Utah, L.L.C. ("3 Point Utah"), 3 Point Media – Franklin, L.L.C. ("3 Point Franklin"), and 3 Point Media – Delta, L.L.C., ("3 Point Delta"), chapter 11 debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), submits this second and final application (the "Final Application") under 11 U.S.C. §§ 330 and 331 seeking (i) interim allowance and payment for services rendered and reimbursement of charges and disbursements incurred for the period from September 1, 2008 through and including November 30, 2010 (the "Final Interim Application Period"), in the amount of $243,614 in fees and $8,193 in

---

[1]     The Debtors consist of:  Millcreek Broadcasting, L.L.C. (EIN: 36-4265091); 3 Point Media – Delta, L.L.C. (EIN: 61-1421503); 3 Point Media – Franklin, L.L.C. (EIN: 36-4499087) and 3 Point Media – Utah, L.L.C. (EIN: 36-4470799).

charges and disbursements, and (ii) final allowance and payment for services rendered and reimbursement of charges and disbursements incurred during the entirety of these Chapter 11 Cases, for the period from May 15, 2007 through and including November 30, 2010 (the "Case Period"), in the amount of $1,110,609 in fees and $23,368 in charges and disbursements.[2]  In support of this Final Application, Skadden represents as follows:

## **BACKGROUND**

1.       On February 22, 2007, (the "Petition Date"), four creditors filed involuntary chapter 11 petitions against each of the Debtors in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., as amended (the "Bankruptcy Code").  On May 15, 2007 (the "Relief Date"), the Court entered the orders for relief.

2.       On May 24, 2007, an official committee of unsecured creditors was appointed by the United States Trustee in these Chapter 11 Cases.  No trustee or examiner has been appointed in any of the Debtors' Chapter 11 Cases.

3.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[2]    As of the filing of this Final Application, the parties have not yet closed on the Sale (defined herein) and are still waiting on the requisite period to elapse for the FCC to reconsider, if at all, the approval of the transfer of licenses to the new buyer.  The Debtors anticipate that the closing of the Sale will occur by the hearing to approve this Final Application.  Although this Final Application seeks approval of fees (both on an interim and final basis) through November 30, 2010, Skadden anticipates incurring, and thus, being reimbursed by the Debtors, attorney's fees and costs in connection with the closing of the Sale in an amount not to exceed $35,000 in the aggregate (the "Additional Fees and Expenses").  Skadden is requesting by this Final Application that such Additional Fees and Expenses, to the extent incurred and reimbursed, also be approved on an interim and final basis by this Court.

4.      The statutory predicates for the relief requested herein are Sections 330 and

331 of the Bankruptcy Code and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

## OVERVIEW OF THE DEBTORS' BUSINESS

5.      Founded in 1998, the Debtors operate FM radio stations in and around Salt

Lake City, Utah.  The Debtors consist of four Illinois Limited Liability Companies: Millcreek, 3

Point Media – Delta, 3 Point Media – Franklin and 3 Point Media – Utah, which operate together

from a single facility in Salt Lake City.  As of the Relief Date, Salt Lake City was ranked as the

31st largest radio market in the United States.  The Debtors are comprised of (a) an operating

segment that runs multiple FM stations that are currently on-air and producing revenue and cash

flow and has a total audience share of approximately 6%-7% of the Salt Lake City radio market,

and (b) a developmental segment which includes Federal Communications Commission ("FCC")

granted licenses and construction permits for additional FM radio stations.

## THE SALE PROCESS

6.      With the anticipated closing of the Sale (defined below) at the beginning of

January, the Debtors, through the significant efforts of Skadden and the other parties in interest in

these cases, will have achieved the best possible result for their estates – a surviving go-forward

business.  In fact, the Debtors, with the assistance of their advisors, including Skadden, determined

during the early stages of these Chapter 11 Cases that the most viable option for maximizing the

value of their estates is through a sale (the "Sale") of substantially all of their assets (the

"Purchased Assets"), pursuant to an asset purchase agreement (the "Asset Purchase Agreement"),

to SLC Radio, LLC ("SLC Radio") an entity formed by D.B. Zwirn Special Opportunities Fund,

L.P. (f/k/a Highbridge/Zwirn Special Opportunities Fund, L.P.) and the financial institutions from time to time signatory to that certain prepetition credit agreement dated as of May 13, 2003 (the "Prepetition Senior Lenders").  As a result, on July 23, 2007, the Debtors filed their Motion for Order (A) Approving the Sale of Substantially All Assets, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Procedures for Establishment of Cure Amounts and (D) Approving Form of Notice (the "Sale Motion") [Docket No. 125].  The Court approved the Sale Motion by an Order entered October 19, 2007 (the "Initial Sale Order") [Docket No. 226].

7.     Although the Debtors worked diligently with the Prepetition Senior Lenders in an effort to complete the Sale, SLC Radio was unable to close on the acquisition of the Purchased Assets.  In response to these difficulties, earlier this year, the Debtors and Prepetition Senior Lenders began discussing an alternative sale transaction in which Simmons Media Group, LLC, a Delaware limited liability company ("SMG"), would become the buyer in place of SLC Radio for certain of the Purchased Assets under an assignment and amendment to the Asset Purchase Agreement (the "Assignment and Amendment").  On June 23, 2010, the Debtors filed their Motion for an Order Approving the Assignment and Amendment of the Asset Purchase Agreement for the Sale of Substantially All of the Assets of the Debtors (the "APA Amendment Motion") [Docket No. 613].  The Court approved the APA Amendment Motion by an Order entered July 16, 2010 (the "Subsequent Sale Order," and together with the Initial Sale Order, the "Sale Orders") [Docket No. 619].

8.     As soon as the conclusion of the FCC approval process occurs with respect to the new buyer of the Purchased Assets, the parties will close on the Sale.  The Debtors have been informed by counsel to the Prepetition Senior Lenders that as of the filing of this Final

5

Application (a) the FCC has granted approval of the transfer of radio licenses to the new buyer and

(b) a review period (during which time the FCC may reconsider its approval of the transfer of

licenses to the new buyer) is set to expire on December 15, 2010 with respect to two licenses and

December 29, 2010 with respect to the other two licenses.  As a result, it is anticipated that the

closing of the Sale will occur by the hearing to approve this Final Application.

## **RETENTION OF SKADDEN**

9.      On the Relief Date, the Debtors applied to the Court for an Order Approving

the Retention of Skadden as their restructuring and bankruptcy counsel (the "Retention

Application") to perform legal services under a general retainer that was necessary to enable the

Debtors to faithfully execute their duties as debtors-in-possession including, among others, the

following professional services to the Debtors:

> (a)      advise the Debtors with respect to their powers and duties as debtors
> and debtors-in-possession in the continued management and operation of
> their businesses and properties;
>
> (b)      attend meetings and negotiate with representatives of creditors and
> other parties in interest and advise and consult on the conduct of the
> Chapter 11 Cases, including all of the legal and administrative requirements
> of operating in chapter 11;
>
> (c)      take all necessary action to protect and preserve the Debtors' estates,
> including the prosecution of actions on their behalf, the defense of any
> actions commenced against those estates, negotiations concerning all
> litigation in which the Debtors may be involved and objections to claims
> filed against the estates;
>
> (d)      prepare on behalf of the Debtors all motions, applications, answers,
> orders, reports and papers necessary to the administration of the estates;
>
> (e)      appear before this Court, any appellate courts, and the United States
> Trustee, and protect the interests of the Debtors' estates before such courts
> and the United States Trustee;
>
> (f)      take any necessary action on behalf of the Debtors to obtain
> confirmation of the Debtors' plan of reorganization; and

(g)    perform all other necessary legal services and provide all other necessary legal advice to the Debtors in connection with these Chapter 11 Cases.

10.    On May 15, 2007, this Court entered an order pursuant to 11 U.S.C. §§ 327(a) and 329 Authorizing the Employment and Retention of Skadden, Arps, Slate, Meagher & Flom LLP and Affiliated Law Practice Entities as Attorneys for the Debtors-in-Possession (the "Retention Order")[3] authorizing the Debtors to employ Skadden as their counsel under the terms set forth in the Retention Application.

## FEE PROCEDURES AND MONTHLY FEE STATEMENTS

11.    On May 15, 2007, this Court entered an Administrative Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures For Interim Compensation and Reimbursement of Expenses of Professionals (the "Administrative Order").  Pursuant to paragraph two of the Administrative Order, Skadden is submitting this Final Application to the Debtors as well as to the Prepetition Senior Lenders, counsel to the Creditors' Committee, and the United States Trustee. On October 16, 2008, Skadden filed its First Interim Fee Application of Skadden, Arps, Slate, Meagher & Flom As Counsel to the Debtors, Seeking Allowance and Payment of Interim Compensation and Reimbursement of Expenses Under §§ 330 and 331 of the Bankruptcy Code (the "First Interim Fee Application") [Docket No. 391] and an order was entered on November 6, 2008 [Docket No. 401] approving the First Interim Fee Application.  The First Interim Fee Application and all of the exhibits and attachments thereto (including the time detail) are incorporated herein as though fully set forth.

---

[3]    A copy of the Retention Order, the Retention Application and the supporting declaration can be found at Docket Nos. 46, 22 and 23, respectively, and are incorporated herein as though fully set forth.

**REQUESTED FEES/REIMBURSEMENT OF EXPENSES DURING THE FINAL
INTERIM APPLICATION PERIOD**

12.     Skadden has played an important legal advisory role in counseling the

Debtors in implementing and consummating the Sale.  As a result of its efforts during the Final

Interim Application Period, Skadden now seeks allowance of $243,614 in fees calculated at the

applicable guideline hourly billing rates of the Skadden professionals who have worked on the

Chapter 11 Cases and $8,193 in charges and disbursements actually and necessarily incurred by

Skadden while providing services to the Debtors during the Final Interim Application Period.

13.     With respect to the Final Interim Application Period, this Final Application

reflects a voluntary reduction in Skadden's requested fees by $25,718, or approximately 10%, and

by $1,083 in reimbursable expenses, or approximately 12%, in connection with services and

expenses Skadden normally would bill its clients.[4]

**SERVICES RENDERED BY SKADDEN DURING THE FINAL INTERIM
APPLICATION PERIOD**

14.     Throughout the Final Interim Application Period, Skadden has worked

closely with the Debtors and their advisors to administer these estates and maximize the return for

the Debtors' estates.  These services have been directed toward a myriad of tasks necessary to

achieve this result.  To meet the Debtors' needs, Skadden attorneys have provided multi-

disciplinary services on a recurrent basis.  These efforts have resulted in tangible benefits to the

Debtors during the Final Interim Application Period – most notably, the continuation of the

─────────────────────

[4]     Skadden believes that the amounts requested in this Final Application are reasonable in relation to the services
rendered during the Final Interim Application Period.  The amounts requested are already reduced to reflect the
client accommodations during the Final Interim Application Period described herein.  To the extent that a party
objects to this Final Application, Skadden reserves the right to recapture such client accommodations and seek up
to the full amount of fees actually incurred in connection with this engagement.

Debtors' businesses on a go-forward basis and the consummation of the Sale.  At the

commencement of the Chapter 11 Cases, Skadden created different matter numbers or subject-

matter categories (the "Matter Categories") to which its professionals assigned the time billed by

them, all of which are related to the tasks performed by Skadden professionals on behalf of the

Debtors.  All Skadden professionals kept a contemporaneous record of the time spent rendering

such services and, consistent with guidelines of the Office of the United States Trustee, separated

tasks in billing increments of one-tenth of an hour.  All of the services performed by Skadden have

been legal in nature and necessary for the proper administration of the Chapter 11 Cases.  Detailed

time entries for each Skadden professional related to these services during the Final Interim

Application Period are available upon request.

15.     Skadden professionals devoted approximately 89% of its time during the

Final Interim Application Period to the following six (6) matters, each of which was responsible

for fees in excess of $20,000:  Asset Dispositions, Financing (DIP and Emergence), Retention and

Fee Matters (SASMF), Case Administration, Reports and Schedules, and Automatic Stay (Relief

Actions).

16.     Skadden professionals devoted approximately 7% of its time during the

Final Interim Application Period to the following two (2) matters and incurred between $5,000

and $20,000 in fees for each such matter:  Leases (Real Property) and Claims Administration

(General).

17.     Skadden professionals devoted the remainder of its time (approximately 4%

in the aggregate) during the Final Interim Application Period to the following seven (7) matters

and incurred less than $5,000 in fees for each such matter:  Retention and Fee Matters (Others),

Litigation (General), U.S. Trustees Matters, General Corporate Advice, Executory Contracts

(Personalty), and Creditor Meetings/Statutory Committees.  Set forth below, in descending order

based on the fees expended, are descriptions of the areas in which Skadden professionals rendered

its services.

MATTERS GREATER THAN $20,000

Asset Dispositions

18.     As discussed above, during the Final Interim Application Period, Skadden

professionals worked closely with the Debtors and the Prepetition Senior Lenders to close the Sale

as originally approved by the Court and as set forth in the initial Asset Purchase Agreement.  As

mentioned above, the Sale of the Purchased Assets to SLC Radio as approved was not going to

close.  As a result, Skadden attorneys devoted substantial resources to brokering a new deal with

the Prepetition Senior Lenders, the Creditors' Committee and the new purchaser, SMG, for the

sale of the Debtors' assets.  This included negotiating, drafting and/or reviewing the Assignment

and Amendment, the APA Amendment Motion, and the Subsequent Sale Order.

19.     Accordingly, on June 23, 2010, Skadden filed with the Court the APA

Amendment Motion.  As part of this process, Skadden worked with the Debtors in preparing and

serving a notice of the APA Amendment Motion on the required notice parties, including all of the

contract counterparties listed on the schedules to the Asset Purchase Agreement.

20.     The Debtors received two objections to the APA Amendment Motion – one

informal objection from the Creditors' Committee and another objection filed by Salt Lake County.

Skadden worked extensively with these objecting parties to resolve their concerns with the

Assignment and Amendment in advance of the hearing on the APA Amendment Motion (the

"APA Amendment Hearing").  The Debtors, led by Skadden, were able to resolve both objections

in advance of the APA Amendment Hearing.

21.     Skadden also prepared for, and on July 14, 2010, attended on behalf of the Debtors, the APA Amendment Hearing, at which time the Court granted the Debtors' APA Amendment Motion.  Skadden's efforts, along with the efforts of the other parties in interest in these Chapter 11 Cases, in negotiating and implementing the Assignment and Amendment, cleared the way for the anticipated completion of the Sale of the Purchased Assets to SMG and ultimately preserving the Debtors' go-forward business.

22.     In connection with the foregoing services, Skadden professionals expended 98.3 hours for which Skadden seeks compensation of $65,025.  A general breakdown of services rendered during the Final Interim Application Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| Matthew M. Murphy | 56.2 | $41,235 |
| Jonathan G. Pfleeger | 40.6 | $23,347 |
| Paraprofessionals | 1.5 | $443 |
| **Total:** | **98.3** | **$65,025** |

Financing (DIP and Emergence)

23.     Critical to the success of the Chapter 11 Cases was obtaining debtor-in-possession financing for the Debtors.  During the Final Interim Application Period, Skadden professionals spent substantial time negotiating, documenting and implementing extensions and amendments to the Company's existing debtor-in-possession financing.  Skadden attorneys worked with the Debtors and the Prepetition Senior Lenders in negotiating the terms of the proposed amendments to their DIP Loan Agreement (defined below) during these Chapter 11 Cases, including the Final Interim Application Period.  On no fewer than five occasions during the

11

Final Interim Application Period, Skadden worked with the Debtors and their Prepetition Senior

Lenders to obtain court approval of additional DIP Financing (defined below).  A brief summary

of the Final DIP Orders (defined below) and the extensions and amendments to the DIP Loan

Agreements (defined below) in these cases is as follows:

- On June 19, 2007, the Court entered the Final Order (1) Authorizing
Debtors, as Debtors in Possession, to (A) Use Cash Collateral, and (B) Incur Post-Petition Secured
Indebtedness, (2) Granting Security Interests and Super-Priority Claims Pursuant to 11 U.S.C.
Sections 364(c) & (d), (3) Granting Adequate Protection Pursuant to 11 U.S.C. Sections 361 and
363, (4) Modifying Automatic Stay and (5) Setting Final Hearing (the "Final DIP Order").  The
Final DIP Order allowed the Debtors to, among other things, enter into the postpetition secured
Debtor-in-Possession Revolving Loan Promissory Note, dated as of May 30, 2007 (the "DIP Loan
Agreement"), pursuant to which the Debtors have obtained certain postpetition loans and other
financial accommodations ("DIP Financing") from Fortress Value Recovery Fund I, LLC
(formerly known as D.B. Zwirn Special Opportunities Fund, L.P.), as agent (the "DIP Agent") for
itself and the other financial institutions from time to time party to the DIP Loan Agreement, as
lenders (collectively, the "DIP Lenders").

- On June 17, 2008, the Court entered an order (the "Amended Final DIP
Order") approving the Debtors' Motion for Order Authorizing Debtors to (A) Amend Post-
Petition Secured Indebtedness, (B) Continue Using Cash Collateral, (C) Continue Granting
Security Interests and Super-Priority Claims and (D) Continue Granting Adequate Protection filed
on May 29, 2008.  The Amended Final DIP Order provided additional DIP Financing (the
"Amended DIP Financing") to the Debtors from their DIP Lenders in an amount not to exceed
$3,500,000 pursuant to that certain Amended and Restated Debtor-In-Possession Revolving Loan
Promissory Note, dated as of May 29, 2008 (the "Amended DIP Loan Agreement") and allowed
the Debtors to maintain their ordinary business operations.

- On September 30, 2008, the Court entered an order (the "Initial Maturity
Extension DIP Order") Authorizing Debtors to (A) Extend Maturity Date With Respect to Its
Post-Petition Secured Indebtedness, (B) Continue Using Cash Collateral, (C) Continue Granting
Security Interests and Super-Priority Claims and (D) Continue Granting Adequate Protection.  The
Initial Maturity Extension DIP Order authorized to the Debtors to extend the Maturity Date under
the Amended DIP Loan Agreement and continue to receive the Amended DIP Financing pursuant
to the Amended DIP Loan Agreement and that certain Amendment No. 1 to Amended and
Restated Debtor-in-Possession Revolving Loan Promissory Note, dated as of September 10, 2008
(the "Initial Maturity Extension Loan Agreement") and allowed the Debtors to maintain their
ordinary business operations.

- On January 2, 2009, the Debtors, pursuant to the Initial Maturity Extension
Loan Agreement and the Initial Maturity Extension DIP Order, further extended the Maturity Date

of the Amended DIP Loan Agreement through July 31, 2009 and amended the Budget for the 2009 calendar year.

- On January 27, 2010, the Court entered an order (the "Second Amended Final DIP Order," and together with the Final DIP Order, the Amended Final DIP Order, and the Initial Maturity Extension DIP Order, the "Final DIP Orders") approving the Debtors' Motion (the "Second Amended DIP Motion") for a Second Amended Order Authorizing Debtors to (A) Amend Post-Petition Secured Indebtedness, (B) Continue Using Cash Collateral, (C) Continue Granting Security Interests and Super-Priority Claims and (D) Continue Granting Adequate Protection filed on January 5, 2010. The Second Amended Final DIP Order provided additional DIP Financing to the Debtors from their DIP Lenders pursuant to that certain Second Amended and Restated Debtor-In-Possession Revolving Loan Promissory Note, dated as of January 27, 2010 (the "Second Amended DIP Loan Agreement," and together with the DIP Loan Agreement, the Amended DIP Loan Agreement and the Initial Maturity Extension Loan Agreement, the "DIP Loan Agreements") and allowed the Debtors to maintain their ordinary business operations.

- On June 23, 2010, the Debtors filed their motion for entry of an order authorizing the Debtors to (a) extend the Maturity Date set forth in the Second Amended DIP Loan Agreement, (b) continue using cash collateral, (c) continue granting security interests and super-priority claims and (d) continue granting adequate protection (the "Subsequent Maturity Extension DIP Motion"). The Court entered an order granting the Debtors' Subsequent Maturity Extension DIP Motion on July 14, 2010.

24.     The DIP Financing was essential to the Debtors' ongoing operations and the Debtors would not have been able to sustain their business during the pendency of these Chapter 11 Cases without such financing. Negotiation and documentation of the various DIP Loan Agreements required a significant amount of Skadden's efforts during the Final Interim Application Period.

25.     In connection with the foregoing services, Skadden professionals expended 67.3 hours for which Skadden seeks compensation of $39,558. A general breakdown of services rendered during the Final Interim Application Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| Matthew M. Murphy | 31.4 | $21,728 |
| Jonathan G. Pfleeger | 32.7 | $16,886 |

| Paraprofessionals | 3.2 | $944 |
| **Total** | **67.3** | **$39,558** |

Retention/Fee Matters (SASM&F)

26.     During the Final Interim Application Period, Skadden professionals devoted time to begin drafting, and attend the hearing on, its First Interim Fee Application.  In connection with the First Interim Fee Application, Skadden also prepared and reviewed detailed monthly compensation invoices for services rendered by Skadden on behalf of the Debtors.  As mentioned above, the First Interim Fee Application was ultimately approved by the Court on November 6, 2008 [Docket No. 401].  Similarly, Skadden professionals have devoted time to drafting this Final Application for final approval of Skadden's fees and expenses during the Case Period.

27.     In preparation for this Final Application, Skadden has prepared detailed monthly compensation invoices for distribution in accordance with the procedures established by this Court's orders.  Skadden's monthly invoices are comprehensive for the benefit of the Debtors, the U.S. Trustee and other parties in interest.  However, because the Debtors are often engaged in negotiations, litigation or matters which are otherwise confidential, Skadden must spend time examining each time entry to ensure that it is preserves the Debtors' confidences.

28.     In connection with the foregoing services, Skadden professionals expended 62 hours for which Skadden seeks compensation of $33,883.  A general breakdown of services rendered during the Final Interim Application Period is as follows:

| Name | Total Hours | Total Value |
| --- | --- | --- |
| Matthew M. Murphy | 10.8 | $7,596 |
| Jonathan G. Pfleeger | 48.4 | $25,656 |

| Paraprofessionals | 2.8 | $631 |
|---|---|---|
| **Total** | **62.0** | **$33,883** |

Case Administration

29.     Skadden professionals also devoted significant resources to the efficient and expeditious administration of these Chapter 11 Cases during the Final Interim Application Period. Work performed under this category may be grouped as follows: (a) general preparation for, and attendance at, court hearings; (b) communications with creditors and other parties in interest, (c) service and publication of notices and (d) general case administration.

30.     Furthermore, Skadden professionals advised the Debtors' management of the Debtors' rights and duties as debtors-in-possession, noting proscribed, permitted, and required conduct.  Skadden professionals frequently advised the Debtors with respect to specific business questions posed by management and by events occurring in the Chapter 11 Cases.  Part of the advice in this regard involved the participation of Skadden in periodic planning and strategy conferences with the Debtors' management team.

31.     To assist the Debtors in continuing to perform their fiduciary duties, Skadden professionals worked with the Debtors to implement procedures for the Debtors to operate their business in accordance with the requirements of the Bankruptcy Code.  Skadden professionals reviewed certain of the Debtors' proposed expenditures, contractual relationships, dispositions of property and other transactions to aid the Debtors in evaluating whether the contemplated transactions were within the ordinary course of business, or were outside the ordinary course of business and required Court approval.

32.     In addition, Skadden paraprofessionals maintained on a daily basis various materials critical to enable Skadden professionals and others to promptly address issues that arose during the Final Interim Application Period.  Skadden paraprofessionals also docketed all pleadings and orders filed in the Chapter 11 Cases and worked with the Debtors' notice and claims agent to ensure that all entities entitled to notice were kept apprised of significant events during the Chapter 11 Cases.

33.     In connection with the foregoing services, Skadden professionals expended 77.5 hours for which Skadden seeks compensation of $33,063.  A general breakdown of services rendered during the Final Interim Application Period is as follows:

| Name | Total Hours | Total Value |
|---|---|---|
| Matthew M. Murphy | 8.2 | $5,862 |
| Jonathan G. Pfleeger | 22.6 | $12,805 |
| Kelly Lazaroff | 4.2 | $2,037 |
| Stephen Neuman | 3.5 | $1,908 |
| Paraprofessionals | 39.0 | $10,451 |
| **Total** | **77.5** | **$33,063** |

Reports and Schedules

34.     During the Final Application Period, Skadden professionals, among other things, advised the Company and its financial professionals on complying with the Office of the United States Trustee's monthly operating report requirement (the "Monthly Operating Reports").  Skadden assisted the Debtors in completing the Monthly Operating Reports, including reviewing

16

the Company's monthly cash receipts and cash disbursements.  These services were performed for

the Debtors during each month of the Final Interim Application Period.

35.    In connection with the foregoing services, Skadden professionals expended

67.5 hours for which Skadden seeks compensation of $24,137.  A general breakdown of services

rendered during the Final Interim Application Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| Jonathan G. Pfleeger | 17.10 | $9,268 |
| Paraprofessionals | 50.4 | $14,869 |
| **Total** | **67.5** | **$24,137** |

Automatic Stay (Relief Actions)

36.    During these Chapter 11 Cases, certain interested parties sought authority

from this Court to lift the automatic stay and take various actions against the estates' property.  In

particular, on December 17, 2007, Scott A. Lyon, Susan J. Harrington and Tom L. Lyon,

noteholders with a secured interest in the Debtors' real property (the "Property"), filed a Motion

for Relief from the Automatic Stay (the "Lift Stay Motion") seeking to foreclose on the Property

due to certain alleged defaults on the part of the Debtors.  Skadden, Arps assisted the Debtors in

both responding to the Lift Stay Motion and negotiating with the noteholders on the terms of a

new lease agreement for the Property.  A settlement was reached between the parties and under

Bankruptcy Rule 9019, Skadden, Arps drafted and filed a motion to approve the settlement.  It was

approved by the Court pursuant to an order entered on March 17, 2008.

37.    On July 29, 2008, Scott A. Lyon, Susan J. Harrington and Tom L. Lyon filed

their second Motion for Relief from the Automatic Stay (the "Subsequent Lift Stay Motion")

seeking again to foreclose on the Property due to certain alleged defaults on the part of the Debtors.

During the Final Interim Application Period, Skadden discussed with the Debtors the legal issues

surrounding the Subsequent Lift Stay Motion and attended the hearings on the Subsequent Lift

Stay Motion.  In November 2008, Skadden, on behalf of the Debtors, were able to reach a

settlement with the movants successfully resolving the Subsequent Lift Stay Motion.

38.    In connection with the foregoing services, Skadden professionals expended

39 hours for which Skadden seeks compensation of $22,160.  A general breakdown of services

rendered during the Final Interim Application Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| Matthew M. Murphy | 16.4 | $11,152 |
| Jonathan G. Pfleeger | 21.7 | $10,742 |
| Paraprofessionals | 0.9 | $266 |
| **Total:** | **39.0** | **$22,160** |

MATTERS BETWEEN $5,000 AND $20,000

Leases (Real Property)

39.    As of the Relief Date, the Debtors were parties to various real property

leases.  During the Final Interim Application Period, Skadden professionals analyzed the Debtors'

real property leases in order to assist the Debtors in deciding which leases to assume or reject.  As

part of the Sale process, the Debtors, working with their advisers, determined which real property

leases would be assumed and assigned to the potential buyers.

40.    In addition, during the Final Interim Application Period, one of the Debtors'

landlords, South Temple Holdings, filed a motion for immediate payment of administrative

18

expense claims.  Skadden spent time assisting the Debtors in analyzing the merits of, as well as

drafting and filing responses to, the South Temple Holdings motion.

   41. In connection with the foregoing services, Skadden professionals expended

20 hours for which Skadden seeks compensation of $10,094.  A general breakdown of services

rendered during the Final Interim Application Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| Matthew M. Murphy | 0.9 | $612 |
| Jonathan G. Pfleeger | 19.1 | $9,482 |
| **Total** | **20.0** | **$10,094** |

Claims Administration

   42. During the Final Interim Application Period, Skadden professionals devoted

time to certain claims administration matters.  In connection with the Sale, Skadden assisted the

Debtors in undergoing a detailed review and analysis of the claims filed in the Chapter 11 Cases.

   43. In connection with the foregoing services, Skadden professionals expended

12.2 hours for which Skadden seeks compensation of $6,905.  A general breakdown of services

rendered during the Final Interim Application Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| Matthew M. Murphy | 5.8 | $4,007 |
| Jonathan G. Pfleeger | 3.6 | $1,942 |
| Tom Kennedy | 2.0 | $720 |
| Paraprofessionals | 0.8 | $236 |

| Total | 12.2 | $6,905 |
|-------|------|--------|

### MATTERS LESS THAN $5,000

44.    During the Application Period, Skadden professionals also devoted time to, among other things, (a) assisting the Debtors' financial advisor in filing and presenting its supplemental retention application and fee applications; (b) researching litigation issues raised by creditors and contract counterparties during these cases; (c) assisting the Debtors in certain issues arising with the retention of professionals during these Chapter 11 Cases; (d) assisting the Debtors' in completing and filing U.S. Trustee Quarterly Reports; (e) advising the Debtors on a number of corporate governance matters; and (f) working with counsel for the Committee to update them on any recent developments in the Sale.

45.    In connection with the foregoing services, Skadden professionals expended 18.5 hours, in the aggregate, for which Skadden seeks compensation of $8,671.  A general breakdown of services rendered during the Final Interim Application Period is as follows:

| Matter Name | Total Hours | Total Value |
|-------------|-------------|-------------|
| Retention Fee Matters (Others) | 8.7 | $3,611 |
| Litigation | 4.4 | $2,179 |
| U.S. Trustee Matters | 3.8 | $1,904 |
| General Corporation Advice | 0.8 | $544 |
| Executory Contracts (Personalty) | 0.6 | $297 |
| Creditor Meet./Statutory Comm. | 0.2 | $136 |
| **Total** | **18.5** | **$8,761** |

46.     In addition to the fees incurred by Skadden during the Final Interim

Application Period, Skadden's charges and disbursements during that time are reasonable and are

consistent with those incurred by other bankruptcy practitioners in other chapter 11 reorganization

cases of similar size in this and other districts.  A general description of the material charges and

disbursements incurred by Skadden during the Final Interim Period is immediately below.

47.     <u>Computer Legal Research.</u>  Skadden charges for on-line computer research,

such as Lexis-Nexis and Westlaw, at the actual vendors' invoice amounts, which amounts have

been reduced by discounts Skadden receives from its vendors.  Skadden is billed monthly by

Lexis-Nexis and Westlaw for actual use of their services and not at a flat billing rate.  Skadden

maintains all Lexis-Nexis and Westlaw charges on a per-client basis.  With respect to on-line

research, Skadden professionals spent time researching various issues in connection with the

drafting of the pleadings and the sale of the Debtors' assets.

48.     <u>Reproduction.</u>  As disclosed in the Engagement Agreement, Skadden

charges 10 cents per page for photocopying performed in-house, while photocopying by outside

vendors is billed to the Debtors at the actual invoice amount.  During the Final Interim Application

Period, Skadden or its outside vendors photocopied a multitude of documents for the Debtors,

such as, among other things, first day orders, notices related to the filing of the Chapter 11 Cases

and various pleadings in these cases.

49.     <u>Courier/Express/Postage</u>.  Skadden charges the Debtors for outside

messenger and express carrier services at the actual vendors' invoice amount which frequently

involved discounts negotiated by Skadden.  Postage is charged at actual U.S. mail rates.  On

certain occasions, internal staff may be required to act as messengers for whom the Debtors are

charged a standard rate for their time.  In order to meet certain court-imposed deadlines, it was

21

necessary to provide notice to parties as quickly as possible.  Therefore, during the Final Interim

Application Period, Skadden professionals incurred various charges for courier, express delivery

and postage.  Specifically, the vast majority of these time-sensitive documents were delivered to

certain entities that were required to receive certain notices and pleadings.

50.     <u>Outside Research Services.</u>  Skadden charges the Debtors for outside

research services based on the actual vendors' invoice amount.  These invoices relate to expenses

incurred by Skadden in reviewing and accessing the pleadings filed in these cases through this

Court's Pacer System.

51.     <u>Telecommunications.</u>  Skadden does not charge the Debtors for local

telephone calls or facsimile services.  Long distance telephone calls made from Skadden offices

are charged to the Debtors based on applicable phone rates and are allocated among the Matter

Categories based on the hours worked by professionals on such Matter Categories.

52.     <u>Electronic Document Management.</u>  Electronic Data Management services

(e.g., scanning, OCR processing, printing from scanned files, and file conversions) performed by

outside vendors are charged to the Debtors at the actual invoice amount.  Skadden charges the

Debtors for Electronic Data Management services performed in-house at rates comparable to those

charged by outside vendors.

53.     <u>Travel Expenses.</u>  Travel Expenses during the Final Interim Application

Period consisted of local travel for Skadden professionals to and from the Debtors' hearings.

**<u>REQUESTED FEES/REIMBURSEMENT OF EXPENSES DURING THE CASE PERIOD</u>**

54.     In addition to the work done by Skadden during the Final Interim

Application Period on these case, Skadden has played a vital legal advisory role in counseling the

Debtors through the entire Case Period –from obtaining critical relief for the Debtors during the

22

initial days of these proceedings to implementing the Sale.  As a result of its efforts during the

Case Period, Skadden now seeks final allowance of $1,110,609 in fees calculated at the applicable

guideline hourly billing rates of Skadden professional who have worked on these Chapter 11

Cases and $23,368 in charges and disbursements actually and necessarily incurred by Skadden

while providing services to the Debtors during the Case Period.

    55. This Final Application reflects a voluntary reduction by Skadden in

connection with each monthly statement during the Case Period in the aggregate amount of

$74,897.30, which reflects a voluntary reduction in Skadden's (i) requested fees by $73,541.50,

and (ii) requested reimbursement for charges and disbursements by $1,355.80, for items Skadden

normally would bill its clients during the Case Period.[5]

    56. For a comprehensive overview of Skadden's work on these case prior to this

Final Application, please refer to Skadden's First Interim Application [Docket No. 391], which

includes detailed time entries, and which is incorporated by reference as though fully set forth

herein.  Skadden is relying on the detailed description of its services in the First Interim

Application for support of the relief requested herein with respect to the Case Period.

## RELIEF REQUESTED

    57. <u>Final Interim Application Period</u>.  In accordance with the Administrative

Order, Skadden has submitted fee statements each month for the period from September 1, 2008

through November 30, 2010 ("<u>Monthly Fee Statements</u>"), and now submits this Final Application

---

[5] Skadden believes that the amounts requested in this Final Application are reasonable in related to the services rendered during the Case Period.  The amounts requested are already reduced to reflect the client accommodations during the Case Period described herein.  To the extent that a party objects to this Final Application, Skadden reserves the right to recapture such client accommodations and seek up to the full amount of fees actually incurred in connection with this engagement.

covering the Final Interim Application Period.  Based on Skadden's customary billing practices,

the Debtors ordinarily would be billed a total of $269,332 for fees and $9,274.85 for charges and

disbursements.  In keeping with Skadden's commitment to self-policing its fees, charges and

disbursements, and based on various accommodations to the Debtors, however, Skadden

voluntarily reduced, as part of its Monthly Fee Statements, its fees by $25,718, and reimbursement

for charges and disbursements by $1,083.

58.    The Administrative Order provides that in order to seek interim

compensation, professionals must submit monthly statements to the Debtors, counsel for the

Debtors, Prepetition Senior Lenders, counsel for the Creditors' Committee, and the United States

Trustee.  If no objection to a Monthly Fee Statement is made within 10 days after service of the

Statements, the Debtors are authorized to pay 90% of the fees requested (with the remaining 10%

of the fees requested referred to herein as the "Holdback") and 100% of the charges and

disbursements requested.  In accordance with the Administrative Order, Skadden has submitted

Monthly Fee Statements for each of the months covered by the Final Interim Application Period.

No party has filed an objection to Skadden's Monthly Fee Statements.  Accordingly, with respect

to the relief requested in this Final Fee Application for the Final Interim Application Period,

Skadden is requesting approval of $243,614 which includes the full settlement of the Holdback

accrued between September 1, 2008 through November 30, 2010.

59.    Reimbursement of Charges and Disbursements. As disclosed in the

Retention Application that the Court approved, it is Skadden's standard policy to charge its clients

in all areas of practice for certain charges and disbursements incurred in connection with such

clients' cases. The charges and disbursements charged to clients include, among others, charges

for messenger services, photocopying, court fees, travel expenses, postage for large mailings, long

24

distance telephone, computerized legal research, investigative searches, and other charges customarily billed by law firms. Certain charges and disbursements are not separately charged for under the bundled rate structure as described in the Engagement Agreement.

60.     Skadden has attempted to minimize the charges and disbursements associated with the Debtors' Chapter 11 Cases, particularly for items such as reproduction and delivery, which have been lowered as a result of the restricted service list which Skadden proposed and the Court approved. During the Final Interim Application Period, Skadden disbursed an aggregate amount of $8,193 for actual and necessary charges and disbursements in the rendition of professional services in the Chapter 11 Cases and requests that it be reimbursed therefore.

61.     <u>Case Period</u>. In accordance with the Administrative Order, Skadden has submitted Monthly Fee Statements for the period from May 15, 2007 through November 30, 2010, and now submits this Final Application covering the Case Period. Based on Skadden's customary billing practices, the Debtors ordinarily would be billed a total of $1,184,150.50 for fees and $24,723.80 for charges and disbursements. In keeping with Skadden's commitment to self-policing its fees, charges and disbursements, and based on various accommodations to the Debtors, however, Skadden voluntarily reduced, as part of its Monthly Fee Statements, its fees by $73,541.50, and reimbursement for charges and disbursements by $1,355.80.

62.     By this final application, Skadden is requesting final allowance of the payment of $1,110,609 in fees (including any unpaid Holdbacks during the Case Period) and the reimbursement of $23,368 in expenses.

63.     <u>Reimbursement of Charges and Disbursements</u>. During the Case Period, Skadden disbursed an aggregate amount of $23,368 for actual and necessary charges and

disbursements in the rendition of professional services in the Chapter 11 Cases and requests that it

be reimbursed therefore.

## <u>REASONABLENESS OF FEES, CHARGES AND DISBURSEMENTS</u>

64.    Section 330 of the Bankruptcy Code governs compensation of professionals

in a bankruptcy case and provides that, when determining the amount of reasonable compensation

to award to a professional, the Court should consider the nature, extent and value of the services to

the bankrupt estate and all other relevant factors.  11 U.S.C. § 330(a)(3).

65.    In addition, Bankruptcy Rule 2016 provides that "an entity seeking interim

or final compensation for services or reimbursement of necessary expenses, from the estate shall

file an application setting forth a detailed statement of (1) the services rendered, time expended

and expenses incurred, and (2) the amounts requested."  Fed. R. Bankr. P. 2016(a).

66.    This Court has stated that "[i]n reviewing fee applications, the bankruptcy

court must address three issues: were the services that are the subject of the application properly

compensable; if so, were they actual and necessary; if so, how will they be valued?"  <u>In re</u>

<u>Lifschultz Fast Freight</u>, 140 B.R. 482, 485 (Bankr. N.D. Ill. 1992) <u>citing</u> <u>In re Wildman</u>, 72 Bankr.

700, 704 (Bankr. N.D. Ill. 1987).

67.    In addition, with respect to expenses, this Court has required that an

"[a]pplication should contain a detailed list of expenses including the date, the type and the

amount."  <u>In re Convent Guardian Corp.</u>, 103 B.R. 937, 939 (Bankr. N.D. Ill. 1989).  In

determining whether an expense is necessary, this Court has stated that "an expense is necessary if

it was incurred because it was reasonably needed to accomplish the proper representation of the

client."  <u>Id.</u>

68.    This Final Application meets these requirements.  First, Skadden's services are properly compensable.  The Court entered the Retention Order pursuant to 11 U.S.C. § § 327(a) and 329 authorizing the retention of Skadden as attorneys for the Debtors.  Further, this Final Application is being properly filed pursuant to 11 U.S.C. § 330.  Therefore, Skadden' services are properly compensable.  See In re Lifschultz, 140 B.R. 482, 485 (court found that where law firm was properly retained and law firm filed appropriate fee application, law firm's services were "properly compensable").

69.    Second, compensation is proper for services that are actual and necessary. The Court found that "[s]ervices necessary under section 330 are those services that aid the professional's client in fulfilling its duties under the Code."  Id.  Further, "[n]ecessary services have always included services that aid in the administration of the case and help the client fulfill duties under bankruptcy law, whether or not those services result in a monetary benefit to the estate."  Id.  The services provided by Skadden were actual and necessary.  As set forth in this Final Application, Skadden's attorneys have provided multi-disciplinary services to the Debtors on a frequent basis.  Skadden's services have assisted the Debtors to engage in an extensive and time consuming sales process, while attending to the needs of their employees and creditors.

70.    Third, "[o]nce the court has determined that the services for which compensation is sought were properly compensable and actual and necessary, it must determine the value of those services."  Id. at 488.  That is, "the court must evaluate what the 'actual, necessary services' were worth to the client, based upon the five criteria listed in section 330(a)(1)."  Id. at 488.  In accordance with the factors enumerated in 11 U.S.C. § 330, the amount requested herein by Skadden is fair and reasonable, and fairly represents the value the Debtors received from Skadden's services, given:  (i) the nature of the bankruptcy cases, (ii) the novelty

27

and complexity of the bankruptcy cases, (iii) the time and labor required to represent the Debtors

effectively, (iv) the time limitations imposed by the bankruptcy cases, (v) the nature and extent of

the services rendered, (vi) Skadden's experience, reputation and ability, (vii) the value of

Skadden's services, and (viii) the cost of comparable services other than in a case under title 11 of

the United States Code.

71.     <u>Nature, complexity and limited expediency of the case.</u>  To maximize the

value of these estates, after extensive analysis of the Debtors' business, the Debtors and their

professionals pursued a sale process with the goal of achieving the maximum value for the

Debtors' assets.  As discussed above,  Skadden professionals worked with all of the Debtors'

constituents to consummate the Sale.  This required extensive and time consuming negotiations

that were necessary in order to effectively complete the Sale process and permit the Debtors'

business to continue as a going concern.

72.     Skadden professionals have assisted the Debtors by employing a streamlined

case management structure that consisted of small, core teams and assigned various attorneys to

other discrete tasks to avoid the performance of duplicative or unnecessary work.  This required

Skadden and other professionals involved in these Chapter 11 Cases to use every effort to seek to

work quickly and efficiently in assisting the Debtors in meeting their goals.

73.     <u>Experience of Skadden.</u>  The experience of Skadden's attorneys has also

benefited the estates.  Skadden is among the largest firms and has one of the largest restructuring

groups in the country.  As more fully set forth in the Retention Application, Skadden's

restructuring attorneys and attorneys from other practice areas have extensive knowledge and

experience in dealing with the multitude and fast-paced issues that arise in similar chapter 11

proceedings. Accordingly, Skadden's depth of experience in chapter 11 matters has insured that a number of pressing matters could be addressed promptly.

74.    Comparable services.  Skadden's rates are consistent with rates charged to other clients in non-bankruptcy matters.  Moreover, its rate structure was disclosed clearly in its Retention Application, which the Court approved and as to which no constituents objected.

75.    The amounts sought by Skadden are consistent with the  fees, charges and disbursements incurred by other chapter 11 debtors in cases of similar size, complexity and duration.  Accordingly, the cost of comparable services supports the Final Application, and the services performed during the Final Interim Application Period and the Case Period more than warrant the allowance of compensation, particularly in view of the results achieved.

76.    Compliance with Guidelines. Skadden believes that this FInal Application, together with the attachments hereto, substantially complies in all material respects with the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 issued January 30, 1996.  To the extent this Final Application does not comply in every respect with the requirements of such guidelines, Skadden respectfully requests a waiver for any such technical non-compliance.

WHEREFORE, Skadden respectfully requests that the Court interim allowance and payment for services rendered and reimbursement of charges and disbursements incurred for the period from September 1, 2008 through and including November 30, 2010, in the amount of $243,614 in fees and $8,193 in charges and disbursements (plus the Additional Fees and Expenses), and (ii) final allowance and payment for services rendered and reimbursement of charges and disbursements incurred during the Case Period, from May 15, 2007 through November 30, 2010, in the amount of $1,110,609 in fees and $23,368 in charges and

disbursements (plus the Additional Fees and Expenses), and (c) grant is such other and further

relief as is just and equitable under the circumstances.

Dated:  December 21, 2010

                        SKADDEN, ARPS, SLATE,
                         MEAGHER & FLOM LLP
                        Matthew M. Murphy (ARDC No. 06257958)
                        Jonathan G. Pfleeger (ARDC No. 06280869)
                        155 N. Wacker Drive
                        Chicago, Illinois  60606
                        (312) 407-0700

                        */s/ Matthew M. Murphy*
                        Attorneys for Debtors
                        and Debtors-in-Possession